UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                            :

ISLAND INTELLECTUAL PROPERTY LLC,        :

                                            :

             Plaintiff,                    :

                                            :

             - against -            :   Civ. Act. No.   19-cv-4792

                                            :

STONECASTLE CASH MANAGEMENT LLC,       :
STONECASTLE INSURED SWEEP LLC,           :
STONECASTLE PARTNERS, LLC., STONECASTLE  :   **COMPLAINT**
FINANCIAL CORP., and STONECASTLE ASSET    :
MANAGEMENT LLC,                            :

                                            :

             Defendants.            :

                                            :

------------------------------------------------------------------------X

      Plaintiff Island Intellectual Property LLC ("Island IP"), by and through its attorneys at

Kelley Drye & Warren LLP, for its Complaint against defendants StoneCastle Cash Management

LLC ("SCCM"), StoneCastle Insured Sweep LLC ("SCIS"), StoneCastle Partners, LLC ("SCP"),

StoneCastle Financial Corp. ("SCFC") and StoneCastle Asset Management LLC ("SCAM")

(collectively, "StoneCastle" or "Defendants"), hereby alleges as follows:

<u>**NATURE OF THIS ACTION**</u>

      1.     The nature of this action is one for patent infringement and unjust enrichment

against SCCM, for unfair competition and misappropriation of trade secrets against SCCM and

SCIS, for breach of contract and breach of the covenant of good faith and fair dealing against

SCIS, and for alter ego liability against SCP, SCFC and SCAM.

      2.     Island IP and SCIS are parties to a License Agreement dated February 11, 2012

(together with Amendment Nos. 1-4, the "License Agreement").  Under the License Agreement,

SCIS licenses certain of Island's IP's patents and other intellectual property, but it may not share

the licensed intellectual property with any of its corporate affiliates unless it exercises an "Affiliate License" pursuant to the terms thereunder.  Instead of properly exercising an Affiliate License, and paying the royalties therefor, SCIS unlawfully gave its corporate parent SCCM access to Island IP's intellectual property, and then breached its contractual duty to grant SCIS an accounting that would have revealed this violation.  Even absent an accounting, Island IP has come to learn, *inter alia*, that SCCM is practicing inventions disclosed in at least five of Island IP's patents, U.S. Patent Nos. 8,150,766, 8,359,267, 8,712,911, 8,719,157 and 8,655,689 (together, the "Patents-in-Suit"), and using other of Island IP's intellectual property without license.  Accordingly, Island IP brings this suit for equitable and monetary relief.

### PARTIES

3.      Plaintiff Island IP is a limited liability corporation organized and existing under the laws of Delaware, having its principal place of business in the State of New York.

4.      Upon information and belief, defendant SCCM is a limited liability company organized and existing under the laws of Delaware, having its principal place of business in New York City.

5.      Upon information and belief, defendant SCIS is a limited liability company organized and existing under the laws of Delaware, having its principal place of business in New York City.

6.      Upon information and belief, defendant SCP is a limited liability company organized and existing under the laws of Delaware, having its principal place of business in New York City.

7.      Upon information and belief, defendant SCFC is a corporation organized and existing under the laws of Delaware, having its principal place of business in New York City.

8.     Upon information and belief, defendant SCAM is a limited liability company organized and existing under the laws of Delaware, having its principal place of business in New York City.

9.     While StoneCastle nominally identifies a series of separate operating subsidiaries, in reality the entire corporate family is run as a single entity, dominated and controlled by the parent company, SCP.  Each StoneCastle entity shares essentially the same Board of Directors and senior management.  In its promotional materials, StoneCastle boasts that "all subsidiaries within the StoneCastle organizational tree … share[s] personnel and systems with its parent, receiving beneficial support and expertise" and that it "incorporates a team approach to managing the various investment and strategic initiatives that involve the firm" with "weekly" meetings involving overlapping executives.  It advertises "$16.1B in assets under administration," a figure that necessarily includes all StoneCastle entities.  By virtue of this incestuous relationship, each StoneCastle entity benefits from Island IP's Intellectual Property, developed by Island IP over decades and at great expenses, without payment.

### JURISDICTION AND VENUE

10.     This is a civil action for, in part, patent infringement arising under the United States patent statutes, 35 U.S.C. § 1 *et seq.*, and for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S. Code § 1832 *et seq.*  This Court has original subject matter jurisdiction over the foregoing federal causes of action under 28 U.S.C. §§ 1331 and 1338(a) and 18 U.S.C. § 1836(c).  This Court has supplemental subject matter jurisdiction over the remaining state law causes of action under 28 U.S.C. § 1367, because such claims are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the U.S. Constitution.

11.    Upon information and belief, Defendants are subject to this Court's personal jurisdiction because each of them does substantial business in New York State, including: (i) offering and/or operating financial services within New York State; (ii) maintaining headquarters within New York State; and (iii) offering and/or operating an infringing insured deposit program within New York State.

12.    Venue in this District is proper: (a) on the patent claims, pursuant to 28 U.S.C. §1400(b), because this District is one in which defendant SCCM has committed acts of infringement and has a regular and established place of business; and (b) on the remaining claims, pursuant to 28 U.S. Code § 1391(b)(1) and (b)(2) and (c)(2), because all Defendants are residents of the State in which this District is located, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

13.    Island IP is a corporate affiliate of Double Rock Corp. ("Double Rock").  Since the 1970s, Double Rock has been one of the leading cash-management and technology solution businesses to the bank, broker-dealer, qualified plan, and retail direct markets. The company was founded by Bruce Bent, who co-created the world's first money-market fund in 1970, is an inductee of the Financial Planning Hall of Fame as well as *Money* magazine's Hall of Fame, and has been chronicled in the Museum of American Finance, an affiliate of the Smithsonian Institution.  Double Rock and its affiliates are industry leaders in providing cash management and money regulation systems, having invented a number of financial innovations.  Double Rock is the corporate parent of Island IP, which holds approximately 60 patents issued by the United States Patent Office.

14.    Some of the financial products developed by Double Rock help banks service

governmental entities as depositers. Banks often accept public deposits from federal, state or municipal entities.  Such customers present banks with certain problems.  Banks operate by accepting deposits on which they pay out one rate of interest, and use those deposits to make investment or loans that earn a higher rate of return.  To comply with applicable regulatory requirements, public deposits of federal, state or municipal entities often must be federally insured, or else collateralized by having banks pledge government securities (*e.g.,* U.S. Treasury Bills) to secure public deposits in the event of the institution's failure.  The interest rates that such banks typically pays for such public deposits are generally higher than the rates of interest it pays other customers.  However, the interest earned on government securities typically does not provide an interest spread over the banks' cost of deposits.

