## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISLAND INTELLECTUAL PROPERTY LLC,<br><br>    Plaintiff,<br><br> v.<br><br>STONECASTLE CASH MANAGEMENT LLC,<br>STONECASTLE INSURED SWEEP LLC,<br>STONECASTLE PARTNERS, LLC,<br>STONECASTLE FINANCIAL CORP., and<br>STONECASTLE ASSET MANAGEMENT<br>LLC,<br><br>    Defendants. | No. 1:19-cv-04792-JPO<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................................. iii

TABLE OF ABBREVIATIONS ........................................................................................... vii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

LEGAL STANDARD ............................................................................................................. 3

ARGUMENT ........................................................................................................................... 4

     I.     The Asserted Patents Are Directed to Plainly Patent-Ineligible
          Subject Matter ...................................................................................................... 4

          A.     The Reciprocal Deposit Patents ................................................................ 7

                 1.     Step 1:  The Reciprocal Deposit Patents Are Directed to an
                      Abstract Idea ................................................................................. 7

                 2.     Step 2:  The Reciprocal Deposit Patents Lack Any Inventive
                      Concept .......................................................................................... 11

                 3.     The Reciprocal Deposit Patents' Remaining Independent and
                      Dependent Claims Do Not Confer Eligibility ................................ 14

          B.     The Allocation Model Patent ................................................................... 17

                 1.     Step 1:  The Allocation Model Patent Is Directed to an Abstract
                      Idea ............................................................................................... 17

                 2.     Step 2:  The Allocation Model Patent Lacks Any Inventive
                      Concept .......................................................................................... 19

                 3.     The Allocation Model Patent's Dependent Claims Do Not Confer
                      Eligibility ...................................................................................... 20

     II.     Island IP's Trade Secret Misappropriation Cause of Action Must
          Be Dismissed ...................................................................................................... 21

     III.     Island IP's Ancillary Causes of Action Against SCIS and SCCM
          Should Be Dismissed .......................................................................................... 24

     IV.     Island IP Has Failed To Properly Plead Alter Ego Liability Against
          SCFC, SAM, and SCP ........................................................................................ 24

## TABLE OF CONTENTS
### (continued)

Page

CONCLUSION....................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alexander Interactive, Inc. v. Leisure Pro Ltd.*,
  2014 WL 4651942 (S.D.N.Y. Sep. 16, 2014)........................................................22

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  573 U.S. 208 (2014).......................................................1, 4, 5, 6, 9, 11, 14, 20

*Anchor Sale & Mktg., Inc. v. Richloom Fabrics Grp., Inc.*,
  2016 WL 4424069 (S.D.N.Y. Aug. 9, 2016)........................................................14

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
  823 F.3d 51 (2d Cir. 2016)...............................................................................8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................3, 4, 13, 23

*Automated Tracking Sols., LLC v. The Coca-Cola Co.*,
  723 Fed. Appx. 989 (Fed. Cir. 2018)..................................................................5

*Becton, Dickinson and Co. v. Cytek Biosciences Inc.*,
  2018 WL 2298500 (N.D. Cal. May 21, 2018).......................................................22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................3, 22, 23

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)........................................................................5

*Bilski v. Kappos*,
  561 U.S. 593 (2010)...................................................................................1, 6, 9

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018)..................................................................11, 12

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  --- F.3d ----, 2019 WL 2588278 (Fed. Cir. June 25, 2019)......................................5

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2nd Cir. 2002)....................................................................4, 14, 20

*In re Chorna*,
  656 Fed. Appx. 1016 (Fed. Cir. 2016).................................................................6

*Clarilogic, Inc. v. FormFree Holdings Corp.*,
    681 Fed. Appx. 950 (Fed. Cir. 2017) ...................................................................6

*In re Currency Conversion Fee Antitrust Litig.*,
    265 F.Supp.2d 385 (S.D.N.Y. 2003) ...............................................................25

*De Jesus v. Sears, Roebuck & Co., Inc.*,
    87 F.3d 65 (2nd Cir. 1996) ...........................................................................24

*Elec. Power Grp. LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ....................................................................10

*Elsevier Inc. v. Doctor Evidence, LLC*,
    2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ...................................................22

*Federal Deposit Ins. Corp. v. Continental Ill. Nat. Bank and Trust Co. of Chicago*,
    245 F.2d 567 (7th Cir. 1957) .......................................................................12

*Finnavations LLC v. Payoneer, Inc.*,
    2019 WL 1236358 (D. Del. Mar. 18, 2019) ..............................................1, 10

*In re Greenstein*,
    --- Fed. Appx. ----, 2019 WL 2418998 (Fed. Cir. June 10, 2019) ......................6

*Intellectual Ventures I LLC v. Capital One Bank (USA), N.A.*,
    792 F.3d 1363 (Fed. Cir. 2015) ......................................................................9

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017) ......................................................................8

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
    711 Fed. Appx. 1012 (Fed. Cir. 2017) ...........................................................10

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015) .................................................................5, 11

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018) ......................................................................5

*Kalin v. Xanboo, Inc.*,
    2009 WL 928279 (S.D.N.Y. Mar. 30, 2009) ..................................................24

*Manley v. Utzinger*,
    2011 WL 2947008 (S.D.N.Y. July 21, 2011) ...................................................8

*Munoz-Nagel v. Guess, Inc.*,
    2013 WL 1809772 (S.D.N.Y. Apr. 30, 2013) ................................................25

*Planet Bingo, LLC v. VKGS LLC*,
    576 Fed. Appx. 1005 (Fed. Cir. 2014) ...................................................................10

*SAP America, Inc. v. Investpic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018)........................................................................11, 12

*Smartflash LLC v. Apple Inc.*,
    680 Fed. Appx. 977 (Fed. Cir. 2017) ...................................................................6

*Solutran, Inc. v. Elavon, Inc.*,
    --- F.3d ----, 2019 WL 3418471 (Fed. Cir. July 30, 2019) ................................6, 9

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010)..............................................................................3, 23

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016).............................................................................10

*Sysco Food Serv. of Metro New York, LLC v. Jekyll & Hyde, Inc.*,
    2009 WL 4042758 (S.D.N.Y. Nov. 17, 2009) ......................................................24

*Telebrands Corp. v. Del Labs., Inc.*,
    719 F.Supp.2d 283 (S.D.N.Y. 2010).....................................................................14

*Teradata Corp. v. SAP SE*,
    2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ......................................................22

*TheECheck.com, LLC v. NEMC Financial Services Grp. Inc.*,
    2017 WL 2627912 (S.D.N.Y. June 16, 2017) ......................................................25

*Trading Techs. Int'l, Inc. v. IBG LLC*,
    921 F.3d 1084 (Fed. Cir. 2019).............................................................................6

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014)...................................................................6, 14, 17

*Univ. of Fla. Research Found., Inc. v. General Electric Co.*,
    916 F.3d 1363 (Fed. Cir. 2019)................................................................10, 16, 19