### PATENTS-IN-SUIT (RECIPROCAL DEPOSIT PATENTS)

15.    Thus, there was a need for improvements in the field to facilitate the economic ability of banks to accept such deposits from governmental entities.  Four of the Patents-in-Suit address this need: (1) U.S. Patent No. 8,150,766 (the "'766 Patent"); (2) U.S. Patent No. 8,359,267 (the "'267 Patent"); (3) 8,712,911 (the "'911 Patent"); and (4) U.S. Patent No. 8,719,157 (the "'157 Patent") (together, the "Reciprocal Deposit Patents").  (The Reciprocal Deposit Patents are annexed hereto as Exhibits A-D.)

16.    The claims in the Reciprocal Deposit Patents are directed to an improvement over prior art computerized deposit sweep systems in which accounts are distributed over a plurality of banking institutions, and involve a very specific, non-routine, unconventional and inventive allocation system and method that result in more efficient use of excess capacity in depositary institutions after an inventive allocation of funds.  For example, the inventive concept involves allocating an amount of governmental funds sourced from a first financial institution to a first set

of financial institutions and held therein, based on obtaining government backed deposit insurance and/or collateralization by government securities for the funds.

17.     Furthermore, the claimed system and method employ a particular inventive process involving the reconciliation of reciprocal deposit accounts, by allocating an amount of funds to the first financial institution, so that an amount of funds sourced from a second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution.

18.     Moreover, the detailed and inventive elements of the claims provide the explanation of how each of these unconventional and non-routine elements achieve the desired technological result.  The claimed invention here is not merely the application of the alleged abstract idea on a generic computer, but is instead directed to a technology-based solution that improves upon the prior art by, *inter alia*, increasing accuracy of a computerized deposit sweep system.

19.     For example, Claim 1 of the '766 Patent discloses a method, comprising:

> (A) accessing, using one or more computers, one or more electronic databases, stored on one or more computers-readable media, the one or more databases comprising:

> (1) aggregated account information for a plurality of government backed-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program, wherein funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein;

> (2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, comprising a respective balance of funds, of the respective client account, held in each of one or more of the aggregated deposit accounts holding funds of the respective client account; and

> (B) obtaining into the one or more computers, transfer data comprising an amount of governmental funds of one or more of the client accounts

sourced for the program from a first one of the financial institutions, that are to be deposited in one or more other of the financial institutions;

(C) allocating the amount of governmental funds sourced from the first financial institution, using the one or more computers, to one or more of a first set of the financial institutions other than the first financial institution, for deposit in one or more aggregated deposit accounts held therein, based at least in part on obtaining government backed deposit insurance and/or collateralization by government securities for the funds;

(D) allocating, using the one or more computers, to the first financial institution for the one or more aggregated deposit accounts held therein, an amount of funds from one or more of a second set of the financial institutions other than the first financial institution, so that an amount of funds sourced from the second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution;

(E) generating and communicating data comprising one or more amounts for one or more instructions, using the one or more computers and a network communication link, to transfer funds between or among two or more of the financial institutions based at least in part on one or more of the allocating steps; and

(F) using the one or more computers, to update at least data for the aggregated account information for one or more of the aggregated deposit accounts taking into consideration at least the amounts from the steps (C), (D) and/or (E), and to update data for one or more respective balances of funds for one or more of the respective client accounts held in each of one or more of the aggregated deposit accounts holding funds of the respective client account taking into consideration at least the amounts from the allocating steps (C) and (D), in one or more of the electronic databases.

(Exhibit A.)

### INFRINGEMENT OF RECIPROCAL DEPOSIT PATENTS

20.     SCCM practices this claimed invention.  It offers a "Federally Insured Cash Account" (FICA) for local government entities.  Like other FICA insured products, SCCM offers banks participating in its network "Reciprocal Deposits."  As of March 2018, FICA products represent $5.4 Billion of assets under management for SCCM.  SCCM's Q2 2018 fact sheet indicates a large percentage of those are sourced from public entities.

21.     With respect to element (A) of claim 1, SCCM practices a method for providing

government entities, through their FICA accounts, the ability to protect their money by placing it

in deposit accounts at banks and saving institutions:

> **FICA® Account Terms and Conditions: Governmental Entities**
> *Effective October 1, 2018*: **…** The Federally Insured Cash Account
> program ("FICA Program") offered by StoneCastle Cash Management,
> LLC ("SCCM") allows customers the ability to protect their money by
> placing it in deposit accounts at banks and savings institutions
> (collectively, "Insured Depositories") in a manner that maintains full
> insurance of the funds by the Federal Deposit Insurance Corporation
> ("FDIC"). Funds will be deposited within SCCM's network of Insured
> Depositories ("Deposit Network").

(*See* FICA® Account Terms and Conditions: Governmental Entities Effective October 1, 2018,

annexed hereto as Exhibit E.)  SCCM's FICA Account uses "aggregated accounts," including

holding customer "deposited funds" "along with funds from other participants in the FICA

program" at a plurality of FDIC insured accounts at a plurality of insured depositories in the

program.  This information is maintained in SCCM's database:

> **FICA® Account Terms and Conditions: Governmental Entities**
> *Effective October 1, 2018*: … SCCM will direct the FICA Custodian to
> deposit funds from your FICA Account, along with funds from other
> participants in the FICA Program (each, a "FICA Depositor") into one or
> more FDIC insured accounts (each, a "Depository Account") at multiple
> Insured Depositories.

*Id.*  Deposits in SCCM's FICA accounts provide non-penalized next-day liquidity for funds held

therein: "Liquidity is available on a next business day basis and limited to 6 transactions per

statement cycle. Same day purchase credit and next day liquidity redemptions are subject to a

3:00 PM ET cut-off." (*See* FICA® Program Banks: Large Deposit FDIC-Insured Accounts dated

January 1, 2019, annexed hereto as Exhibit F.)  Lastly, SCCM keeps track of client account

information, including a respective balance of funds, as reflected in its monthly statements:

> **FICA® Account Terms and Conditions: Governmental Entities**
> *Effective October 1, 2018*  …
>
> **6)  Insured Depositories**

> Your monthly account statement will indicate the Insured Depositories in which your FICA Account funds have been deposited.
>
> **10) Account Statements**
>
> You will receive a monthly account statement from StoneCastle via our website at www.FICAaccount.com. … All activity with respect to your FICA Account, including your account balance through one or more Depository Accounts at each Insured Depository, the net interest earned in your FICA Account and transaction history will appear on your account statement. The account statement will also include the aggregate of your opening and closing balances in your FICA Account.

(Exhibit E.)

22.   <u>With respect to element (B) of claim 1</u>, SCCM as agent will receive transfer data from customers, including government entities:

> **FICA® Account Terms and Conditions: Governmental Entities**
> *Effective October 1, 2018* …
>
> **2) Appointment of StoneCastle as your Agent**
>
> By opening a FICA Account, you are appointing StoneCastle as your Manager and authorized agent to direct the FICA Custodian pursuant to these Terms and Conditions, which StoneCastle may modify by notice to you. … StoneCastle will select the Insured Depositories into which the funds in your FICA Account will be deposited. StoneCastle will act as your agent in directing the FICA Custodian to deposit funds from your FICA Account into the Depository Account(s) at the Insured Depositories. If you make a withdrawal request, StoneCastle will act as your agent in directing the FICA Custodian to withdraw funds from the Depository Accounts and crediting such funds to your FICA Account. The FICA Custodian will transfer funds from your FICA Account to you as you direct pursuant to instructions satisfactory to the FICA Custodian. StoneCastle will also act as your agent to forward to the FICA Custodian the information needed to maintain your account with the FICA Custodian.