*In re Villena*,
    745 Fed. Appx. 374 (Fed. Cir. 2018) ...................................................................6

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
    887 F.3d 1376 (Fed. Cir. 2018).............................................................................10

**Statutes**

35 U.S.C. § 101 .........................................................................................................1, 4

**Rules**

Fed. R. Evid. 201(b)(2) ..................................................................................................8

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| 157 Patent | U.S. Patent No. 8,719,157 (D.I. 13-4) |
| 267 Patent | U.S. Patent No. 8,359,267 (D.I. 13-2) |
| 689 Patent | U.S. Patent No. 8,655,689 (D.I. 13-10) |
| 766 Patent | U.S. Patent No. 8,150,766 (D.I. 13-1) |
| 911 Patent | U.S. Patent No. 8,712,911 (D.I. 13-3) |
| Allocation Model Patent | The 689 Patent |
| Asserted Patents | U.S. Patent Nos. 8,150,766; 8,359,267; 8,655,689; 8,712,911; and 8,719,157 |
| Compl. | Complaint (D.I. 13) |
| FDIC | Federal Deposit Insurance Corporation |
| FFIEC | Federal Financial Institutions Examination Council |
| Island IP | Plaintiff Island Intellectual Property LLC |
| Reciprocal Deposit Patents | The 157, 267, 766, and 911 Patents |
| SCCM | Defendant StoneCastle Cash Management LLC |
| SCIS | Defendant StoneCastle Insured Sweep LLC |
| SCP | Defendant StoneCastle Partners, LLC |
| SCFC | Defendant StoneCastle Financial Corp. |
| SAM | Defendant StoneCastle Asset Management LLC |
| StoneCastle | Defendants StoneCastle Cash Management LLC, StoneCastle Insured Sweep LLC, StoneCastle Partners, LLC, StoneCastle Financial Corp., and StoneCastle Management LLC |

Pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6), Defendants SCCM, SCIS, SCP, SCFC and SAM respectfully submit this memorandum in support of their motion to dismiss Plaintiff Island IP's Complaint for failure to state a claim.

## **INTRODUCTION**

Island IP's patent infringement claims should be dismissed under clear Supreme Court precedent.  Island IP asserts five patents that merely claim the implementation of a fundamental financial practice on a computer.  The Supreme Court has twice held that such patent claims are unequivocally ineligible for patenting under 35 U.S.C. § 101.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014); *Bilski v. Kappos*, 561 U.S. 593 (2010).

This is not a close case.  Nothing in the claims of the five asserted patents purports to improve in any way the functioning of a computer or even arguably provides any other technological invention.  Since the Supreme Court decided *Alice*, the Federal Circuit has *never* found a claim like those asserted in this case—where the claims simply recite using a computer to implement a financial practice—to be eligible for patenting.  Indeed, the law is so clear on this point that a district court sanctioned a plaintiff earlier this year for even filing a case asserting such clearly ineligible claims.  *Finnavations LLC v. Payoneer, Inc.*, 2019 WL 1236358 (D. Del. Mar. 18, 2019).  Since the asserted patent claims here are clearly ineligible, the patent infringement counts should be dismissed.

Island IP's trade secret claim is also completely deficient and must be dismissed.  Island IP does not allege the most basic element of any trade secret misappropriation claim—the identification of the allegedly-misappropriated trade secret.  It is clearly-settled law in this district that any claim for misappropriation must identify what alleged trade secrets were misappropriated. Instead, the Complaint contains nothing more than vague innuendo that it has unidentified trade secrets "relating to cash management and money regulation systems."  Compl. ¶ 104.  Such

allegations unambiguously fail the pleading standard for trade secret misappropriation claims in this district, as they impede StoneCastle's ability to investigate and answer. The trade secret claim thus must be dismissed.

Island IP's remaining claims against SCIS and SCCM fare no better. Each of the remaining claims is derivative of the patent infringement and/or trade secret claims. Thus, once the first six counts of the Complaint fall, counts VII through X must similarly be dismissed.

Island IP's alter ego claim against SCFC, SAM, and SCP should also be dismissed because the Complaint provides no factual basis for its conclusory assertions. Courts have consistently held that such barebones alter ego allegations do not meet the required pleading standard.

## BACKGROUND

**Island IP's Patent Infringement Causes of Action.** Island IP asserts that SCCM has infringed five of Island IP's patents. Compl. ¶¶ 48–102. Four of the five patents, dubbed the "Reciprocal Deposit Patents" by Island IP (*id.* ¶ 15), share a specification and are directed to essentially the same invention. In its Complaint, Island IP groups the Reciprocal Deposit Patents together, but provides purportedly factual allegations of infringement for only one of those four patents—the 766 patent. *Id.* ¶¶ 20–25. As to the remaining three Reciprocal Deposit Patents, Island IP fails to offer any factual allegations to support its causes of action; instead, Island IP simply offers the legal conclusion that SCCM infringes each patent. *Id.* ¶¶ 62–63, 73–74, 84–85, 95–96. The fifth and final asserted patent, dubbed the "Allocation Model Patent" by Island IP (*id.* ¶ 26), is not part of the same patent family as the Reciprocal Deposit Patents but is nonetheless directed to similar subject matter.

**Island IP's Trade Secret Misappropriation Cause of Action.** Island IP next asserts that SCCM and SCIS have misappropriated Island IP's trade secrets under the Defend Trade Secrets Act. *Id.* ¶¶ 103–113. Island IP does not identify what the alleged trade secrets are, but instead

vaguely asserts that it its trade secrets "relat[e] to cash management and money regulation systems." *Id.* ¶ 104.

**Island IP's Ancillary Causes of Action.**  In addition to its patent infringement and trade secret causes of action, Island IP advances a number of miscellaneous causes of action against SCCM and/or SCIS, including unfair competition, unjust enrichment, breach of contract, and breach of covenant of good faith and fair dealing.  *Id.* ¶¶ 114–138.  All of these miscellaneous causes of action are ancillary to and depend from Island IP's patent infringement and trade secret misappropriation causes of action.  *See id.*

**Island IP's Alter Ego Liability Cause of Action.**  In addition to its ten counts against SCCM and SCIS, Island IP also includes a single count against three other StoneCastle entities— SCP, SCFC and SCAM—alleging that they are alter egos of SCIS and SCCM, and thus should be held liable for their alleged actions.  *Id.* ¶¶ 139-144.  There is no factual predicate alleged for this claim, and instead the conclusory allegations are made on "information and belief."  *Id.*

## <u>LEGAL STANDARD</u>

To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (same).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

A plaintiff's pleading obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Starr*, 592 F.3d at 321 (quoting *Twombly*, 550 U.S. at 555).  "[N]aked assertions devoid of further factual enhancement" are not sufficient to survive a motion to dismiss, and "mere conclusory statements" or

"[t]hreadbare recitals of the elements of a cause of action" are given no weight. *Iqbal*, 556 U.S. at 678 (internal citations and quotes omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed. *Id.* at 679.