(Exhibit E.)  "Public entities" make up a large portion of institutional investors that use SCCM's

FICA product:

> **Who Uses FICA®?**
>
> FICA® has been widely accepted by Financial Professionals who are seeking a safe and liquid cash management vehicle. Today, over 1,200 institutional entities use FICA®, including Fortune 500 firms, public entities, foundations, endowments, hedge funds, private equity firms and

insurance companies.

According to the most recent AFP Liquidity Survey, FICA® and other Structured Bank Deposit Vehicles are used by 24% of organizations which maintain cash and short term holdings in banks.

(*See* Federally Insured Cash Account (FICA®), annexed hereto as Exhibit G.)

23.    <u>With respect to element (C) of claim 1</u>, SCCM, as agent, allocates the governmental funds and directs the custodian where to deposit such funds:

> **FICA® Account Terms and Conditions: Governmental Entities**
> *Effective October 1, 2018 ...*
>
> **2) Appointment of StoneCastle as your Agent**
>
> By opening a FICA Account, you are appointing StoneCastle as your Manager and authorized agent to direct the FICA Custodian pursuant to these Terms and Conditions, which StoneCastle may modify by notice to you. ...
>
> StoneCastle will select the Insured Depositories into which the funds in your FICA Account will be deposited. StoneCastle will act as your agent in directing the FICA Custodian to deposit funds from your FICA Account into the Depository Account(s) at the Insured Depositories. If you make a withdrawal request, StoneCastle will act as your agent in directing the FICA Custodian to withdraw funds from the Depository Accounts and crediting such funds to your FICA Account. The FICA Custodian will transfer funds from your FICA Account to you as you direct pursuant to instructions satisfactory to the FICA Custodian. StoneCastle will also act as your agent to forward to the FICA Custodian the information needed to maintain your account with the FICA Custodian.

(Exhibit E.)

24.    <u>With respect to element (D) of claim 1</u>, SCCM offers banks holding funds for "local government customers" reciprocal deposits which "free up pledged collateral on municipal accounts":



**A Simple Solution for Large Deposit Relationships**

FICA® | For Banks is a simple and powerful tool that allows your bank to enhance relationships with commercial, non-profit, individual, and local government customers*. FICA® | For Banks allocates your customers' large deposits across its proprietary bank network, ensuring full FDIC insurance on all deposits. Your bank can retain customer relationships and gain access to non-brokered reciprocal deposits, potentially lowering its overall cost of funds.

**Benefits to Your Bank …**

• Free up pledged collateral on municipal accounts

**What are Reciprocal Deposits?**

Banks receive reciprocal deposits through a deposit placement network in return for placing a matching amount of deposits at other network banks.

(*See* Large Deposit FDIC Insured Accounts dated July 2018, annexed hereto as Exhibit H.)

25.     With respect to elements (E) and (F) of claim 1, SCCM arranges for transfer of funds between or amount two more financial institutions, maintains this information in its databases using its "proprietary systems":

**Program Manager**

… FICA is administered and managed by [SCCM] …. As mentioned, the New York City-based manager, SCCM, is principally owned by StoneCastle [SCP]), which makes available to SCCM access to the proprietary systems and personnel in the course of fulfilling its responsibilities as program manager. SCCM has approximately 60 employees, and is responsible for approximately $12.2 billion in assets.

(*See* KBRA: SCCM Federally Insured Cash Account (FICA) dated February 21, 2018, annexed hereto as Exhibit I.)

### PATENT-IN-SUIT (ALLOCATION MODEL PATENT)

26.     The Fifth Patent-in-Suit is U.S. Patent No. 8,655,689 (the "'689 Patent" or "Allocation Model Patent"). It provides a method of allocating funds based on excess capacity present in each depository institution. (The '689 Patent / Allocation Model Patent is annexed hereto as Exhibit J.)

27.     The claims in the Allocation Model Patent are directed to an improvement over

prior art computerized deposit sweep systems in which accounts are distributed over a plurality of banking institutions, and involve a very specific, non-routine, unconventional and inventive allocation system and method that result in more efficient use of excess capacity in depositary institutions after an inventive allocation of funds using stratified client accounts.  For example, the inventive concept involves formation of client account stratifications based on account balances and, after allocation of funds from the stratified client accounts to depositary institutions, parameters are modified and the account stratifications are adjusted to account for excess capacity available at the depositary institutions so that transfer of funds to the depositary institutions can be performed more efficiently by using the excess capacity.

28.    Furthermore, the claimed system and method employ a particular inventive process involving the formation of client account stratifications and using those stratifications to trigger modifications in a first group of parameters, then in a second group of parameters, that will reduce and make possible the calculation and distribution of these funds across, not individual client bank accounts, but across aggregated deposit accounts held in different depository institutions.

29.    Moreover, the detailed and inventive elements of the claims provide the explanation of "how" each of these unconventional and non-routine elements achieve the desired technological result.  The claimed invention here is not merely the application of the alleged abstract idea on a generic computer, but is instead directed to a technology-based solution that improves upon the prior art by, inter alia, increasing efficiency of a computerized deposit sweep system.

30.    For example, Claim 1 of the '689 Patent discloses an allocation modeling method in a depository program with a government backed insurance limit, comprising:

accessing, using one or more computers, one or more electronic databases, stored on one or more computer-readable media, comprising:

(i) aggregated account information for a plurality of government backed-insured and interest-bearing aggregated deposit accounts held in a plurality of depository institutions in a program, wherein funds from a plurality client accounts are held in the aggregated deposit accounts in the depository institutions in the program, the aggregated account information for a respective one of the aggregated deposit accounts comprising a balance of funds held in the respective aggregated deposit account;

(ii) client account information for each of the respective client accounts, wherein the client account represents funds of the respective client held in the one or more aggregated deposit accounts holding funds of the respective client, the client account information comprising a respective balance of funds from the respective client account held in each of the one or more insured and interest-bearing aggregated deposit accounts holding funds of the respective client account;