In deciding a motion to dismiss, a court may consider documents attached to the complaint, documents incorporated into the complaint by reference, matters of which judicial notice may be taken, or documents deemed integral to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2nd Cir. 2002).

## ARGUMENT

Island IP has asserted eleven causes of action in this suit, none of which should proceed beyond the pleading stage. First, all of the asserted patents claim subject matter that is plainly patent-ineligible under clear Supreme Court precedent. Next, Island IP's trade secret cause of action is insufficiently pled, as it fails to identify the alleged trade secrets at issue and to allege conduct that amounts to misappropriation. Island IP's ancillary causes of action against SCIS and SCCM all depend on its patent and trade secret causes of action, and must similarly be dismissed. Finally, Island IP's alter ego cause of action is conclusory, with no factual support, and must be dismissed. Island IP's Complaint should thus be dismissed in its entirety.

## I.    The Asserted Patents Are Directed to Plainly Patent-Ineligible Subject Matter

Section 101 of the Patent Act sets forth four classes of patent-eligible subject matter: processes, machines, manufactures, and compositions of matter. 35 U.S.C. § 101. Abstract ideas, however, are not patent-eligible because they are the basic "building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). Thus, an instruction to implement an abstract idea through the use of generic computer technology is not patentable. *Id.* at 222–23.

The Supreme Court has set forth a two-step framework to determine whether claims cover patent-ineligible subject matter.  First, a court must determine whether the claims are directed to an abstract idea.  *Id.* at 217.  At this step, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to [an abstract idea]."  *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).  Second, if a court concludes claims are directed to an abstract idea, the court must then evaluate whether the claims contain an "inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself."  *Alice*, 573 U.S. at 217–18 (internal citations and quotes omitted).  An inventive concept must be more than a "well-understood, routine, conventional activit[y]" that is known in the industry.  *Id.* at 225.  The "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."  *Id.* at 223.

An accused infringer has the burden of proving patent-ineligibility by clear and convincing evidence.  *See Cellspin Soft, Inc. v. Fitbit, Inc.*, --- F.3d ----, 2019 WL 2588278, at *9 (Fed. Cir. June 25, 2019).  However, when addressing a motion advanced under § 101, a court need not analyze each claim individually; instead, "courts may evaluate representative claims."  *Automated Tracking Sols., LLC v. The Coca-Cola Co.*, 723 Fed. Appx. 989, 991 (Fed. Cir. 2018).

While the issue of patent-eligibility "may contain underlying issues of fact," it is ultimately a question of law.  *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1342 (Fed. Cir. 2018).  Thus, where there are no disputed facts material to the issue, patent-eligibility is appropriate to address on a motion to dismiss.  *Id.* at 1342 n.4; *see also Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368, 1370 (Fed. Cir. 2018) (holding certain claims invalid at pleading stage and stating that "not every § 101 determination contains genuine disputes over the underlying facts material to the §

101 inquiry.");  *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 713, 717 (Fed. Cir. 2014) (affirming grant of "pre-answer motion to dismiss under Rule 12(b)(6) without formally construing the claims").

In ruling on arguments made under § 101, the Supreme Court and the Federal Circuit have held myriad claims directed to fundamental business, financial, or economic practices to be patent-ineligible.  *See*, *e.g.*, *Alice*, 573 U.S. at 224–27 (method of mitigating risk via intermediated settlement); *see also Bilski*, 561 U.S. at 598 (method of hedging risk of price fluctuations); *Solutran, Inc. v. Elavon, Inc.*, --- F.3d ----, 2019 WL 3418471, at *1–*2 (Fed. Cir. July 30, 2019) (method of crediting a merchant account while processing a check); *In re Greenstein*, --- Fed. Appx. ----, 2019 WL 2418998, at *3 (Fed. Cir. June 10, 2019) (method of allocating returns to different investors in a collective investment vehicle); *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1092–96 (Fed. Cir. 2019) (user interface for financial trading); *In re Villena*, 745 Fed. Appx. 374, 376–77 (Fed. Cir. 2018) (method of property valuation); *Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 Fed. Appx. 950, 953–55 (Fed. Cir. 2017) (method of providing certified financial data indicating financial risk); *Smartflash LLC v. Apple Inc.*, 680 Fed. Appx. 977, 982–84 (Fed. Cir. 2017) (method of controlling access to data based on payment); *In re Chorna*, 656 Fed. Appx. 1016, 1019–22 (Fed. Cir. 2016) (hindsight allocation instrument for tracking financial instruments).  Indeed, the Supreme Court has made clear that "fundamental economic practice[s]," which are "building block[s] of the modern economy," are abstract ideas "beyond the scope of § 101."  *Alice*, 473 U.S. at 219–20 (internal citations and quotes omitted).  As in those prior cases, the patents here unambiguously claim fundamental economic practices that are not eligible for patent protection.  Island IP should never have brought this suit.

A.      **The Reciprocal Deposit Patents**

As set forth above, all four Reciprocal Deposit Patents share a common specification, and all four are directed to essentially the same invention.  Claim 1 of the 766 Patent, which is representative of the claims in the Reciprocal Deposit Patents, is directed to patent-ineligible subject matter.  Moreover, none of the other claims in the Reciprocal Deposit Patents provides additional or different limitations that compel a different result.

1.      **Step 1:  The Reciprocal Deposit Patents Are Directed to an Abstract Idea**

As the Reciprocal Deposit Patents acknowledge, the FDIC provides insurance for funds deposited in bank accounts, but only up to a certain limit.  *See*, *e.g.*, 766 Patent at 5:5–10. Accordingly, if a deposit account holds funds in excess of the FDIC's limit, the funds that exceed the limit will generally not be insured.  To avoid having a depositor's funds under-insured, the financial industry has long used multi-bank depository programs whereby depositors can, on the front end, deposit with a given bank an amount of funds that exceeds federal deposit insurance limits, and the bank, on the back end, will then divide that deposit among a network of banks such that each bank in the network holds funds equal to or less than the maximum amount covered by insurance.  FDIC opinion letters show that the financial services industry has engaged in this practice for decades.  For example, one such letter from 1986 discusses "multi-bank depository programs," explaining that "[i]n programs of this kind, a lead bank accepts funds from a customer, and then transmits the funds to other banks – usually ones affiliated with the lead bank – for deposit.  The lead bank does not send more than $100,000 to any given depository bank."  Ex. 1,

FDIC Interpretation Letter dated Aug. 15, 1986, at 1.[1,2]  Thus, the abstract idea of dividing and transferring funds to stay within insurance limits is a fundamental economic practice that is well-known in the financial industry.