(iii) depository institution information for respective of the depository institutions in the program, the depository information for a respective one of the depository institutions comprising a capacity cap for funds held therein from the program, and

for each respective one of a plurality of depository institutions participating in the program performing the steps:

obtaining, using the one or more computers, for a high stratification a current or an adjusted total high stratification balance in the respective depository institution, comprising a total of balances held or that may be held in the respective depository institution of high stratification client accounts, each of the high stratification client accounts having a total balance managed by the program within a highest range of balances that may be fully insured with government backed insurance through an allocation across government backed-insured interest-bearing aggregated deposit accounts in a first number of depository institutions;

obtaining, using the one or more computers, for a second stratification a current or an adjusted total second stratification balance in the respective depository institution, comprising a total of balances held or that may be held in the respective depository institution of second stratification client accounts, each of the second stratification client accounts having a total balance managed by the program within a second range of balances that may be fully insured with government backed insurance through an allocation across government backed-insured interest-bearing aggregated deposit accounts in a second number of depository institutions, wherein the second range has a lower upper limit than the highest range;

obtaining, using the one or more computers, for a lowest stratification a current or an adjusted total lowest stratification balance in the respective

depository institution, comprising a total of balances held or that may be held in the respective depository institution of lowest stratification client accounts, each of the lowest stratification client accounts having a total balance managed by the program within a third range of balances that may be fully insured with government backed insurance through an allocation across government backed-insured interest-bearing aggregated deposit accounts in a third number of depository institutions, wherein the lowest range has a lower upper limit than the second range;

calculating or having calculated, using the one or more computers, for each of the respective depository institutions, a respective total balance in the program, based at least in part on the total high stratification balance, the total second stratification balance, and the total lowest stratification balance, held in the respective depository institution;

calculating or having calculated, using the one or more computers, a respective excess capacity for each of the respective depository institutions based at least in part on a difference between the capacity cap for the respective depository institution and the total balance for the respective depository institution; and

modifying, based at least in part on the respective excess capacities of the respective depository institutions, one or more of parameters selected from the group of a number of client accounts, additional client account funds, a total number of the depository institutions participating in the program, and the capacity caps for one or more of the depository institutions.

(Exhibit J.)

### INFRINGEMENT OF ALLOCATION MODEL PATENT

31.   SCCM practices this claimed invention. Specifically, it practices a method for developing, maintaining, and allocating funds based on excess capacity present in each depository institution. As part of this process, SCCM performs modeling and determines allocation of funds to be deposited at each of the depository institutions.

32.   With respect to element (A) of claim 1, SCCM accesses, selects, tracks, and maintains government backed-insured and interest bearing aggregate deposit accounts:

FICA benefits from SCCM proprietary algorithms, which is used to allocate customers' deposits to ensure full deposit insurance is on each customer account at those respective institutions. As defined above, that means that each deposit for each customer at each bank must be $250,000 or below. The minimum initial investment for FICA is $1,000,000, and while FICA does not necessarily benchmark against a particular index, it

does compete yield-wise against money market funds, treasuries and other cash products.

Operationally, the funds in a client's FICA account are held at U.S. Bank NA (custodian). SCCM will select the insured depositaries and direct the custodian to deposit funds from a client's FICA account into the depositary accounts at those insured banks. Deposits are never more than $250,000, in order to take advantage of the FDIC and NCUSIF insurance; thus, the importance of the SCCM proprietary algorithm used to allocate deposits.

… SCCM, via the FICA platform, instructs the custodian as per allocation to banks in the program network.

(Exhibit I at 4-6.)

### FICA® Account Terms and Conditions: Governmental Entities
*Effective October 1, 2018* …

### Introduction

The Federally Insured Cash Account program ("FICA Program") offered by StoneCastle Cash Management, LLC ("SCCM") allows customers the ability to protect their money by placing it in deposit accounts at banks and savings institutions (collectively, "Insured Depositories") in a manner that maintains full insurance of the funds by the Federal Deposit Insurance Corporation ("FDIC"). Funds will be deposited within SCCM's network of Insured Depositories ("Deposit Network").

### 6) Insured Depositories

Your monthly account statement will indicate the Insured Depositories in which your FICA Account funds have been deposited.

### 10) Account Statements

You will receive a monthly account statement from SCCM via our website at www.FICAaccount.com. … All activity with respect to your FICA Account, including your account balance through one or more Depository Accounts at each Insured Depository, the net interest earned in your FICA Account and transaction history will appear on your account statement. The account statement will also include the aggregate of your opening and closing balances in your FICA Account.

(Exhibit E at 1-5.)

33.   With respect to elements (B)-(D) of claim 1, SCCM's "FICA® | For Advisors" program offers: "Federally insured [deposits] up to $25 million per tax ID | $50 million for joint accounts." (*See* FICA® | For Advisors, annexed hereto as Exhibit K.) SCCM reports it has more

than 800 banks and savings and loans participating in its network. Many of these financial institutions are small institutions with limited capabilities of handling large amounts of deposits. While SCCM caters to high net worth individuals, not all of its customers have such large deposits. Upon information and belief, SCCM is using Island IP's proprietary model, embodied in the '689 Patent, that its affiliate SCIS has licensed to use to address these same modeling problems.

### MISAPPROPRIATION OF TRADE SECRETS AND BREACH OF LICENSE AGREEMENT

34.     Island IP has licensed its highly valuable intellectual property portfolio, including the Patents-in-Suit, to several large banks and other leading financial institutions. The portfolio includes approximately 60 licensed patents, as well as related business know-how, including technical, scientific, trade, quality assurance, quality control, financial and business information, know-how, trade secrets, materials, software and other intellectual property other than patent rights necessary, *inter alia*, to implement Island IP's patented inventions (collectively, together with the patent portfolio, the "Intellectual Property").

35.     On February 11, 2012, Island IP entered into a License Agreement with Intermedium Financial LLC ("Intermedium"), under which Intermedium agreed to pay a royalty for access to Island IP's Intellectual Property, based on Intermedium's asset under management. Because Intermedium was a small, start-up business likely to be acquired in the future, Island IP made sure that, if any future affiliate Intermedium wanted access to its Intellectual Property, such affiliate would first be required to execute an Affiliate License.

> Section 2.2. Affiliate License. Licensee may extend the License in Section 2.1 to any Affiliate of Licensee under the same terms and conditions as set forth herein, upon written notification to Licensor of such Affiliate License grant, and such Affiliate agreeing to be bound in writing by the terms of this Agreement as if it were a party hereto, including without limitation payment by such Affiliate of royalties in accordance with Article III.

36.     With respect to the license itself, the License Agreement (as subsequently amended) further provides that:

> Section 2.1. <u>License</u>. …Licensor hereby grants as of the Effective Date, and Licensee hereby accepts, a non-exclusive, worldwide, right and license under and to the Licensed Patents, Business Know-how, and Intellectual Property, to practice any and all methods claimed or disclosed therein, and to make, have made, use, distribute, lease, sell, offer for sale, import, export, develop and otherwise dispose of and exploit any and all products and services within the Business Field ("License"). Licensee shall be permitted, on an unrestricted basis but subject to the confidentiality acknowledgement in Section 2.8 hereof [sic],[1] to develop, adapt, modify, improve upon, create derivative works of or otherwise develop the Licensed Patents, alone or in conjunction with others. For the avoidance of any doubt. the have made rights of the Licensee hereunder shall extend to suppliers of products and provider of services of Licensee with respect to the Business Field, solely for the purpose of providing such products or services to or on behalf of Licensee or its Affiliate (as contemplated in Section 2.2).