The claims of the Reciprocal Deposit Patents are directed to precisely this abstract idea.  In fact, Island IP itself explains that the Reciprocal Deposit Patents "involve[] allocating an amount of governmental funds sourced from a first financial institution to a first set of financial institutions and held therein, based on obtaining government backed deposit insurance and/or collateralization by government securities for the funds."  Compl. ¶ 16.  Indeed, "[s]tripped of excess verbiage," *see Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1339 (Fed. Cir. 2017), Claim 1 of the 766 Patent recites little more than the steps involved in using a computerized database to facilitate a multi-bank depository program.  The claim in essence recites accessing a database with information about funds, obtaining data about funds to be transferred, allocating funds to be transferred based on maintaining insurance for those funds, communicating the amount of funds to be transferred, and then updating the database to account for changes in account balances.  These instructions amount to a walk-through for how to perform the abstract idea in a digital environment, but "[s]teps that do nothing more than spell out what it means to 'apply it on

---

[1]  *See also* Ex. 2, Federal Reserve Interpretation Letter dated June 22, 1983, at 1 (discussing money market deposit accounts where "for federal deposit insurance purposes, additional [accounts] would be established at other depository institutions for a particular [] customer if his [account] would otherwise exceed $100,000"); Ex. 6, FDIC Interpretation Letter dated Apr. 1, 1994, at 1 (discussing FDIC insurance of $1,000,000 certificate of deposit "broken down into ten $100,000 participations"); Ex. 3, FDIC Interpretation Letter dated May 22, 1986, at 1; Ex. 4, FDIC Interpretation Letter dated July 23, 1986, at 1–2; Ex. 5, FDIC Interpretation Letter dated Aug. 11, 1986, at 1–2.

[2]  StoneCastle respectfully requests the Court take judicial notice of the content of the FDIC interpretation letters cited above and attached as exhibits hereto.  That content can be accurately and readily determined from the letters, whose accuracy cannot reasonably be questioned.  *See* Fed. R. Evid. 201(b)(2); *see also Manley v. Utzinger*, 2011 WL 2947008, at *1 n.1 (S.D.N.Y. July 21, 2011) ("The Court may take judicial notice of public records in deciding a motion to dismiss"); *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016) (at motion to dismiss stage, court may take judicial notice of FDA guidance documents).

a computer' cannot confer patent eligibility." *Intellectual Ventures I LLC v. Capital One Bank (USA), N.A.*, 792 F.3d 1363, 1370 (Fed. Cir. 2015).

The Supreme Court and Federal Circuit have consistently held that claims directed to fundamental economic practices, like those in the Asserted Patents here, are unpatentable.  For example, in *Bilski*, the Supreme Court held claims directed to the abstract idea of hedging risk arising from price fluctuations to be unpatentable.  *Bilski*, 561 U.S. at 611–12.  Similarly, in *Alice*, the Supreme Court held claims directed to the abstract idea of using an intermediary to validate and process a transaction between two parties to be unpatentable.  *Alice*, 573 U.S. at 219-27.  The Federal Circuit has consistently followed suit.  As recently as July 30 of this year, the Federal Circuit—reversing a district court's ruling to the contrary—held that a patent directed to "the abstract idea of crediting a merchant's account as early as possible while electronically processing a check" was ineligible under § 101.  *Solutran*, 2019 WL 3418471, at *3–*6.

The claims at issue here are directed to similar patent-ineligible economic practices.  Whereas the claims in *Bilski* and *Alice* were directed to mitigating risk arising from price fluctuations and settlement obligations, the claims here are directed to mitigating risk arising from holding under-insured assets.  And, just as the claims in *Bilski* and *Alice* relied on long-standing economic practices, the claims here rely on the long-standing practice of multi-bank depository programs.  While the claims here may be somewhat more verbose than the claims at issue in *Bilski* and *Alice*, the Supreme Court "has long warned against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art."  *Alice*, 573 U.S. at 211 (internal quotation marks and alterations omitted).

Moreover, the Federal Circuit has also repeatedly explained that claims describing processes that can be performed by humans mentally or manually are patent-ineligible abstract

ideas.  *See, e.g.*, *Univ. of Fla. Research Found., Inc. v. General Electric Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019); *see also Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1385–86 (Fed. Cir. 2018); *Intellectual Ventures I LLC v. Erie Indemnity Co.*, 711 Fed. Appx. 1012, 1015 (Fed. Cir. 2017); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1146 (Fed. Cir. 2016); *Elec. Power Grp. LLC v. Alstom S.A.*, 830 F.3d 1350, 1353–54 (Fed. Cir. 2016); *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. Appx. 1005, 1007–08 (Fed. Cir. 2014).  The claims of the Reciprocal Deposit Patents are of exactly this type.  The claims recite the steps of an abstract idea that bankers could have (and likely did, as evidenced by the FDIC interpretation letters cited above) performed manually long before computers:  accessing account information, receiving information about an amount of funds to be transferred, allocating funds to be transferred, communicating the amount of funds to be transferred, and updating account information to reflect transfers.  These claims simply recite implementing this idea with computers.

Since *Alice*, the case law has been abundantly clear—claims that simply implement a financial practice using generic computer technology are not eligible for patent protection.  Indeed, since *Alice*, the Federal Circuit has not upheld the patentability of a single claim similar to those at issue here.  In fact, the case law has been so clear that Judge Andrews in the District of Delaware declared a case exceptional and awarded attorneys' fees to an alleged infringer where a patentee filed a post-*Alice* patent infringement lawsuit on the basis of a patent directed to financial bookkeeping.  *Finnavations LLC v. Payoneer, Inc.*, 2019 WL 1236358 (D. Del. Mar. 18, 2019).  Judge Andrews rightly concluded that "Since *Alice*, the law of patent eligibility has perhaps become unpredictable and unclear on the fringes.  But one thing has remained true: patents which look like *Alice* are ineligible."  *Id.* at *2.  Here, the asserted claims look even more like *Alice* than

those Judge Andrews dismissed in the *Finnavations* case, and Island IP's decision to assert them is even more egregious.

Finally, while the claim language includes some additional qualifications, those qualifications do not change the fact that the claims are directed to an abstract idea. For example, the claim's recitation of "aggregated accounts" and "government funds" does not change that the claim's "character as a whole is directed to" the abstract idea of dividing funds to maintain insurance. *Internet Patents*, 790 F.3d at 1346. Implementing the abstract idea in the specific contexts of aggregated accounts or government funds changes nothing. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1291 (Fed. Cir. 2018) ("As a matter of law, narrowing or reformulating an abstract idea does not add 'significantly more' to it."); *see also SAP America, Inc. v. Investpic, LLC*, 898 F.3d 1161, 1169 (Fed. Cir. 2018) ("limitation of the claims to a particular field of information . . . does not move the claims out of the realm of abstract ideas"). Nor does the claim's additional step of allocating funds to be transferred back to the first bank change the nature of the claims as a whole. When considered as a whole, the Reciprocal Deposit Patents' claims are unambiguously directed to the abstract idea of allocating excess funds to maintain deposit insurance, a fundamental economic practice, and a risk-management practice similar to the risk-management practice held to be patent-ineligible in *Alice*. *See Alice*, 573 U.S. at 217–20.