The License Agreement, in turn, defines "Business Know-how," "Intellectual Property" and "Know-how" as follows:

> "Business Know-how" means Know-how owned or Controlled by Licensor, Parent and/or their respective Affiliates as of the Effective Date that Licensor, Parent and/or their respective Affiliates use in connection with, or is otherwise useful to, in the Business Field.

> "Intellectual Property" means any and all Intellectual Property rights and other similar proprietary rights in any jurisdiction, whether registered or unregistered, whether owned or held for use under license, including all rights and interests in, pertaining to or deriving from any patents or patent applications (including continuations, continuations-in-part, divisions, reissues and reexaminations), Know-how, and any registrations of, applications to register, and renewals and extensions of, any of the foregoing. Intellectual Property includes "Licensed Patents" as defined

---

1       The cross-reference to Section 2.8 of the License Agreement is a scrivener's error.  The confidentiality acknowledgment is actually set forth in a Mutual Confidentiality Agreement the parties had executed a few months earlier, which remains in effect (a copy of which is annexed hereto as Exhibit M).  The Agreement provides, *inter alia*, that: "Recipient agrees to keep all Confidential Information confidential and not disclose any Confidential Information to any other person" nor "allow the use of any Confidential Information for any purpose." (*Id.*)

below and Business Know-how, as defined above.

"Know-how" means any and all technical, scientific, trade, quality assurance, quality control, financial and business information, know-how, trade secrets, materials, Software and other Intellectual Property (other than Patent Rights), including without limitation all methods, protocol. Results, analyses, conclusions and other information, data, discoveries, inventions, improvements, processes, regulatory documentation, information and submissions and formulae, whether patentable or unpatentable.

(*Id.*)

37.     At around the same time period of the Intermedium License Agreement, Bruce R. Bent II, the President of Double Rock, also approached Stephen Rotella, the President of StoneCastle, about acquiring a license to the Island IP Intellectual Property.  StoneCastle earlier had access to Island IP's Intellectual Property pursuant to a Non-Disclosure Agreement which StoneCastle had executed in connection with a contemplated bid to acquire Double Rock's insured cash deposit business.  (The business ultimately was acquired by Reich & Tang Asset Management, LLC.)   Mr. Rotella assured Mr. Bent that StoneCastle did not make use of omnibus accounts, automation, or other unique features of Island IP's Intellectual Property, and thus had no need for a license.  Mr. Bent accepted his assurances.

38.     In early 2017, Intermedium approached Island IP, informed it that Intermedium was contemplating being acquired by StoneCastle, and requested that Island IP consent to transfer Island IP license to the successor StoneCastle entity.  Island IP agreed, on the express condition that no other StoneCastle entity would be allowed to use Island IP's Intellectual Property unless Intermedium first executed a license on behalf of such entity, such that the affiliates' revenues would be included in the royalty calculation.

39.     This was a critical condition to Island IP because, with the acquisition of Intermedium, StoneCastle would be entering into a business for which the Island IP Intellectual Property was ideally suited – the processing of thousands of transactions per day, for thousands

-18-

of broker-dealer clients.  (Upon information and belief, StoneCastle's business up until then had been focused on fewer transactions for larger institutional clients.)  And with the Intermedium acquisition would come its President, David Gareis, Double Rock's former Director of Operations and a named inventor on several of Island IP's patents.

40.     Further, in such an acquisition, Gareis would be reuniting at StoneCastle a number of his former Double Rock colleagues.  Although the New York City area does not lack for managerial talent in the financial services industry, in the years prior to acquiring Intermedium, StoneCastle had gone on a hiring spree of former Double Rock executives, each of whom was uniquely situated to implement Island IP's patented inventions.  Those hires included Eric Lansky (a Double Rock Managing Director), Brandon Semiloff (Double Rock's Director of Institutional Sales), Patrick Farrell (Double Rock's Chief Financial Officer), David Lentinello (Double Rock's Director of Fund Accounting and Financial Reporting), and David Fuccillo (Double Rock's Manager of Client Services) (collectively, together with David Gareis discussed above, the "Former Double Rock Executives").

41.     Each of the Former Double Rock Executives possessed trade secrets of Double Rock and, during their tenure at Double Rock, had executed an "Agreement Regarding Employee Obligations" in which such executive had covenanted that: "Upon termination of my employment with the Company, I shall not use the Confidential Information for any reason or disclose it to any person."   (By way of example, the Agreement Regarding Employee Obligations executed by Eric Lansky is annexed hereto as Exhibit L.)

42.     Intermedium consented to Island IP's condition.  On April 12, 2017, Island IP and Intermedium executed an amendment to the License Agreement acknowledging that Intermedium had sold substantially all its assets to SCIS (the StoneCastle successor entity), and

permitting SCIS to assume all rights, obligations, privileges, and licenses of Intermedium under the License Agreement.  Other than SCIS itself, however, no StoneCastle affiliate executed an Affiliate License in connection therewith, nor has one done so subsequently.

43.     Upon information and belief, following SCIS's 2017 acquisition of Intermedium, certain of the Former Double Rock Executives made use of Island IP's Intellectual Property for the benefit of SCCM and possible other StoneCastle entities without license.  StoneCastle openly admits that "all subsidiaries within the SCCM organizational tree … share[s] personnel and systems with its parent, receiving beneficial support and expertise" and that SCP "incorporates a team approach to managing the various investment and strategic initiatives that involve the firm" with "weekly" meetings involving overlapping executives.

44.     On October 29, 2018, after Island IP grew concerned that one or more StoneCastle affiliates were using Island IP's Intellectual Property without the requisite Affiliate License, it wrote to SCIS and asked it to investigate and provide assurances that this was not the case.  On November 13, 2018, SCIS responded in part that: "SIS has not exercised this option to date and has no plans to do so. Indeed, per the License Agreement, SIS has no obligation to investigate its affiliates under the terms of the License Agreement or to certify that any affiliate is or is not practicing a claimed technology in one of the Licensed Patents."  In a December 4, 2018 follow-up letter, SCIS further claimed to be "unaware of any conduct by its affiliates which may invoke Section 2.2 of the License Agreement."  It also reiterated its prior claim that SCIS "has no obligation under the terms of the License Agreement or any legal obligation to investigate the activities of the [StoneCastle] entities listed in your letter."

45.     As SCIS twice disclaimed any duty to investigate its affiliates for unlicensed use of Island IP's Intellectual Property—even though such unlicensed use most likely would have

come about through SCIS— Island IP, rather than debate SCIS's erroneous view of the License
Agreement, took it upon itself to conduct the requisite investigation.  In that respect, the License
Agreement provides in relevant part as follows:

> Section 3.4. <u>Audits</u>. Licensor shall, during the Term of this Agreement and
> thereafter for a period of one (1) year, have the right, at its own expense and no
> more than one time in any given twelve (12) month period, during regular
> business hours and on reasonable notice of at least twenty (20) Business Days to
> Licensee, and on a mutually agreed upon date, to examine, through a third party
> accounting firm reasonably acceptable to Licensee, Licensee's books of account
> and records relating to Licensee's performance of its obligations under this
> Agreement.