## 2.    Step 2:  The Reciprocal Deposit Patents Lack Any Inventive Concept

In its Complaint, Island IP advances several allegedly inventive concepts claimed by the Reciprocal Deposit Patents. None is sufficient to transform the claims' recitation of an abstract idea into a patent-eligible invention.

Island IP first alleges that the "inventive concept involves allocating an amount of governmental funds from a first financial institution to a first set of financial institutions and held

therein, based on obtaining government backed deposit insurance and/or collateralization by government securities for the funds." Compl. ¶ 16.  But this is just the abstract idea itself, limited to deposits of government funds.  There is nothing inventive in specifying that the funds to be allocated are government deposits.  *See BSG Tech*, 899 F.3d at 1291; *SAP America*, 898 F.3d at 1169.  The practice of allocating deposits to maintain insurance is an abstract idea regardless of whose funds are being allocated.

Island IP next alleges that an inventive concept can be found in the disclosure of "reciprocal deposit accounts," whereby after an initial amount of funds is allocated from a first bank to a second bank, a subsequent amount of funds equal to or greater than the initial amount is allocated back to the first bank.  Compl. ¶ 17.  There is nothing inventive about banks maintaining reciprocal deposit accounts; banks have long engaged in the practice of maintaining such accounts with other banks.  In fact, as far back as 1957, the Seventh Circuit Court of Appeals discussed the practice of reciprocal deposit accounts and the impact of those accounts on FDIC liabilities.  *See generally Federal Deposit Ins. Corp. v. Continental Ill. Nat. Bank and Trust Co. of Chicago*, 245 F.2d 567, 569–72 (7th Cir. 1957).  Similarly, the Federal Financial Institutions Examination Council's oldest internet-accessible instructions for the preparation of financial reports repeatedly include instructions for how financial institutions should treat reciprocal balances and reciprocal holdings.[3,4]  And, even beyond the long-present practice of reciprocal deposit accounts held among

---

[3] *See, e.g.*, Ex. 7, FFIEC, "Instructions for Preparation of Consolidated Reports of Condition and Income," September 1997, at RC-1 ("Reciprocal balances arise when two depository institutions maintain deposit accounts with each other, i.e., when a reporting bank has both a 'due from' and a 'due to' balance with another depository institution."), RC-A-1, RC-E-2, RC-E-21, RC-M-15 ("Reciprocal holdings are cross-holdings resulting from formal or informal arrangements in which two or more banking organizations intentionally swap, exchange, or otherwise agree to hold each other's capital instruments."), RC-O-6, RC-O-7, A-68 (available at: https://www.ffiec.gov/forms031.htm).

[4] The FFIEC "is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by," among other agencies, the FDIC.  Ex. 8 (available at: https://www.ffiec.gov/about.htm).  StoneCastle respectfully requests the Court take judicial notice of the content of

banks, there is nothing inventive about "reconciling" accounts—it is a fundamental accounting practice.

Island IP's final attempt to confer patent-eligibility on the Reciprocal Deposit Patents is its assertion that the claimed invention "is not merely the application of the alleged abstract idea on a generic computer, but is instead directed to a technology-based solution that improves upon the prior art by, *inter alia*, increasing accuracy of a computerized deposit sweep." Compl. ¶ 18. But, in support of its claim, Island IP simply recites Claim 1 of the 766 Patent. Island IP does not explain *how* the claim allegedly improves on the prior art, *how* the claim "increas[es] accuracy" or *why* the claim is "not merely the application of the alleged abstract idea on a generic computer." As set forth above, "naked assertions devoid of further factual enhancement" are not sufficient to survive a motion to dismiss, and "mere conclusory statements" in a complaint are given no weight. *See Iqbal*, 556 U.S. at 678 (internal citations and quotes omitted).

In any event, the language in the Reciprocal Deposit Patents themselves belies Island IP's assertion that the claimed invention is not merely the abstract idea on a generic computer. The specification repeatedly confirms that generic computers can be used to implement the claimed invention. For example, the specification states that an "exemplary system for implementing the overall system or portions of the invention might include a general purpose processing unit, a system memory, and a system bus that couples various system components including the system memory to the processing unit." *E.g.*, 766 Patent at 9:26–31. The specification also explains that the claimed invention may include "read only memory (ROM)," "random access memory (RAM)," a "hard disk drive," and an "optical disk drive." *Id.* at 9:31–38; *see also id.* at 8:30–55.

---

the FFIEC instructions cited above and attached as an exhibit hereto. That content can be accurately and readily determined from the instructions, whose accuracy cannot reasonably be questioned. *See, supra*, fn. 2.

These are entirely generic computing components.  *See Alice*, 573 U.S. at 223–24 ("wholly generic computer implementation" is not sufficient); *see also Ultramercial*, 772 F. 3d at 716.

### 3.    The Reciprocal Deposit Patents' Remaining Independent and Dependent Claims Do Not Confer Eligibility

Claim 1 of the 766 Patent is the only claim of the Reciprocal Deposit Patents for which Island IP has even attempted to properly state a claim for relief.  *See* Compl. ¶¶ 20–25.  Thus, the patentability of any claim other than Claim 1 of the 766 Patent cannot save Island IP's Complaint. Even if Island IP were to show that another claim of the Reciprocal Deposit Patents were, unlike Claim 1 of the 766 Patent, patent-eligible, the Complaint would still fail to state a claim as to the Reciprocal Deposit Patents because no such claims were properly pled.

Regardless, the claims of the Reciprocal Deposit Patents other than Claim 1 of the 766 Patent fail to add anything that would change the analysis set forth above.  In fact, the claims of the Reciprocal Deposit Patents are so similar that the Patent and Trademark Office initially rejected the claims of the 267 and 911 Patents *because those claims were not patentably distinct from the claims of the 766 Patent*.  Ex. 9 (267 Patent File History, Final Rejection, dated June 4, 2012) at 2–4; Ex. 11 (911 Patent File History, Non-Final Rejection, dated Aug. 1, 2013) at 2–4.[5]  Indeed, the examiner concluded the pending claims in the 267 and 911 Patents were so similar to the claims of the 766 Patent that they were "equivalent" and "patentably obvious" to one another.  Ex. 9 (267 Patent File History, Final Rejection, dated June 4, 2012) at 3; Ex. 11 (911 Patent File History,

---

[5]  The file histories of the Asserted Patents may properly be considered on a motion to dismiss.  *See Anchor Sale & Mktg., Inc. v. Richloom Fabrics Grp., Inc.*, 2016 WL 4424069, at *1 n.1 (S.D.N.Y. Aug. 9, 2016) (court can "take judicial notice of official records of the PTO"); *Telebrands Corp. v. Del Labs., Inc.*, 719 F.Supp.2d 283, 287 n.3 (S.D.N.Y. 2010) ("The Court may properly take judicial notice of official records of the United States Patent and Trademark Office . . . .").  Moreover, the 911 and 267 Patents on their face reference their terminal disclaimers, and the submitted portions of the file histories relate directly to those terminal disclaimers.  In deciding a motion to dismiss, a court may consider documents attached to the complaint, documents incorporated into the complaint by reference, matters of which judicial notice may be taken, or documents deemed integral to the complaint.  *See Chambers*, 282 F.3d at 152–53 (court may consider documents deemed integral to the complaint).