46.     On December 12, 2018, Island IP invoked its audit rights under the License
Agreement.  SCIS responded by asking Island IP to prepare a non-disclosure agreement (NDA),
which Island IP did, and by proposing an audit date, which Island IP did and SCIS initially
accepted.  One business day before the agreed-upon audit date, however, SCIS rejected Island
IP's proposed NDA, and proposed a different NDA with drastic conditions.  Among other things,
SCIS's NDA refused in advance to allow the auditors to review the lion's share of the documents
on their request list.  For those few documents which they were allowed to review, the auditors
would be prohibited from copying any information to analyze off premises.  Once the audit was
complete, the auditors would be required to destroy all of their work papers and everything short
of their final report.   And that report, in turn, could only be shown to Island IP's counsel, not to
Island IP itself, and would be required to be shown to SCIS.

47.     SCIS's proposed NDA would have rendered Island IP's audit rights nugatory.
After receiving it, Island IP endeavored over multiple conferences to try to convince SCIS to
accept a more standard NDA, to no avail.  Thus, the audit never was allowed to proceed.  Based
instead on its own investigation and analysis, and subject to supplementation as more facts
become known, Island IP now asserts the claims set forth below.

### FIRST CAUSE OF ACTION:
### PATENT INFRINGEMENT AGAINST SCCM ('766 PATENT)

48.     Island IP realleges the prior paragraphs as if fully set forth herein.

49.     On April 3, 2012, the '766 Patent was duly and legally issued in the names of Bruce Bent, Bruce Bent, II, and Arthur T. Bent, III.  The '766 Patent was assigned to Island IP, which is the exclusive assignee of the '766 Patent.

50.     As set forth above, SCCM offers one or more products within the scope of the claims of the '766 Patent.

51.     SCCM has infringed and is continuing to infringe at least Claim 1 of the '766 Patent, literally and/or through the doctrine of equivalents.

52.     SCCM has induced or contributed to, and is continuing to induce or contribute to, the infringement by others, of the '766 Patent.

53.     SCCM has had actual notice of the '766 Patent since at least July 16, 2012.

54.     SCCM's infringement of the '766 Patent has been, and continues to be, deliberate and willful.

55.     SCCM's conduct has caused and, unless enjoined, will continue to cause, irreparable harm to Island IP.

56.     Island IP is suffering and will continue to suffer damages as the direct and proximate result of the SCCM's infringement of the '766 Patent.

57.     Island IP is suffering and will continue to suffer irreparable injury as the direct and proximate result of SCCM's infringement of the '766 Patent

58.     WHEREFORE, on its First Cause of Action, Island IP demands: (a) entry of judgment that SCCM infringes the '766 Patent; (b) an injunction against SCCM under 35 U.S.C. § 283, to stop infringement of the '766 Patent; (c) an award of damages against SCCM of no less

than $18 million, to compensate Island IP for the infringement of the '766 Patent, trebled to compensate for willfulness of the infringement, pursuant to 35 U.S.C. § 284; (d) interest thereon; (e) a judgment deeming this to be an exceptional case within the meaning of 35 U.S.C. § 285, entitling Island IP to an award of costs, reasonable attorney's fees, and expenses incurred in this action; and (f) such other and further relief as the Court may deem just and proper.

## SECOND CAUSE OF ACTION:
## PATENT INFRINGEMENT AGAINST SCCM ('267 PATENT)

59.     Island IP realleges the prior paragraphs as if fully set forth herein.

60.     On January 22, 2013, the '267 Patent was duly and legally issued in the names of Bruce Bent, Bruce Bent, II, and Arthur T. Bent, III.  The '267 Patent was assigned to Island IP, which is the exclusive assignee of the '267 Patent.

61.     As set forth above, SCCM offers one or more products within the scope of the claims of the '267 Patent.

62.     SCCM has infringed and is continuing to infringe at least Claim 1 of the '267 Patent, literally and/or through the doctrine of equivalents.

63.     SCCM has induced or contributed to, and is continuing to induce or contribute to, the infringement by others, of the '267 Patent.

64.     SCCM has had actual notice of the '267 Patent since at least January 26, 2017, and the inventions disclosed in the '267 Patent since at least July 16, 2012.

65.     SCCM's infringement of the '267 Patent has been, and continues to be, deliberate and willful.

66.     SCCM's conduct has caused and, unless enjoined, will continue to cause, irreparable harm to Island IP.

67.     Island IP is suffering and will continue to suffer damages as the direct and

proximate result of the SCCM's infringement of the '267 Patent.

68.     Island IP is suffering and will continue to suffer irreparable injury as the direct and proximate result of SCCM's infringement of the '267 Patent

69.     WHEREFORE, on its Second Cause of Action, Island IP demands: (a) entry of judgment that SCCM infringes the '267 Patent; (b) an injunction against SCCM under 35 U.S.C. § 283, to stop infringement of the '267 Patent; (c) an award of damages against SCCM of no less than $18 million, to compensate Island IP for the infringement of the '267 Patent, trebled to compensate for willfulness of the infringement, pursuant to 35 U.S.C. § 284; (d) interest thereon; (e) a judgment deeming this to be an exceptional case within the meaning of 35 U.S.C. § 285, entitling Island IP to an award of costs, reasonable attorney's fees, and expenses incurred in this action; and (f) such other and further relief as the Court may deem just and proper.

### THIRD CAUSE OF ACTION:
### PATENT INFRINGEMENT AGAINST SCCM ('911 PATENT)

70.     Island IP realleges the prior paragraphs as if fully set forth herein.

71.     On April 29, 2014, the '911 Patent was duly and legally issued in the names of Bruce Bent, Bruce Bent, II, and Arthur T. Bent, III.  The '911 Patent was assigned to Island IP, which is the exclusive assignee of the '911 Patent.

72.     As set forth above, SCCM offers one or more products within the scope of the claims of the '911 Patent.

73.     SCCM has infringed and is continuing to infringe at least Claim 1 of the '911 Patent, literally and/or through the doctrine of equivalents.

74.     SCCM has induced or contributed to, and is continuing to induce or contribute to, the infringement by others, of the '911 Patent.

75.     SCCM has had actual notice of the '911 Patent since at least January 26, 2017,

and the inventions disclosed in the '911 Patent since at least July 16, 2012.

76.     SCCM's infringement of the '911 Patent has been, and continues to be, deliberate and willful.

77.     SCCM's conduct has caused and, unless enjoined, will continue to cause, irreparable harm to Island IP.

78.     Island IP is suffering and will continue to suffer damages as the direct and proximate result of the SCCM's infringement of the '911 Patent.