Non-Final Rejection, dated Aug. 1, 2013) at 4.  Island IP was able to convince the Patent and Trademark Office to allow those claims only by submitting a terminal disclaimer, voluntarily agreeing that the claims of the later patents would expire at the same time as the claims of the 766 Patent.  Ex. 10 (267 Patent File History, Response After Final Office Action, dated Aug. 24, 2012) at 2; Ex. 12 (911 Patent File History, Amendment/Request for Reconsideration After Non-Final Office Action, dated Oct. 25, 2013) at 2.

The Patent and Trademark Office was correct that the claims within the Reciprocal Deposit Patents are not patentably distinct from one another.  For example, the lead independent claims in each of the 267, 911, and 157 Patents are strikingly similar to Claim 1 of the 766 Patent, with each adding nothing more than immaterial details, more verbose descriptions of the same abstract idea, or recitations of steps that are inherent or obviously included in the abstract idea.  For instance:

- Whereas Claim 1 of the 766 Patent describes accounts with "government backed" insurance, Claim 1 in each of the 267, 911, and 157 Patents describes accounts with FDIC insurance;

- Whereas Claim 1 of the 766 Patent is open ended with respect to the types of financial institutions participating in the claimed multi-bank depository program, Claim 1 of the 267 Patent specifies that at least one such financial institution is a "money center financial institution" that holds government securities;

- Claims 1 of the 911 and 157 Patents include the requirement that the transfer data obtained in the "obtaining" step is obtained via the Internet;

- Claim 1 of the 267 Patent includes the qualification that transfers of money to the program identify the source and amount of the transfer;

- Claims 1 of the 911 and 157 Patents include a limitation requiring that the account information to be accessed includes the balance of funds held in the deposit accounts; and

- Claim 1 of the 911 Patent includes the requirement that the selection of a second institution for the transfer of funds is made based on a maximum or minimum level of that institution's participation in the program.

All of the differences between Claim 1 of the 766 Patent and Claims 1 of the remaining Reciprocal Deposit Patents are insufficient to change the Section 101 analysis:  FDIC insurance is simply one type of government-backed insurance; a "money center financial institution" is simply one type of financial institution (*e.g.*, 766 Patent at 4:50–59); obtaining data via the Internet is not material to a patentability analysis, see *Univ. of Fla.*, 916 F.3d at 1367; and identifying source and amount data, storing account balance data, and choosing recipient banks based on their respective minimum or maximum levels of participation are just additional steps of the abstract idea.

Similarly, the dependent claims in the Reciprocal Deposit Patents—which are largely analogous from patent to patent—fail to add anything that could transform the patent-ineligible independent claims into patent-eligible inventions.[6]  The dependent claims merely add token additional details, such as:  requiring that the steps of the claims are "performed by an intermediary" (Claim 2 of the 766 Patent; Claims 9 of the 267, 911, and 157 Patents); requiring that the funds allocated comprise a "predetermined percentage" of the funds sourced (Claim 6 of the 766 Patent; Claims 2 of the 267, 911, and 157 Patents); specifying that the funds are sourced from one or more accounts of one or more public entities (Claim 11 of the 766 Patent; Claim 7 of the 267 Patent; Claims 6 of the 911 and 157 Patents); specifying that one or more of the financial institutions is a credit union (Claim 12 of the 766 Patent; Claim 8 of the 267 Patent; Claims 7 of the 911 and 157 Patents); and specifying that the selection of financial institutions is "based at least in part on one or more first criteria" (Claim 19 of the 766 Patent; Claim 14 of the 267 Patent; Claim 10 of the 157 Patent).  None of these additional limitations, or any others disclosed in the dependent claims, provides an inventive concept; rather, they are all immaterial, token additional

---

[6]  Each of the Reciprocal Deposit Patents include an independent system claim which is merely the system-claim version of the method claim described in each respective Claim 1, and is therefore patent-ineligible for the same reasons each Claim 1 is patent-ineligible.  *See* 766 Patent, Claim 31; 267 Patent, Claim 27; 911 Patent, Claim 20; 157 Patent, Claim 16.

steps that do not change the nature of the claim as directed to an abstract idea without any inventive concept. *See Ultramercial*, 772 F.3d at 714 (token extra-solution activity insufficient to confer patent-eligibility).

As such, all claims of the Reciprocal Deposit Patents are patent-ineligible as a matter of law, and Counts I-IV should thus be dismissed.

**B.    The Allocation Model Patent**

The claims of the 689 Patent are similarly directed to patent-ineligible subject matter, just as the claims in *Bilski* and *Alice* were, and just as the claims in the Reciprocal Deposit Patents are.

**1.    Step 1:  The Allocation Model Patent Is Directed to an Abstract Idea**

Whereas the Reciprocal Deposit Patents are directed to the abstract idea of divvying up funds to maintain insurance (*i.e.*, implementing a multi-bank depository program), the 689 Patent is directed to the abstract idea of keeping a digital ledger to facilitate that same abstract idea.  The 689 Patent discloses, in essence, a computerized method of bookkeeping for the type of multi-bank depository program described in the FDIC interpretation letters referenced above.  The 689 Patent's specification even describes these multi-bank depository programs, noting that they "comprise[] a deposit arrangement to make available government-backed insurance," and "may provide government-backed insurance in an amount greater than" the amount that would be available "in a single depository institution[.]"  689 Patent at 7:21–26.  The specification then explains that "[t]he present invention may be used in the context of these" programs. *Id.* at 7:66–67.

The claims of the 689 Patent, like those in the Reciprocal Deposit Patents, are cloaked in convoluted "patentese."  But, stripped of excess verbiage, they reveal a simple process for tracking or modeling balances and available capacity in multi-bank depository programs.  In essence, representative Claim 1 of the 689 Patent recites the simple process of:  (i) accessing a database

with account information and each bank's capacity cap for the multi-bank depository program; (ii) obtaining total balances for high-, middle-, and low-tier account groupings held at a given bank in the program; (iii) calculating the total balance of program funds in a given bank; (iv) calculating a given bank's excess capacity, based on the difference between the total balance and the capacity cap; and (v) modifying a parameter based on the calculated excess capacity.  And, lest there be any doubt that the verbose language of Claim 1 simply describes the idea set forth above, Figure 3 in the 689 Patent includes its own explanation of the claimed method[7]:



This method is simply the abstract idea of bookkeeping for a multi-bank depository program.  It is plainly the type of process humans can do manually or with a pen and paper.  In

---

[7]  The final step shown in Figure 3, step 370, is not found in Claim 1 of the 689 Patent.

fact, the patent explicitly discloses that multiple steps can be performed manually.  *E.g.*, 689 Patent at 8:59–62, 9:21–27, 11:12–21, 12:38–45, 12:50–57, 12:63–67, 22:57–58, 26:6–8, 26:16–19, 26:23–24.  The patent even explains that the invention can be implemented *via Microsoft Excel*. *Id.* at Fig. 5A, Fig. 5B, 31:25–32:63.  As explained above, claims that merely claim a process that humans can do mentally, manually, or with a pen and paper are not patent eligible.  *See*, *supra*, at 9–11.  The 689 Patent's claims are clearly the type of "do it on a computer" claims that are not patent-eligible.  *See*, *e.g.*, *Univ. of Fla.*, 916 F.3d at 1367.