79.     Island IP is suffering and will continue to suffer irreparable injury as the direct and proximate result of SCCM's infringement of the '911 Patent

80.     WHEREFORE, on its Third Cause of Action, Island IP demands: (a) entry of judgment that SCCM infringes the '911 Patent; (b) an injunction against SCCM under 35 U.S.C. § 283, to stop infringement of the '911 Patent; (c) an award of damages against SCCM of no less than $18 million, to compensate Island IP for the infringement of the '911 Patent, trebled to compensate for willfulness of the infringement, pursuant to 35 U.S.C. § 284; (d) interest thereon; (e) a judgment deeming this to be an exceptional case within the meaning of 35 U.S.C. § 285, entitling Island IP to an award of costs, reasonable attorney's fees, and expenses incurred in this action; and (f) such other and further relief as the Court may deem just and proper.

## FOURTH CAUSE OF ACTION:
### PATENT INFRINGEMENT AGAINST SCCM ('157 PATENT)

81.     Island IP realleges the prior paragraphs as if fully set forth herein.

82.     On May 6, 2014, the '157 Patent was duly and legally issued in the names of Bruce Bent, Bruce Bent, II, and Arthur T. Bent, III.  The '157 Patent was assigned to Island IP, which is the exclusive assignee of the '157 Patent.

83.     As set forth above, SCCM offers one or more products within the scope of the

claims of the '157 Patent.

84.     SCCM has infringed and is continuing to infringe at least Claim 1 of the '157 Patent, literally and/or through the doctrine of equivalents.

85.     SCCM has induced or contributed to, and is continuing to induce or contribute to, the infringement by others, of the '157 Patent.

86.     SCCM has had actual notice of the '157 Patent since at least January 26, 2017, and the inventions disclosed in the '157 Patent since at least July 16, 2012.

87.     SCCM's infringement of the '157 Patent has been, and continues to be, deliberate and willful.

88.     SCCM's conduct has caused and, unless enjoined, will continue to cause, irreparable harm to Island IP.

89.     Island IP is suffering and will continue to suffer damages as the direct and proximate result of the SCCM's infringement of the '157 Patent.

90.     Island IP is suffering and will continue to suffer irreparable injury as the direct and proximate result of SCCM's infringement of the '157 Patent

91.     WHEREFORE, on its Fourth Cause of Action, Island IP demands: (a) entry of judgment that SCCM infringes the '157 Patent; (b) an injunction against SCCM under 35 U.S.C. § 283, to stop infringement of the '157 Patent; (c) an award of damages against SCCM of no less than $18 million, to compensate Island IP for the infringement of the '157 Patent, trebled to compensate for willfulness of the infringement, pursuant to 35 U.S.C. § 284; (d) interest thereon; (e) a judgment deeming this to be an exceptional case within the meaning of 35 U.S.C. § 285, entitling Island IP to an award of costs, reasonable attorney's fees, and expenses incurred in this action; and (f) such other and further relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION:**
**PATENT INFRINGEMENT AGAINST SCCM ('689 PATENT)**

92.      Island IP realleges the prior paragraphs as if fully set forth herein.

93.      On February 18, 2014, the '689 Patent was duly and legally issued in the name of David Edgar Gareis, who was then an employee of Double Rock.  The '689 Patent was assigned to Island IP, which is the exclusive assignee of the '689 Patent.

94.      As set forth above, SCCM offers one or more products within the scope of the claims of the '689 Patent.

95.      SCCM has infringed and is continuing to infringe at least Claim 1 of the '689 Patent, literally and/or through the doctrine of equivalents.

96.      SCCM has induced or contributed to, and is continuing to induce or contribute to, the infringement by others, of the '689 Patent.

97.      SCCM has had actual notice of the '689 Patent since at least January 26, 2017.

98.      SCCM's infringement of the '689 Patent has been, and continues to be, deliberate and willful.

99.      SCCM's conduct has caused and, unless enjoined, will continue to cause, irreparable harm to Island IP.

100.     Island IP is suffering and will continue to suffer damages as the direct and proximate result of the SCCM's infringement of the '689 Patent.

101.     Island IP is suffering and will continue to suffer irreparable injury as the direct and proximate result of SCCM's infringement of the '689 Patent

102.     WHEREFORE, on its Fifth Cause of Action, Island IP demands: (a) entry of judgment that SCCM infringes the '689 Patent; (b) an injunction against SCCM under 35 U.S.C. § 283, to stop infringement of the '689 Patent; (c) an award of damages against SCCM of no less

than $18 million, to compensate Island IP for the infringement of the '689 Patent, trebled to compensate for willfulness of the infringement, pursuant to 35 U.S.C. § 284; (d) interest thereon; (e) a judgment deeming this to be an exceptional case within the meaning of 35 U.S.C. § 285, entitling Island IP to an award of costs, reasonable attorney's fees, and expenses incurred in this action; and (f) such other and further relief as the Court may deem just and proper.

### SIXTH CAUSE OF ACTION:
### MISAPPROPRIATION OF TRADE SECRETS AGAINST SCCM AND SCIS
### UNDER DEFEND TRADE SECRETS ACT

103.    Island IP realleges the prior paragraphs as if fully set forth herein.

104.    Island IP has devoted considerable time and resources developing certain proprietary, secret and confidential information relating to cash management and money regulation systems and, in particular, to the implementation of the inventions set forth in Island IP's patent portfolio (the "Island IP Trade Secrets").

105.    Island IP owns, and possesses exclusive rights to the license of, the Island IP Trade Secrets.

106.    The Island IP Trade Secrets are extremely valuable to Island IP.  Island IP has invested tens of millions of dollars in the Island IP Intellectual Property, a figure that StoneCastle would far exceed were it to attempt to replicate that development today.

107.    Island IP took appropriate measures to maintain the confidentiality of the Island IP Trade Secrets by restricting access to, and disclosure of, this information through, *inter alia*, the confidentiality and use restrictions set forth in the License Agreement, Mutual Confidentiality Agreement, and Agreements Regarding Employee Obligations.

108.    Absent execution of the requisite Affiliate License, SCIS was only permitted to use the Island IP Trade Secrets for its own business and was not permitted to disclose the Island

IP Trade Secrets to any of its corporate affiliates, such as SCCM.

109.   SCIS did not execute an Affiliate License on behalf of SCCM, but nevertheless shared the Island IP Trade Secrets with that corporate affiliate, in violation of the confidentiality and use restrictions set forth in the License Agreement, Mutual Confidentiality Agreement, and Agreements Regarding Employee Obligations.

110.   SCCM was aware of the foregoing confidentiality and use restrictions, and yet accepted and used the Island IP Trade Secrets in interstate commerce for its own economic benefit without executing an Affiliate License, knowing it would injure Island IP.

111.   SCCM's and SCIS's misappropriation of the Island IP Trade Secrets was willful, malicious and performed in bad faith.  SCCM's and SCIS's misappropriation of the Island IP Trade Secrets caused financial harm to Island IP.