  **2. Step 2:  The Allocation Model Patent Lacks Any Inventive Concept**

  As with the Reciprocal Deposit Patents, the Allocation Model Patent is devoid of any inventive concept that could transform the claims into a patent-eligible invention.  Island IP attempts to save the 689 Patent by making unsupported assertions about inventiveness and supposed efficiencies.  Compl. ¶¶ 27–28.  But, as explained above, naked assertions and legal conclusions are not sufficient to survive a motion to dismiss.  *See*, *supra*, at 3–4.

  In any event, Island IP's claims of inventiveness focus almost entirely on the patent's recitation of "client account stratifications."  Compl. ¶¶ 27–28.  There is nothing inventive about pooling client accounts in different tiers.  Indeed, the practice of placing client accounts into different tiers will be familiar to any banking customer who has noticed their bank offering different designations and services to clients depending on the amount of money held with the bank.  Unsurprisingly, multiple prior art references incorporated by reference into the 689 Patent disclose grouping accounts into different tiers, including in the context of allocating deposits over multiple depository institutions.  *See*, *e.g.*, Ex. 14, U.S. Pat. No. 8,781,931 at 20:26–33, 33:64–34:8; Ex. 13, U.S. Pat. No. 7,509,286 at 2:64–3:53, 20:5–37, 21:1–26; Ex. 15, U.S. Pat. No.

7,752,107 at 12:51–61.[8]  Moreover, though Island IP makes the conclusory assertion that using different tiers allows the abstract idea to be performed more efficiently, Island IP does not explain how or why this is true (it is not).  *See* Compl. ¶¶ 27–28.  Thus, the use of client account tiers does not provide the inventive concept necessary to save the 689 Patent.

Additionally, the 689 Patent makes clear that the claimed invention can be performed using generic computer technology.  As explained above, the specification discloses an embodiment that uses Microsoft Excel.  The specification further notes that other embodiments can be "program products comprising machine-readable media" which "may be any available storage media which may be accessed by a general purpose or special purpose computer or other machine with a processor," including "RAM, ROM, EPROM, EEPROM, CD-ROM or other optical disk storage, magnetic disk storage or other magnetic storage devices, or any other storage medium which may be used to store desired program code in the form of machine-executable instructions or data structures which may be accessed by a general purpose or special purpose computer or other machine with a processor."  689 Patent at 33:35–50; *see also id.* at 33:51–34:50.  Accordingly, the purported invention claimed by the 689 Patent is nothing more than an instruction to perform an abstract idea using generic computer technology—a combination that is not patentable.  *See Alice*, 573 U.S. at 212.

### 3.   The Allocation Model Patent's Dependent Claims Do Not Confer Eligibility

As with Island IP's approach to the Reciprocal Deposit Patents, Claim 1 is the only claim of the 689 Patent for which Island IP has attempted to state a claim for relief.  *See* Compl. ¶¶ 31–

---

[8] On a motion to dismiss, a court may consider documents attached to the complaint as an exhibit.  *Chambers*, 282 F.3d at 152–53.  The 689 Patent was attached as an exhibit to the Complaint (*see* D.I. 13-10), and each of Exhibits 13, 14, and 15 was incorporated by reference into the 689 Patent.  689 Patent at 9:28–32.  Thus, as Exhibits 13, 14, and 15 are part of the 689 Patent, the Court may properly consider those exhibits in conjunction with this Motion.

33.  The patentability of the remaining claims is therefore not material here.  Indeed, as with the Reciprocal Deposit Patents, even if Island IP were to show that a dependent claim of the 689 Patent were patent-eligible, the Complaint would still fail to state a claim.[9]

Regardless, the dependent claims in the 689 Patent fail to add anything that that could transform patent-ineligible Claim 1 into a patent-eligible invention.  The dependent claims merely describe further steps inherent in the abstract idea, such as:  allocating funds across depository institutions and summing totals (Claim 2); determining a need to change capacity caps based on existing average balances (Claim 3); determining average account balances by tier and using that average to project new total balances based on new accounts (Claim 4); and revising a parameter (such as capacity cap or number of banks participating in the program) and then re-allocating funds to account for that revision (Claim 6).  None of the additional limitations disclosed in the dependent claims provide an inventive concept.  Instead, they simply prescribe more (largely mathematical) steps that can be performed manually as part of the abstract idea, and, at best, comprise token extra-solution activity.

As such, all the claims of the Allocation Model Patent are patent-ineligible, and Count V should be dismissed as a result.

## II.    Island IP's Trade Secret Misappropriation Cause of Action Must Be Dismissed

Island IP's trade secret misappropriation claim (Compl. ¶¶ 103–113) does not satisfy Rule 8's pleading standards for at least two reasons.

First, Island IP has failed to identify the supposed trade secrets at issue.  To state a claim for trade secret misappropriation, "a plaintiff must plead facts with sufficient particularity to

---

[9]  Claim 19 is the only independent claim other than claim 1 in the 689 Patent.  Claim 19 is merely the system claim that corresponds to the method of Claim 1, and is therefore patent-ineligible for the same reasons Claim 1 is patent-ineligible.

provide defendants fair notice of what the claim is and the grounds on which it rests." *Alexander Interactive, Inc. v. Leisure Pro Ltd.*, 2014 WL 4651942, at *5 (S.D.N.Y. Sep. 16, 2014) (internal quotations omitted) (citing *Twombly*, 550 U.S. at 555); *see also Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018) ("to survive a motion to dismiss, a party alleging that it owns a trade secret must put forth specific allegations as to the information owned").  "This requires, at minimum, that the plaintiff generally identify the trade secrets at issue."  *Alexander Interactive*, 2014 WL 4651942, at *5.

Here, Island IP does not adequately identify the alleged trade secrets at issue.  Instead, Island IP simply states that it has developed unidentified trade secrets "relating to cash management and money regulation systems."  Compl. ¶ 104.  But "[a]lleging the existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue does not give rise to a plausible allegation of a trade secret's existence." *Elsevier*, 2018 WL 557906, at *6 (internal quotations and citations omitted); *see also Teradata Corp. v. SAP SE*, 2018 WL 6528009, at *3–4, (N.D. Cal. Dec. 12, 2018) ("the design and optimization of [massively parallel processing] systems and the execution of analytical queries in such systems" not sufficient identification of trade secrets under DTSA); *Becton, Dickinson and Co. v. Cytek Biosciences Inc.*, 2018 WL 2298500, at *3–4 (N.D. Cal. May 21, 2018) (broad categories of information insufficient to state a claim under DTSA).  Island IP's description does not allow StoneCastle to determine even generally what information allegedly constitutes the trade secrets, and, accordingly, impedes StoneCastle's ability to determine whether it has in fact used such information, or whether such information qualifies as a trade secret.  Island IP's hopelessly vague description is not sufficient to state a claim for relief.