112.   Under 18 U.S.C. § 1832(a): "Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information; (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information; (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization; (4) attempts to commit any offense described in paragraphs (1) through (3); or (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the

conspiracy, shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both.  Under 18 U.S.C. § 1832(b)(1): "An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

113.    WHEREFORE, on its Sixth Cause of Action, Island IP demands: (a) entry of judgment against SCCM and SCIS for monetary damages, pursuant to 18 U.S. Code § 1836(b)(3)(B)-(D), of no less than $50 million, to compensate Island IP for the actual loss caused by the misappropriation of the Island IP Trade Secrets, for the unjust enrichment caused by the misappropriation of the Island IP Trade secrets that is not addressed in computing damages for actual loss, and/or for the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the Island IP Trade Secrets, with such damages to be doubled as exemplary damages, and reasonable attorney's to be awarded, because SCCM's and SCIS's misappropriation was willful and malicious; (b) a permanent injunction pursuant to 1836(b)(3)(B); and (c) such other and further relief as the Court may deem just and proper.

### SEVENTH CAUSE OF ACTION:
### UNFAIR COMPETITION AGAINST SCCM AND SCIS

114.    Island IP realleges the prior paragraphs as if fully set forth herein.

115.    SCCM and SCIS employed deceptive business tactics in their misappropriation of the Island IP Trade Secrets for use by SCCM without an Affiliate License.

116.    Such deceptive business tactics were to Island IP's detriment.

117.    SCCM's and SCIS's actions were undertaken in bad faith.

118.    WHEREFORE, on its Seventh Cause of Action, Island IP demands entry of judgment against SCCM and SCIS for compensatory damages of no less than $50 million, in an

amount to be determined at trial, along with interest thereon and Island IP's costs, reasonable attorney's fees, and expenses incurred in this action, punitive damages, and such other and further relief as the Court may deem just and proper.

**EIGHTH CAUSE OF ACTION:**
**UNJUST ENRICHMENT AGAINST SCCM**

119.    Island IP realleges the prior paragraphs as if fully set forth herein.

120.    SCCM's unauthorized use of the Island IP Trade Secrets conferred significant monetary benefits upon SCCM by enabling it to offer products in the marketplace which it otherwise would not have been able to offer.

121.    SCCM has been unjustly enriched at the expense of Island IP by virtue of its improper actions and the improper actions of its affiliate, SCIS, as described above.

122.    It would be against equity and good conscience for SCCM to retain the economic bene-fits that it derived from its conduct.

123.    Island IP is entitled to disgorgement and restitution of all economic benefits that SCCM derived from its unauthorized use of the Island IP Trade Secrets.

124.    WHEREFORE, on its Eighth Cause of Action, Island IP demands entry of judgment against SCCM for disgorgement and restitution of no less than $50 million, in an amount to be determined at trial, along with interest thereon and Island IP's costs, reasonable attorney's fees, and expenses incurred in this action, and such other and further relief as the Court may deem just and proper.

**NINTH CAUSE OF ACTION:**
**BREACH OF CONTRACT AGAINST SCIS**

125.    Island IP realleges the prior paragraphs as if fully set forth herein.

126.    The License Agreement was and is a valid and enforceable contract between

Island IP and SCIS.

127.    Under Section 2.2 of the License Agreement, SCIS was required to execute an Affiliate License on behalf of its affiliate before SCCM could practice the invention in the licensed patents and/or make use of the other licensed Intellectual Property.

128.    Under Section 3.4 of the License Agreement, SCIS was required to allow Island IP annually to audit and examine SCIS's books of account and records relating to SCIS's performance of its obligations under this Agreement

129.    SCIS breached its obligations under Section 2.2 of the License Agreement by failing to execute the Affiliate License.

130.    SCIS breached its obligations under Section 3.0 of the License Agreement by failing to allow Island IP to conduct its annual audit.

131.    At all times herein, Island IP has fulfilled its obligations to SCIS under the License Agreement.

132.    As a direct and proximate result of SCIS's breaches of the License Agreement, Island IP has incurred financial injury, including, without limitation, lost royalties.

133.    WHEREFORE, on its Ninth Cause of Action, Island IP demands entry of judgment against SCIS for compensatory damages of no less than $18 million, in an amount to be determined at trial, along with interest thereon and Island IP's costs, reasonable attorney's fees, and expenses incurred in this action, and such other and further relief as the Court may deem just and proper.

### TENTH CAUSE OF ACTION:
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST SCIS

134.    Island IP realleges the prior paragraphs as if fully set forth herein.

135.    SCIS had an obligation to act in good faith and deal fairly with Island IP in

performing its obligations under the License Agreement, including, without limitation, the Affiliate License requirement set forth in Section 2.2 thereunder.

136.    SCIS violated this obligation of good faith and fair dealing by failing to exercise the Affiliate License and thereby enabling its affiliate SCCM to enjoy all of the benefits of the License Agreement without payment of royalties thereunder.

137.    Such conduct was performed by SCIS in bad faith.

138.    WHEREFORE, on its Tenth Cause of Action, Island IP demands entry of judgment against SCIS for compensatory damages of no less than $18 million, in an amount to be determined at trial, along with interest thereon and Island IP's costs, reasonable attorney's fees, and expenses incurred in this action, and such other and further relief as the Court may deem just and proper.

### ELEVENTH CAUSE OF ACTION: ALTER EGO LIABILITY AGAINST SCP, SCFC AND SCAM

139.    Island IP realleges the prior paragraphs as if fully set forth herein.

140.    Upon information and belief, each nominally separate StoneCastle entity is in fact operated by SCP as a single entity, dominated and controlled by SCP.

141.    As described above, such domination was used to commit a wrong against Island IP which resulted in its injury.

142.    Upon information and belief, SCFC and SCAM are additional alter egos of SCCM and SCIS who unjustly benefitted therefrom.

143.    Under applicable law, the corporate shield as between these StoneCastle entities should be disregarded and/or pierced, such that the aforementioned liabilities of SCCM and SCIS are imposed directly upon SCP, SCFC and SCAM.

144.    WHEREFORE, on its Eleventh Cause of Action, Island IP demands entry of

judgment against SCP, SCFC and SCAM for damages of no less than $172 million, representing: (a) actual damages for patent infringement on its First through Fifth Causes of Action of no less than $18 million, trebled by statute to $54 million; (b) actual damages for theft trade secrets, unfair competition and unjust enrichment on its Sixth through Eighth Causes of Action of no less than $50 million, doubled (in the case of the Sixth Cause of Action) by statute to $100 million; and (c) actual damages for breach of contract and breach of the implied covenant on its Ninth and Tenth Causes of Action of no less than $18 million; plus, on each Cause of Action, interest, costs, attorney's fees, and expenses and, where applicable, punitive damages.

Dated:  New York City
         May 23, 2019

KELLEY DRYE & WARREN LLP

*/s/ John Dellaportas*

_____

John Dellaportas
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-5000
Facsimile: (212) 808-7897

*Attorneys for Plaintiff Island IP*