Second, Island IP has failed to adequately plead facts supporting its claim that any entity misappropriated its alleged trade secrets. To adequately state a claim for trade secret misappropriation, Island IP must allege "enough facts to state a claim to relief that is plausible on its face." *Starr*, 592 F.3d at 321 (quoting *Twombly*, 550 U.S. at 570). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed. *Iqbal*, 556 U.S. at 679.

Island IP acknowledges that SCIS is licensed to use Island IP's trade secrets (to the extent any exist). Compl. ¶ 42. Island IP alleges that SCIS improperly shared Island IP's trade secrets with SCCM. *Id.* ¶ 109. The sole basis for that claim, however, is Island IP's allegation that entities within the StoneCastle organization "share[] personnel and systems," and that the StoneCastle entities employ a "team approach" to managing their various businesses that includes holding weekly meetings "involving overlapping executives." *Id.* ¶ 43. Nothing in that allegation suggests—implicitly or explicitly—that SCIS shared any purported Island IP trade secret with any other StoneCastle entity. Island IP does not advance *any* factual support for its allegation that SCIS actually shared trade secrets with other StoneCastle entities. Indeed, it appears that Island IP would have this Court simply assume that because various StoneCastle entities may share some personnel or work together in some respect, SCIS must have unlawfully shared confidential information with the rest of the StoneCastle organization. That assumption is not warranted, and is not supported by a single factual allegation in the Complaint. Island IP has "not nudged [its] claim[] across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570.

Thus, since Count VI is not sufficiently pled, it must be dismissed.

**III.    Island IP's Ancillary Causes of Action Against SCIS and SCCM Should Be Dismissed**

Each of Island IP's remaining causes of action against SCIS and SCCM should also be dismissed.  All of those causes of action arise out of Island IP's patent infringement and/or trade secret misappropriation claims.  *See* Compl. ¶¶ 114–138.  Thus, if Island IP's patent infringement and trade secret misappropriation claims are dismissed as they should be, then there will no longer be any predicate allegations for the remaining claims.  Because Island IP's patent infringement and trade secret misappropriation claims should be dismissed, as explained above, Island IP's ancillary causes of action (Counts VII-X) should be dismissed as well.

**IV.    Island IP Has Failed To Properly Plead Alter Ego Liability Against SCFC, SAM, and SCP**

Island IP purports to advance alter ego liability claims against SCFC, SAM, and SCP, the only claims brought against these three entities.  Under New York Law, "two elements are required to pierce the corporate veil: (1) the parent must exercise complete domination in respect to the transaction attacked, and (2) such domination must have been used to commit fraud or wrong against the plaintiff, which proximately caused the plaintiff's injury."  *Sysco Food Serv. of Metro New York, LLC v. Jekyll & Hyde, Inc.*, 2009 WL 4042758, at *2 (S.D.N.Y. Nov. 17, 2009) (dismissing complaint for failure to plead alter ego theory with specificity).  Island IP must allege enough factual detail to overcome "the presumption of separateness afforded to related corporations."  *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2nd Cir. 1996); *see also Kalin v. Xanboo, Inc.*, 2009 WL 928279, at *11 (S.D.N.Y. Mar. 30, 2009) ("Here, . . . Plaintiffs allegations are insufficient to carry the heavy burden placed on a party who seeks to pierce the corporate veil.") (internal quotes omitted).  Island IP cannot meet this burden.

As to SCFC and SAM, Island IP alleges ***no facts*** whatsoever to support its alter ego cause of action.  The complaint makes no allegation that either SCFC or SAM exercised control

24

with respect to any actions, let alone the alleged actions forming the basis of Island IP's causes

of action.  Island IP's only allegation is that "[u]pon information and belief, SCFC and [SAM]

are additional alter egos of SCCM and SCIS who unjustly benefited therefrom."  Compl. ¶ 142.

That "belief" is meaningless where, as here, it is not "accompanied by a statement of facts upon

which the belief is founded." *Munoz-Nagel v. Guess, Inc.*, 2013 WL 1809772, at *3 (S.D.N.Y.

Apr. 30, 2013) (internal citation and quotes omitted).  Hence, Island IP's claim against SCFC

and SAM must be dismissed.

Island IP's claim against SCP fares no better.  For SCP, the Complaint alleges merely that

"the entire corporate family is run as a single entity, dominated and controlled by the parent

company, SCP" and that "all subsidiaries within the SCCM organizational tree share[] personnel

and systems with its parent[.]"  Compl. ¶¶ 43, 142.  Such "conclusory allegations cannot suffice

to state a claim based on veil-piercing or alter-ego liability, even under the liberal notice pleading

standard." *In re Currency Conversion Fee Antitrust Litig.*, 265 F.Supp.2d 385, 426–27 (S.D.N.Y.

2003).  Allegations that SCP supervises its subsidiaries and shares personnel do not allege that

SCP exercised any *control* over the specifically alleged acts in the Complaint.  *See*

*TheECheck.com, LLC v. NEMC Financial Services Grp. Inc.*, 2017 WL 2627912, at *3 (S.D.N.Y.

June 16, 2017) ("The Complaint alleges that because [individuals] . . . dominated, controlled and

supervised NEMC . . . .This is insufficient to allege alter ego liability[.]")

Accordingly, Island IP's alter ego claim against SCFC, SAM, and SCP (Count XI) should

be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss all of Plaintiff's claims against

StoneCastle with prejudice and grant such other and further relief as it deems appropriate.

Dated: August 5, 2019

Respectfully submitted,

By:    */s/ Katherine Q. Dominguez*   
     Katherine Q. Dominguez

Josh Krevitt
Brian A. Rosenthal
Katherine Q. Dominguez
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: (212) 351-4000
jkrevitt@gibsondunn.com
barosenthal@gibsondunn.com
kdominguez@gibsondunn.com

Jordan Bekier
Gibson, Dunn & Crutcher LLP
333 Grand Avenue
Los Angeles, CA 90071-3197
Tel.: (213) 229-7000
jbekier@gibsondunn.com

*Attorneys for Defendants StoneCastle Cash*
*Management LLC, StoneCastle Insured*
*Sweep LLC, StoneCastle Partners, LLC,*
*StoneCastle Financial Corp., and StoneCastle*
*Management LLC*

## **CERTICATE OF SERVICE**

I certify that the foregoing document was electronically filed with the Clerk of the Court

on August 5, 2019, via the Court's CM/ECF system and has been served on all counsel of record

who have consented to electronic service.

Dated:   August 5, 2019                      */s/ Katherine Q. Dominguez*

Katherine Q. Dominguez