UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                          :
ISLAND INTELLECTUAL PROPERTY LLC,                         :
                                                          :
                    Plaintiff,                            :
                                                          :
- against -                                               :     Civ. Act. No.  1:19-cv-04792-JPO
                                                          :
STONECASTLE CASH MANAGEMENT LLC,                          :
STONECASTLE INSURED SWEEP LLC,                            :
STONECASTLE PARTNERS, LLC, STONECASTLE                    :
FINANCIAL CORP., and STONECASTLE ASSET                    :
MANAGEMENT LLC,                                           :
                                                          :
                    Defendants.                           :
                                                          :
------------------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

EMMET, MARVIN & MARTIN, LLP
John Dellaportas
Beth Khinchuk (SDNY application pending)
120 Broadway
New York, NY 10271
Telephone: (212) 238-3000
Facsimile: (212) 238-3100
*Attorneys for Plaintiff*
*Island Intellectual Property LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL ALLEGATIONS .....................................................................................................5

ARGUMENT ...........................................................................................................................11

    I.    DISMISSAL STANDARD.........................................................................................11

    II.    THE PATENTS-IN-ISSUE SATISFY 35 U.S.C. § 101 ............................................14

        A.    Governing Standard ........................................................................14
        B.    The Claims Are Eligible Under Step One of *Alice Corp.*..............16
        C.    The Claims Are Eligible Under Step Two of *Alice Corp.* ............18

    III.    THE DTSA CLAIM IS WELL-PLED .......................................................................21

    IV.    THE COMMON LAW CLAIMS ARE WELL-PLED................................................24

    V.    THE ALTER EGO CLAIMS ARE WELL-PLED ....................................................24

    VI.    LEAVE TO REPLEAD SHOULD BE GRANTED IF NEEDED .............................25

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Aatrix Software v. Green Shades Software,*
   890 F.3d 1354 (Fed. Cir. 2018)...................................................................... 12

*Alice Corp. Pty. Ltd. v. CLS Bank International,*
   537 U.S. 208 (2014) ........................................................................................ 2

*Alice Corp. Pty. Ltd. v. CLS Bank International,*
   573 U.S. 208 (2014) ................................................................................. 15, 16

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................................... 11

*BASCOM Glob. Internet Services v. AT&T Mobility, LLC,*
   827 F.3d 1341 (Fed. Cir. 2016)................................................................. 18, 20

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)................................................................................. 11, 12

*Berkheimer v. HP Inc.,*
   881 F.3d 1360 (Fed. Cir. 2018)................................................................. 15, 19

*Bilski v. Kappos,*
   —— U.S. ——, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) ................................. 8, 9

*Bobcar Media, LLC, v. Aardvark Event Logistics, Inc.,*
   2017 WL 74729 (S.D.N.Y. Jan. 4, 2017) .......................................................... 11

*Cellspin Soft, Inc. v. Fitbit, Inc.,*
   927 F.3d 1306 (Fed. Cir. 2019)................................................................. 13, 21

*Chubb Ina Holdings Inc. v. Chang,*
   2017 WL 499682 (D.N.J. Feb. 7, 2017) ........................................................... 22

*Diamond v. Diehr,*
   480 U.S. 174 (D.N.J. Feb. 7, 2017) ................................................................. 20

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed. Cir. 2016)........................................................... 16, 17, 18

*ExpertConnect, L.L.C. v. Fowler,*
   2019 WL 3004161 (S.D.N.Y. July 10, 2019) .................................................... 23

*Finjan, Inc., v. Blue Coat Systems, Inc.,*
   879 F.3d 1299 (Fed. Cir. 2018)....................................................................... 19

*Finnavations LLC v. Payoneer, Inc.,*
2019 WL 1236358 (D. Del. Mar. 18, 2019) ....................................................................... 9

*General Security, Inc. v. Commercial Fire & Security, Inc.,*
2018 WL 3118274 (E.D.N.Y. June 25, 2018) ................................................................... 23

*Golden Horn Shipping Co. Ltd. v. Volans Shipping Co. Ltd.,*
2014 WL 5778535 (S.D.N.Y. Nov. 6, 2014) ..................................................................... 25

*Hayden v. Cnty. of Nassau,*
180 F.3d 42 (2d Cir. 1999) ............................................................................................... 25

*Hinds County, Miss. v. Wachovia Bank N.A.,*
708 F. Supp. 2d 348 (S.D.N.Y. Apr. 26, 2010) ............................................................... 25

*In Re Dealer Management Systems Antitrust Litigation,*
362 F. Supp. 3d 558 (N.D. Ill. 2019) ............................................................................... 23

*Island Intellectual Prop. LLC v. Reich & Tang Deposit Solutions,*
2017 NYLJ Lexis 1732 (Sup. Ct., N.Y. Cnty. June 4, 2017) ........................................... 18

*Island Intellectual Property LLC v. Deutsche Bank AG,*
2012 WL 386282 (S.D.N.Y. Feb. 6, 2012) ......................................................................... 8

*Lugosch v. Pyramid Co. of Onondaga,*
435 F.3d 110 (2d Cir. 2006) ............................................................................................. 23

*Medidata Solutions, Inc., v. Veeva Systems Inc.,*
2018 WL 6173349 (S.D.N.Y. Nov. 26, 2018) ................................................................... 23

*Microsoft Corp. v. i4i L.P.,*
564 U.S. 91 (2011) ...................................................................................................... 20, 21

*Mission Measurement Corp. v. Blackbaud, Inc.,*
216 F. Supp. 3d 915 (N.D. Ill. 2016) ............................................................................... 22

*NetJets Aviation, Inc. v. LHC Commc'n, LLC,*
537 F.3d 168 (2d Cir. 2008) ............................................................................................. 25

*Nielsen v. Rabin,*
746 F.3d 58 (2d Cir. 2014) ............................................................................................... 12

*MyMail, Ltd. v. ooVoo, LLC,*
2019--- F.3d ----, 2019 WL 3850614 (Fed. Cir. Aug. 16, 2009) ..................................... 13

*PPS Data, LLC v. Jack Henry & Associates, Inc.,*
2019 WL 1317286 (E.D. Tex. Mar. 21, 2019) ................................................................. 18

*Research Corp. v. Microsoft Corp.,*
   627 F.3d 859 (Fed. Cir. 2010).............................................................. 18

*SimpleAir, Inc. v. Google LLC,*
   884 F.3d 1160 (Fed. Cir. 2018)............................................................ 15

*Tesla Wall Systems, LLC, v. Related Companies, L.P.,*
   2017 WL 6507110 (S.D.N.Y. Dec. 18, 2017) ........................................ 22, 23

*TNS Media Research LLC v. TIVO Research and Analytics, Inc.,*
   223 F. Supp.3d 168 (S.D.N.Y. 2016)..................................................... 19

*Trading Technologies International, Inc. v. CQG, Inc.,*
   675 F. App'x 1001 (Fed. Cir. 2017) ..................................................... 18

*Uniloc USA, Inc. v. ADP, LLC,*
   772 F. App'x 890 (Fed. Cir. 2019) ....................................................... 17

**Statutes, Rules and Other Authorities**

18 U.S.C. § 1836(b) .............................................................................. 21

18 U.S.C. § 1839(3)(A)-(B) ................................................................... 21

18 U.S.C. § 1839(5) .............................................................................. 21

35 U.S.C. § 101 ............................................................................. *passim*

35 U.S.C. § 282(a) ................................................................................ 20

Fed. R. Civ. P. 8 ................................................................................21-22

Fed. R. Civ. P. 12 ............................................................................11-13, 20

Plaintiff Island Intellectual Property LLC ("Island IP") respectfully submits this memorandum of law in opposition to the motion ("Motion" or "Mot.") of defendants StoneCastle Cash Management LLC ("SCCM"), StoneCastle Insured Sweep LLC ("SCIS"), StoneCastle Partners, LLC ("SCP"), StoneCastle Financial Corp. ("SCFC"), and StoneCastle Asset Management LLC ("SCAM") (together, "StoneCastle") to dismiss.

## PRELIMINARY STATEMENT

This is a case of innovation versus expropriation. The innovators are the plaintiff, Island IP, its parent, Double Rock Corporation ("Double Rock"), and its three inventor-proprietors, the Bents, who have spent five decades developing technologies that have improved the well-beings of community banks and individual investors. Since the 1970s, Double Rock has been a leading, commercially successful cash-management and technology solution provider to the bank, broker-dealer, qualified plan, and retail direct markets. The company was founded by Bruce Bent, who co-created the world's first money-market fund in 1970. In later decades, Double Rock revolutionized the insured cash deposits business, while also building one of the nation's largest family-owned fund companies, with $125 billion in assets under management. The Bents' inventions have been recognized by the U.S. Patent and Trademark Office with 70 patents, issued by 18 separate examiners. These patents, including the five patents-in-issue in this case, have defeated eligibility and other challenges in multiple federal litigations, and are currently licensed by the top providers of insured deposit sweep services.

The expropriator is StoneCastle, which built its business on stolen information, in a plan it devised and executed over an extended period. StoneCastle has never been granted a patent on anything, having abandoned previous applications in the face of Island IP's prior art. When, in 2010, Double Rock decided to sell its insured cash deposits business, StoneCastle posed as a buyer to gain access to Island IP's information. Over the next few years, it proceeded to hire

many of Double Rock's top managers (all of whom had nondisclosure agreements with Double Rock), and misused their trade secrets for its benefit. In 2017, StoneCastle acquired Intermedium Financial LLC (now SCIS), a licensee of Island IP, whose Managing Director is a co-inventor on 19 of Island IP's patents, including one of the patents-in-suit here. The License Agreement provides that SCIS can exercise an "Affiliate License" clause and bring all the other StoneCastle entities under license for Island IP's entire patent portfolio and accompanying trade secrets, but that would require those other affiliates to pay a modest royalty on their assets under management. So instead, StoneCastle has chosen to steal those inventions and trade secrets, and sell products and services that read directly on the patents.

Last fall, when Island IP learned of StoneCastle's infringement and trade secret theft, Island IP reached out to SCIS to inquire as to whether any of its affiliates were improperly acting without a license. SCIS responded that it had "no obligation to investigate its affiliates … or to certify that any affiliate is or is not practicing a claimed technology in one of the Licensed Patents." Island IP disagreed, but in an effort to avoid a dispute, it invoked its audit right under the parties' License Agreement. SCIS again refused to cooperate, as it continued to blatantly copy Island IP's inventions and flout its patents and trade secrets. Finally, left with no other choice, Island IP brought this suit in order to seek redress.

In the wake of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 537 U.S. 208 (2014), it has become *de rigueur* for accused infringers of method claims to move to dismiss based on alleged patent ineligibility. While some *Alice Corp.* challenges are meritorious, this one is not. StoneCastle claims: "This is not a close case." Mot. at 1. Island IP agrees. StoneCastle's eligibility challenge is woefully deficient. It is, at best, a regurgitation of arguments duly considered and rejected by multiple Examiners, and by Judge Forrest in this District and Judge Sleet in the District of Delaware. StoneCastle has simply trawled through the prior art disclosed

in the Patents-In-Issue, and now casts some broad, disparaging generalizations based on overgeneralized summaries of alleged past industry practices.

What StoneCastle does not do is *grapple with the actual claim language in the patents*. One can read its entire brief without ever learning of the actual inventions, or the technological problems those inventions overcame, or the unconventional steps the inventions used to overcome those problems (all as recognized by the Patent Office when it issued the patents). Instead, StoneCastle cavalierly mischaracterizes the inventions as simply being "directed to the abstract idea of allocating excess funds to maintain deposit insurance" (Mot. at 11), and then disparages the actual disclosures in the patents (some up to 60-pages long) as just "patentese." As the prosecution histories reflect, however, the Patent Office duly appreciated that these inventions set forth practical applications eligible for patenting.

Specifically, there are five patents at issue in this case (together, the "Patents-in-Suit"). The first four (U.S. Patent Nos. 8,150,766, 8,359,267, 8,712,911 and 8,719,157) are directed to improvements over prior art computerized deposit sweep systems that had been preventing local community banks from accepting large deposits of municipal and/or state funds. Such funds must be collateralized with federal government securities or else federally insured investments. Under the prior art, holding such funds could be unfeasible for many local banks. The claimed inventions set forth computer methods and systems for addressing this technical problem, by creating an exchange for local banks to swap out their funds to banks that can more easily collateralize or insure the deposits, and then receive in exchange funds from client transaction accounts held in large aggregated accounts from one or more other banks in the system. The various claim sets of these patents cover different and detailed practical applications of how this process is accomplished in the systems that perform the process.

The fifth Patent-in-Suit (U.S. Patent No. 8,655,689) addresses a related technological

problem. The claims in this patent are directed to an improvement over prior art computerized deposit sweep systems in which accounts are distributed over a plurality of banking institutions, and involve a very specific, non-routine, unconventional and inventive allocation system and method that result in more efficient use of excess capacity in depositary institutions after an inventive allocation of funds using stratified client accounts. For example, the inventive concept involves formation of client account stratifications based on account balances and, after allocation of funds from the stratified client accounts to depositary institutions, parameters are modified and the account stratifications are adjusted to account for excess capacity available at the depositary institutions so that transfer of funds to the depositary institutions can be performed more efficiently by using the excess capacity. This process expedited the speed in which such allocations are performed and minimized the wires that might otherwise need to be made if conventional allocations were used.

Island IP's inventions did not exist in the prior art, and were not practiced in the market until Double Rock developed and practiced them. They were met with immediate commercial success, and are still practiced by major financial institutions under license from Island IP (and by StoneCastle without one). The inventions disclose patent eligible subject matter under 35 U.S.C. § 101, as StoneCastle's own executives have admitted.

As set forth below, StoneCastle in its Motion brushes aside the fundamental holdings of *Alice Corp.* and subsequent Federal Circuit holdings on patent eligibility, including the *Enfish, Berkheimer, Aatrix* and *Cellspin* decisions which instruct how to apply the two-step *Alice Corp.* test under § 101. More fundamentally, StoneCastle completely disregards the claim language itself in their zeal to show some sort of patent ineligibility. They also ignore the governing Second Circuit pleading standards to argue that Island IP's remaining claims should be dismissed for lack of particularity. Their Motion should be denied.

## FACTUAL ALLEGATIONS

This Complaint ("Compl.") asserts claims for patent infringement and unjust enrichment against SCCM, unfair competition and misappropriation of trade secrets against SCCM and SCIS, breach of contract and breach of the covenant of good faith and fair dealing against SCIS, and alter ego liability against SCP, SCFC and SCAM. Compl. ¶¶ 48-144.

As noted above, plaintiff Island IP is a subsidiary of Double Rock. Since the 1970s, Double Rock has been a leading cash-management and technology solution business. The company was founded by Bruce Bent, who in 1970 co-created the world's first money-market fund, which is now a four-trillion-dollar industry in the U.S. alone. Mr. Bent is an inductee of *Financial Planning* and *Money* magazines' Halls of Fame, and has been chronicled in the Museum of American Finance, a Smithsonian affiliate. Before the 2008 financial crisis, Double Rock (then "The Reserve") was one of the nation's largest family-owned fund companies, with over $125 billion assets under management. Compl. ¶ 13; Decl. Exh. A.

Some of Double Rock's customers have been community banks. In servicing those customers, Double Rock observed technological problems with existing banking computer systems. As explained in the patent specifications (*e.g.,* '766 Patent, 1:19-49), such banks often accept public deposits from federal, state or municipal entities. To comply with regulatory requirements, public deposits often must be federally insured, or collateralized by pledging government securities (*e.g.,* U.S. Treasury Bills) to secure such deposits in the event of the institution's failure. The interest rates such banks pay for such deposits are generally higher than the rates of interest they pay other customers. However, the interest earned on government securities typically does not provide a spread over the banks' cost of deposit. While sweeps existed in the prior art, existing deposit management systems were technologically challenged and thus could not take advantage of them in this context. Compl. ¶ 14.

Indeed, StoneCastle itself identified this technological problem to the Patent Office in August 2011, when it filed its own (failed) patent application. In it, StoneCastle emphasized "there is a need to provide a new financial management system for automated administration of funds from multiple depositors each of who [sic] has funds that exceed the FDIC insurance limit and in deposit accounts at multiple banks so that no single depositor holds funds in excess of the SMDIA at any single depository institution." Decl. Exh. F, p. 2, par. [0004].

In 2006, Double Rock set out to develop and commercialize a series of technological solutions to this fundamentally technological problem. Double Rock's innovative, proprietary and patented and patent pending technology was a commercial success. Aided by this technology, the *American Banker* reported that, by 2008, the company's customer base had grown to 350 banks. Decl. Exh. B. It also created a significant societal good. As Mr. Bent Sr. had earlier explained: "Independent community banks are the backbone of the U.S. economy. … Placing deposits into these banks 'guarantees' immediate reinvestment back into local communities, not flight to global money centers." *Id.,* Exh. C.

Meanwhile, Double Rock, through the innovations reflected in its patents and trade secrets, continued to improve on the technology its bank customers could offer. In 2009, Frank Bonanno—who was then Double Rock's Director of Marketing and is now SCCM's Managing Director & Head of Marketing (https://stonecastle.com/about/)—explained: "Consumers now enjoy 20 times the FDIC protection available in a traditional bank account…. This advancement truly distinguishes [Double Rock subsidiary] Landing Rock's Insured Deposits Direct as the premier cash management solution." Decl. Exh. D. Earlier that decade, Mr. Bonanno's predecessor, Eric Lansky—who is now SCCM's President (https://stonecastle.com/depository-institutions/about/) —had similarly described the company's new-formed collaboration with Bank of New York as: "a partnership between two innovators." *Id.,* Exh. E.

The foregoing statements by Messrs. Bonanno and Lansky, admitting to the novelty and efficacy of Double Rock's inventions, were made *before* they joined StoneCastle. However, StoneCastle's managers continued to make such admissions even *after* joining StoneCastle. In 2017, David Gareis—SCP's Managing Director (and Mr. Bent II's brother-in-law)—filed an affidavit with the Patent Office, with StoneCastle's blessing, attesting that a related Double Rock invention—since issued as U.S. Patent No. 10,068,294 ("Method And System For Allocating Funds Over A Plurality Of Time Deposit Instruments In Depository Institutions")—was novel and patent eligible. Decl. Exh. G. As he then explained:

> The present invention is related to a technical problem associated with the computer operations necessary to improve upon returns and existing insurance coverage provided across customers' aggregated accounts …. In order to overcome these technological problems, the presently-claimed invention recites a unique and innovative computer system and process …. This remarkable and innovative technological solution was made up of a unique combination of unconventional and non-routine computer processes that achieve in a very particular manner the surprising result.

*Id.* (emphasis added). In short, basically everything StoneCastle is now telling this Court, it candidly admitted to the Patent Office to be false, when it served StoneCastle's purpose of expanding the technology available to its licensed subsidiary, SCIS.

StoneCastle is not the only entity to burden the Courts with spurious eligibility attacks on Island IP's patent portfolio when it suited its perceived financial interest to do so. In the earlier part of this decade, Promontory Interfinancial Network, LLC and others also sought to invalidate Island IP's patents, including U.S. Patent No. 7,519,551 (grandparent to four of the Patents-In-Issue). The actions were consolidated before District Judge Forrest (Ret.), who rejected the defendants' argument in that case, identical to the one StoneCastle makes here, that the claims "can be performed by humans mentally or manually [and thus] are patent-ineligible abstract ideas." Mot. at 9-10. Instead, Judge Forrest—adopting the Report and Recommendation of

Special Master Martens— held the reverse to be true:

> For context, … the asserted claims can be summarized as methods enabling financial institutions, such as banks or broker dealers, to "sweep" their clients' (*e.g.,* individual depositors') funds into external accounts at multiple deposit-taking banks that earn interest and provide FDIC insurance.

> …[T]he Court will provide its analysis with respect to the most significant question defendants raise: Does the holding and reasoning in … *Bilski v. Kappos,* —— U.S. ——, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010)—require a conclusion that the remaining claims in this action are ineligible for patent protection as a matter of law? The answer is no.
>
> ...
>
> The claims [in this case] indicate that computers as a practical matter are required to perform the disclosed methods. ... **Reading the claims, it is not difficult to conclude that their methods would be impracticable but for significant and complex computer programming permitting the transfer, tracking, calculation and actual payment of funds and interest between various financial institutions and numerous client and aggregated accounts**. ... **[A]s Special Master Martens recognized—the claims on their face "require controlled interaction between the intermediate banks, the source banks who deal with the customers, and the program banks which hold the aggregated accounts. The claims variously define steps of posting interest amounts and transferring funds from one bank to another, all done with the aid of computers."… Critical to plaintiffs' claims therefore are exchanges explicitly recognized by the Federal Circuit as taking methods … "far removed from purely mental steps."**

*Island Intellectual Property LLC v. Deutsche Bank AG*, 2012 WL 386282, **2-8 (S.D.N.Y. Feb. 6, 2012) (citations omitted, emphases added).[1]

Just as in this case, the defendants had no evidence to support their claims; rather, they simply argued that ineligibility was apparent from the face of the claims, and from the fact that the prior art reflected scattered references to sweep programs, albeit without reference to Island IP's far more sophisticated inventions. Even on summary judgment (let alone the more liberal pleading standard here), Judge Forrest found their arguments to be woefully insufficient: "**The**

---

[1] While Judge Forrest decided this pre-*Alice Corp.*, she relied in principal part on the *Bilski* decision that *Alice Corp.* adopts, and on which StoneCastle expressly relies.

claims, on 'their four corners,' identify computers as significant parts of the inventions.  As a result, defendants' failure to identify evidence that "'the calculations could be performed entirely in the human mind'… precludes summary judgment." *Id.* at *8 (emphasis added). Promontory and other industry leaders are now licensees as well.

In that respect, they are not alone.  A few years ago, the company that acquired Double Rock's insured cash deposits business, Reich & Tang Asset Management, LLC, brought declaratory judgment actions in the District of Delaware, seeking to invalidate, *inter alia*, the Patents-In-Issue based on *Alice Corp.*  In its Motion, StoneCastle touts a decision out of the District of Delaware, entitled *Finnavations LLC v. Payoneer, Inc.*, 2019 WL 1236358 (D. Del. Mar. 18, 2019), which dealt with an unrelated patent directed to bookkeeping, not computer methods and systems as in the Patents-In-Issue.  Yet in its discussion of District of Delaware jurisprudence, StoneCastle curiously fails to mention that in 2017, *all of the Patents-In-Issue in this case* were adjudged by the very same District Court to be "valid, enforceable, and patent-eligible." Decl. Exhs. H, I.  Reich & Tang remains a licensee as well.

For present purposes, the most important licensee of the Patents-In-Issue is SCIS.  In early 2017, Intermedium approached Island IP, informed it that Intermedium was contemplating being acquired by StoneCastle, and requested that Island IP consent to transfer its license to the successor StoneCastle entity.  Island IP agreed, and indeed facilitated the transaction, in order to help Intermedium grow its business.  However, Island IP did <u>on the express condition</u> that no other StoneCastle entity would be allowed to use Island IP's intellectual property unless Intermedium first executed a license on behalf of such entity, such that the affiliates' revenues would be included in the royalty calculation. Compl. ¶¶ 35-38.

This condition was critical to Island IP because, with the acquisition of Intermedium, StoneCastle would be entering into a business for which the Island IP's intellectual property was

ideally suited – the processing of thousands of transactions per day for thousands of broker-dealer and bank clients. With Intermedium came its President, David Gareis, Double Rock's longstanding former Director of Operations and a co-inventor on 19 of its patents, and a know-how license that Intermedium had acquired. Further, before acquiring Intermedium, StoneCastle went on a hiring spree of former Double Rock executives, each of whom held trade secrets necessary to fully implement Island IP's inventions, including its Managing Director, Director of Institutional Sales, Chief Financial Officer, Director of Fund Accounting and Financial Reporting, Manager of Client Services, and two Directors of Marketing. Each of these former executives, during their tenure at Double Rock, had access to Double Rock's know-how and inner workings and therefore, as a condition of employment, covenanted in writing that: "Upon termination of my employment with the Company, I shall not use the Confidential Information for any reason or disclose it to any person." Compl. ¶¶ 39-41, Exh. L.

Intermedium consented to Island IP's condition. Thereafter, however, no StoneCastle affiliate has ever executed an Affiliate License. This caused concern for Island IP, because StoneCastle has completely blurred the corporate boundaries among its various affiliates. Each StoneCastle entity shares essentially the same Board of Directors and senior management. In its promotional materials, StoneCastle boasts that "all subsidiaries within the StoneCastle organizational tree … share[s] personnel and systems with its parent, receiving beneficial support and expertise" and that it "incorporates a team approach to managing the various investment and strategic initiatives that involve the firm" with "weekly" meetings involving overlapping executives. It advertises "$16.1B in assets under administration," a figure that necessarily includes all StoneCastle entities. In this way, each of these other StoneCastle entities benefit from Island IP's intellectual property, developed by Double Rock over decades and at huge expense, without a corresponding royalty payment. Compl. ¶¶ 42-43.

In October 2018, Island IP wrote to SCIS and asked it to investigate and provide assurances that its license was being respected. SCIS responded that: "per the License Agreement, [it] has no obligation to investigate its affiliates under the terms of the License Agreement or to certify that any affiliate is or is not practicing a claimed technology in one of the Licensed Patents." Last December, Island IP invoked its audit rights under the License Agreement. SCIS responded by refusing to permit the audit unless Island IP agreed in advance to a series of conditions that would have rendered the audit meaningless, such as prohibiting the auditors from sharing their conclusions with anyone at Island IP other than its outside counsel. Island IP tried for months to convince StoneCastle to accept more standard audit terms, to no avail. So instead, Island IP conducted its own investigation and analysis, as reflected in the Complaint. Based thereon, it has brought this action. Compl. ¶¶ 44-47.

## ARGUMENT

### I. DISMISSAL STANDARD

"To determine whether a patent pleading survives a Rule 12(b)(6) motion to dismiss, the Court applies Second Circuit law and follows the pleading standard set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)." *Bobcar Media, LLC, v. Aardvark Event Logistics, Inc.* 2017 WL 74729, *3 (S.D.N.Y. Jan. 4, 2017). Under *Twombly*, 550 U.S. at 570, a plaintiff need only plead sufficient factual allegations "to state a claim to relief that is plausible on its face." A claim, in turn, is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Twombly,* 550 U.S. at 556).

StoneCastle dutifully recites, but then proceeds to ignore, this governing standard, even though there is no exception for patent eligibility challenges. To the contrary, as the Federal Circuit explained in *Aatrix Software v. Green Shades Software*, 890 F.3d 1354, 1357 (Fed. Cir. 2018) (on reh'g *en banc*), "[i]f patent eligibility is challenged in a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), we must apply the well-settled Rule 12(b)(6) standard which is consistently applied in every area of law." At issue in *Aatrix* were patents directed to "improv[ing] the functioning of the data processing systems, computers, and other hardware" *Id.* at 1358. The Federal Circuit, on rehearing of the appeal from the District Court's dismissal, held that: "Whether a claim element is well-understood, routine and conventional to a skilled artisan in the relevant field at a particular time is a fact question …[which] must be answered under the normal procedural standards …." *Id.* at 1359 (emphasis added).

The Complaint sets forth equally concrete factual allegations as those in *Aatrix*. As for the first four Patents-In-Issue—U.S. Patent Nos. 8,150,766 (the "'766 Patent"), 8,359,267 (the "'267 Patent"), 8,712,911 (the "'911 Patent"), and 8,719,157 (the "'157 Patent") (together, the "Reciprocal Deposit Patents") (Compl. Exhs. A-D)—the Complaint alleges that:

> The claims in the Reciprocal Deposit Patents are directed to an improvement over prior art computerized deposit sweep systems in which accounts are distributed over a plurality of banking institutions, and involve a very specific, non-routine, unconventional and inventive allocation system and method that result in more efficient use of excess capacity in depositary institutions after an inventive allocation of funds. For example, *the inventive concept involves allocating an amount of governmental funds sourced from a first financial institution to a first set of financial institutions and held therein, based on obtaining government backed deposit insurance and/or collateralization by government securities for the funds.*

> Furthermore, the claimed system and method employ a particular inventive process involving the reconciliation of reciprocal deposit accounts, *by allocating an amount of funds to the first financial institution, so that an amount of funds sourced from a second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution*.

-12-

Moreover, the detailed and inventive elements of the claims provide the explanation of how each of these unconventional and non-routine elements *achieve the desired technological result*. The claimed invention here is not merely the application of the alleged abstract idea on a generic computer, but is instead directed to a *technology-based solution that improves upon the prior art by, inter alia, increasing accuracy of a computerized deposit sweep system*.

Compl. ¶¶ 16-18 (emphases added). The Complaint sets forth comparable allegations for U.S. Patent No. 8,655,689 (the "'689 Patent") (Compl. Exh. J), which provide a detailed explanation of how the claimed invention achieves the technological effect of improving the efficiency of the allocation process, shortening the time it takes, and reducing the number of wire transfers required as part of the deposit sweep process. Compl. ¶¶ 27-30. Moreover, the allegations in the Complaint are not mere verbiage—the Patents-In-Issue provide precise explanations as to "what" and "how" the claimed inventions achieve their desired results.

As noted above, on a Rule 12(b)(6) motion to dismiss, each of these foregoing allegations must be accepted as true. Indeed, even at trial, as StoneCastle acknowledges, in order for it to invalidate the Patents-In-Issue on eligibility or any other ground, it would have to put forward "clear and convincing evidence." Mot. at 5 (citing *Cellspin Soft, Inc. v. Fitbit, Inc.,* 927 F.3d 1306, 1319 (Fed. Cir. 2019) (recognizing presumption of validity under § 282 includes presumption that claims are patent eligible under § 101)).[2]

Here, the only "evidence" StoneCastle provides are old FDIC and similar letters that make general references to reciprocal deposits. Multiple prior Courts and Examiners have duly

---

[2]    To the extent that StoneCastle's eligibility argument relies on particular claim constructions—it is impossible to tell, as the Motion pays almost no attention to actual claim language—then its challenge must also await a *Markman* hearing. *See MyMail, Ltd. v. ooVoo, LLC,* 2019--- F.3d ----, 2019 WL 3850614, *4-5 (Fed. Cir. Aug. 16, 2009). StoneCastle's failure to set forth its claim constructions is yet another reason why its motion fails.

considered and rejected such prior art as insufficient to deny patent eligibility. For example, the Examiner held that the '766 Patents was eligible notwithstanding the prior art references U.S. Patent No. 4,985,833 ("Oncken") and Merrill Lynch Cash Management Account ("CMA"), which contain much the same teachings as the FDIC letters, because:

> Oncken enables depositors to deal with a single financial institution regardless of the amount of funds deposited and still obtain federal insurance for their funds. … CMA teaches a method for managing a plurality of client financial accounts (or CMAs). … **However, there is no teaching or suggestion of aggregation of the CMA account activity to determine a net transaction aggregated across all of the transaction data associated with the CMSs. … Oncken and CMA [further] fail to teach, suggest or render obvious at least the following features of the allowed claims**:
>
> (C) allocating the amount of governmental funds sourced from the first financial institution, by-the one or more computers, to one two-or more of a first set of the financial institutions other than the first financial institution for deposit in one or more aggregated deposit accounts held therein, based at least in part on obtaining government backed deposit insurance and/or collateralization by government securities for the funds.
>
> (D) allocating, using the one or more computers, to the first financial institution for the one or more aggregated deposit accounts held therein, an amount of funds from one or more of a second set of the financial institutions other than the first financial institution, so that an amount of funds sourced from the second set of the financial …[sic] institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution; ….

Decl. Exh. J (emphasis added). In so concluding, the Examiner also reviewed all the same § 101 arguments made by prior defendants like Promontory that StoneCastle now advances. *See* Compl. Exhs. A-D, J at "References Cited." None of it changed the Examiner's conclusion that the Patents-In-Issue added unconventional and non-routine elements to the prior art that achieved a novel, non-obvious and desirable technological result. Nor should it here.

## II. THE PATENTS-IN-ISSUE SATISFY 35 U.S.C. § 101

### A. <u>Governing Standard</u>

35 U.S.C. § 101 clearly defines patent-eligible subject matter as follows: "Whoever

invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." For the Patents-In-Issue, all of the claims are either a process or a manufacture, so § 101 on the face of the statute is satisfied. (For reference, each representative claim is set forth in Appendix A.)[3]

StoneCastle does not dispute this. Instead, it invokes a common law exception to § 101, articulated in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014). As the U.S. Supreme Court explained therein, patent protection does not cover claims that monopolize the "building blocks of human ingenuity," such as "nature, natural phenomena, and abstract ideas." *Id.* at 216. However, "*[a]t some level, 'all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.*'" *Id.* at 217 (emphasis added, citation omitted). Courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.* "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept. … [A]pplication[s] of such concepts 'to a new and useful end,' we have said,

---

[3]    For purposes of this motion, Island IP asks the Court to consider the following "representative claims": (a) claims 1 and 31 of the '766 Patent; (b) claims 1 and 27 of the '267 Patent; (c) claims 1 and 20 of the '911 Patent; (d) claims 1 and 26 of the '157 Patent; and (e) claims 1 and 19 of the '689 Patent. Island IP does not agree to StoneCastle's demand that claim 1 of the '766 Patent be the sole representative claim. This would not be proper, as the Patents-In-Issue each disclose distinct inventions, and within each of those five patents, claim 1 is only representative of the method claims, whereas the other representative claim is, in each case, a system claim. *See Berkheimer v. HP Inc.,* 881 F.3d 1360, 1365-66 (Fed. Cir. 2018).

StoneCastle also argues that a terminal disclaimer supports its position on representative claims. It does not. *See SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1168 (Fed. Cir. 2018) (finding that terminal disclaimers do "not give rise to a presumption that a patent subject to a terminal disclaimer is patentably indistinct from its parent patents. It follows that a court may not presume that assertions of a parent patent and a terminally-disclaimed continuation patent against the same product constitute the same cause of action.").

-15-

remain eligible for patent protection." *Id.* (citation omitted).

To guide Courts, the Supreme Court has formulated a two-step test for patent eligibility: "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice Corp.*, 573 U.S. at 217. If so, the Court then must ask: "What else is there in the claims before us?" *Id.* (citation omitted). To answer that question, the Court must consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (citation omitted). If the Court finds that either step of the two-step *Alice Corp.* test is satisfied, then the patent claim is eligible.

Here the challenged patent claims satisfy both *Alice Corp.* steps. Fundamentally, *Alice Corp.* stands for the principle that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358. As set forth below, the Patents-In-Issue recite far more than the use of a generic computer to perform an abstract idea, and thus each of the representative claims is plainly patent eligible.

**B.      The Claims Are Eligible Under Step One of *Alice Corp.***

First, the Court must determine if a patent claim is purely abstract. "[T]he 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character <u>as a whole</u> is directed to excluded subject matter.'" *Enfish, LLC v. Microsoft Corp.,* 822 F.3d 1327, 1335 (Fed. Cir. 2016) (emphasis added, citation omitted). If the claim is not, as a whole, abstract, there is no need to progress to step two.

In its Motion, StoneCastle makes the baseless assertion that: "Since the Supreme Court decided *Alice Corp.*, the Federal Circuit has never found a claim like those asserted in this case … to be eligible for patenting." Yet StoneCastle ignores *Enfish* and the very many other cases

wherein the Federal Circuit has done just that. For example, in *Uniloc USA, Inc. v. ADP, LLC*, 772 F. Appx. 890, 897 (Fed. Cir. 2019), the District Court had deemed ineligibility patent claims "directed to the use of file packets with segments configured to initiate centralized registration of an application from an application server." On appeal, the Federal Circuit reversed the decision, holding that the claims were not, as the District Court found, directed to "an abstract idea. It is true … that the goal of the claims is functional … But the patent claims a particular improvement in *how* this is done …. This is the clear 'focus' of the claims and the asserted advance described in the specification." *Id.*

Similarly, in *Enfish*, the District Court had deemed ineligible patent claims which it characterized as being directed to the "storing, organizing, and retrieving memory in a logical table." *Id.* at 1337. On appeal, the Federal Circuit reversed the decision, warning that "***describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.***" *Id.* (emphasis added). In so doing, the Federal Circuit rejected the contention—like StoneCastle makes here (Mot. at 10)—that "the invention's ability to run on a general-purpose computer dooms the claims." *Id.* at 1338. "Much of the advancement made in computer technology consists of improvements to software that, by their very nature, may not be defined by particular physical features <u>but rather by logical structures and processes</u>." *Id.* at 1339 (emphasis added).

The Patents-In-Issue, much like the claims in *Enfish*, improve the way computers operate through "logical structures and processes." Here, the claims are not merely directed at high level "reciprocal deposits," but are instead directed to a particular application of that allegedly abstract idea. As such, under *Enfish*, they pass the step one of *Alice Corp.*

In its Motion, StoneCastle also claims that patents directed to technological improvements in the financial services industry are somehow anathema. Once again the Federal

Circuit has directly held otherwise. In *Trading Technologies International, Inc. v. CQG, Inc.,* 675 F. App'x 1001, 1002 (Fed. Cir. 2017), the Federal Circuit affirmed the eligibility of patents that "describe and claim a method and system for the electronic trading of stocks, bonds, futures, options and similar products." It is difficult to envision more financially oriented patents than those. Yet the Federal Circuit ruled the patents not abstract, because they held "an inventive concept that allows traders to more efficiently and accurately place trades using this electronic trading system." *Id.* at 1004; *accord, e.g., PPS Data, LLC v. Jack Henry & Associates, Inc.,* 2019 WL 1317286, *1 (E.D. Tex. Mar. 21, 2019) (finding eligible a patent directed to "methods and systems for remotely processing financial instrument deposits through electronic interaction between the physical location of the instrument and a financial institution").

As noted above, Island IP has successfully commercialized its inventions; indeed, a comparable license agreement with Reich & Tang was projected to "yield approximately $92 million in royalty payments over the course of the license." *Island Intellectual Prop. LLC v. Reich & Tang Deposit Solutions*, 2017 NYLJ Lexis 1732, *5 (Sup. Ct., N.Y. Cnty. June 4, 2017); *see also* Decl. Exh. K. This further undermines StoneCastle's claims that these inventions are "abstract." *See, e.g., BASCOM Glob. Internet Servs. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) ("inventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act") (quoting *Research Corp. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010)). Indeed, it is precisely <u>because of</u> their commercial importance that StoneCastle has chosen to misappropriate these inventions.

### C.       The Claims Are Eligible Under Step Two of *Alice Corp.*

The leading case on the second step of the *Alice Corp.* test is *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-70 (Fed. Cir. 2018). As the Federal Circuit teaches in *Berkheimer*: "The second

step of the *Alice* test is satisfied when the claim limitations 'involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Id.* at 1367 (citation omitted). In this District, "[t]he Court has developed the following list of non-exhaustive questions relevant to the step-two analysis: (1) Is there an improvement recited? (2) Is there a benefit recited? (3) Is something new recited? (4) Does the patent have one or more particular applications? (5) What are the steps and limits to be followed in applying the invention?" *TNS Media Research LLC v. TIVO Research and Analytics, Inc.,* 223 F. Supp.3d 168, 181 (S.D.N.Y. 2016) (citation omitted). The answers to these questions—never addressed by StoneCastle—demonstrate how the Patents-In-Issue satisfy step two.

As the Examiner expressly found, the inventions disclose and address an unconventional technological solution to a technological problem. Decl. Exh. J. The solution developed and claimed in the Patents-In-Issue does not merely claim reciprocal deposits as a desired end result, but rather, solves difficult technological problems in the field of reciprocal deposits and municipal deposits with a very particular detailed solution of ***how*** to do it, using a detailed, practical combination of steps explained through multiple embodiments. The Patents-In-Suit instruct users, including community banks and their service providers like StoneCastle, exactly ***how*** to get to the desired end result, so using detailed, practical steps explained through multiple and varied embodiments. As they involve much more than mere routine and conventional activities known in the industry, the Patents-In-Suit are plainly patent eligible. *See Finjan, Inc., v. Blue Coat Systems, Inc.,* 879 F.3d 1299, 1305 (Fed. Cir. 2018) (patent eligible where "claims recite more than a mere result. Instead, they recite specific steps … that accomplish the desired result."); *BASCOM*, 827 F.3d at 1351 (claimed combination of limitations did not simply recite instruction to apply abstract idea of Internet content filtering, but instead recited "technology-based solution" that overcame disadvantages of prior art filtering systems).

Further, as the Federal Circuit explained in *BASCOM*, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." 827 F.3d at 1350 (holding claims patent eligible where they "recite a specific, discrete implementation of the abstract idea"). Here, the structural elements required to perform the steps recited in the Patents-In-Suit integrate the alleged abstract idea into a practical application. *See, e.g., Diamond v. Diehr*, 480 U.S. 174, 186 (1981) (finding eligible "practical application" of abstract idea of mathematical algorithm). As the Examiner recognized, the combination of elements recited in the Patents-In-Suit are addressed to, and resolve, a specifically identified problem in the state of the art. Thus, they also satisfy step two of *Alice Corp.*

That said, for purposes of the present motion, all the Court needs to find is that at least a factual dispute exists for it to deny StoneCastle's premature and overly generalized motion. Here, there is—at the absolute minimum—a factual dispute as to whether (as prior Courts and Examiners have found) the claims of the Patents-In-Issue disclose unconventional and non-routine steps which were not found in the prior art and are in fact inventive beyond the broad concept of merely providing "reciprocity." As noted above, the Patents-In-Suit, like all issued patents, are "presumed valid" and the "burden of establishing invalidity ... rest[s] on the party asserting such invalidity." 35 U.S.C. § 282(a). The Supreme Court has explained that, because patent claims are substantively examined for validity during prosecution, they are given a presumption of validity when asserted in district courts. *See Microsoft Corp. v. i4i L.P.*, 564 U.S. 91, 95 (2011). This presumption includes a presumption that patents issued by the Patent Office are presumed eligible, because patent-eligibility determinations involve questions of fact that are considered by examiners during prosecution, which is the basis for the presumption of validity, as the Supreme Court explained in *i4i*. *Id.* at 131; *see also Cellspin Soft*, 927 F.3d at 1319. That fact issue cannot be resolved on a Rule 12(b) motion to dismiss.

### III.    THE DTSA CLAIM IS WELL-PLED

The Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1831 *et seq.*, provides a federal cause of action to an owner of a trade secret that is misappropriated and is related to a product or service used in, or intended for use in, interstate commerce. 18 U.S.C. § 1836(b).  A trade secret is defined therein as, *inter alia*, technical information, including "programs," "processes," and "codes," if (A) "the owner thereof has taken reasonable measures to keep such information secret"; and (B) "the information derives independent economic value ... from not being generally known ... [or] readily ascertainable ... [to] another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(A)-(B). "Misappropriation," in turn, is defined as an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty. 18 U.S.C. § 1839(5).

Island IP's DTSA claim is well-pled.  In it, Island IP states that it expended considerable time and resources developing "proprietary, secret and confidential information relating to cash management and money regulation systems and, in particular, to the implementation of the inventions set forth in Island IP's patent portfolio" (the "Island IP Trade Secrets"), which it has licensed to large banks and other leading financial institutions, that it owns and possesses exclusive rights to the license of, the Island IP Trade Secrets, that the Island IP Trade Secrets are very valuable to Island IP, and that it takes appropriate measures to maintain the confidentiality thereof, by restricting access and disclosure. Compl. ¶¶ 35, 104-07.

In its Motion, StoneCastle argues that Count VI "does not satisfy Rule 8's pleading standards for at least two reasons." Mot. at 21.  First, it claims Island IP's description of the

Island IP Trade Secrets "does not allow StoneCastle to determine even generally what information allegedly constitutes the trade secrets." *Id.* at 22. This argument is disingenuous, given that since 2012, SCIS *has been paying to license those very trade secrets*. The parties' License Agreement jointly defines Island IP's confidential information to include: "any and all technical, scientific, trade, quality assurance, quality control, financial and business information, know-how, trade secrets, materials, Software and other Intellectual Property (other than Patent Rights), including without limitation all methods, protocol, results, analyses, conclusions and other information, data, discoveries, inventions, improvements, processes, regulatory documentation, information and submissions and formulae, whether patentable or unpatentable." Compl. ¶ 36. In addition, the ex-Double Rock executives who now run StoneCastle each agreed in writing not to disclose any "secret or confidential information of [Double Rock and its affiliates], including but not limited to, customer and business partner lists," and "all discoveries, inventions, improvements, formulas, ideas, devices, writings or other matters …, whether or not subject to protection under Patent … laws …." *Id.* ¶ 41, Exh. L.

That satisfies Rule 8. As Judge Rakoff held in *Tesla Wall Systems, LLC, v. Related Companies, L.P.,* 2017 WL 6507110, *10 (S.D.N.Y. Dec. 18, 2017), "there is no heightened pleading requirement on actions brought under the DTSA." (citing *Chubb Ina Holdings Inc. v. Chang*, 2017 WL 499682, *10 (D.N.J. Feb. 7, 2017)). "[T]rade secrets need not be disclosed in detail in a complaint alleging misappropriation." *Tesla, supra* (citing *Mission Measurement Corp. v. Blackbaud, Inc.,* 216 F. Supp. 3d 915, 921 (N.D. Ill. 2016)). "At the pleading stage, plaintiffs need only describe the information and efforts to maintain the confidentiality of the information in general terms." *In Re Dealer Management Systems Antitrust Litigation*, 362 F. Supp. 3d 558, 573 (N.D. Ill. 2019) (citation omitted).

In *Tesla Wall Systems*, for example, it was deemed sufficient that "Tesla's complaint is

highly specific regarding defendants' course of conduct, [and] pleads numerous specific categories of information, such as 'technical data, internal pricing information, work product, research, engineering designs' ...." 2017 WL 6507110 9 (citation omitted); *accord, e.g., Medidata Solutions, Inc., v. Veeva Systems Inc.,* 2018 WL 6173349, *3 (S.D.N.Y. Nov. 26, 2018) ("The Complaint sufficiently identifies the trade secrets at issue. It specifies numerous specific categories of information relating to its software, marketing and business plans. These allegations give Defendants adequate notice as to what the misappropriation allegations concern."). Similarly, a DTSA claim is sufficiently pled where an ex-employee misappropriates confidential information such as customer lists in breach of an employment agreement. *See General Security, Inc. v. Commercial Fire & Security, Inc.,* 2018 WL 3118274, *5 (E.D.N.Y. June 25, 2018); *accord, e.g., ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, *3 (S.D.N.Y. July 10, 2019) (DSTA sufficiently pled by violation of employment agreement).

Here, Island IP alleges far more than what was deemed sufficient in each of those cases. Mindful of the Circuit's strict standard for filing under seal, set forth in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006), the Complaint initially alleged trade secrets in categories, as deemed permissible in *Tesla, supra*. Additional detail as to the trade secrets is set forth in the accompanying declaration of Bruce R. Bent II ("Decl."), ¶¶ 2-11.

Second, StoneCastle argues that the DTSA claim should be dismissed as not "plausible on its face." That is absurd. To reiterate, the Complaint alleges that StoneCastle feigned interest in buying Double Rock's insured cash deposits business to gain access to its secrets and speak with its employees, and hired many of the company's top managers (who were subject to nondisclosure agreements with Double Rock and its affiliates), and acquired one of Island IP's intellectual property licensees (run by a co-inventor on 19 of its patents), and held weekly debriefing meetings with the holders of Double Rock trade secrets and subjecting them to weekly

debriefing meetings amongst "all subsidiaries within the StoneCastle organizational tree" in order to "share … beneficial support and expertise," <u>and</u> rolled out copy-cat products and services that employ Island IP's trade secrets and read directly on its patents. While these allegations will have to be proven at trial, they are manifestly plausible.

## IV. THE COMMON LAW CLAIMS ARE WELL-PLED

StoneCastle next argues that "[e]ach of Island IP's remaining causes of action against SCIS and SCCM should also be dismissed" because "[a]ll of those causes of action arise out of Island IP's patent infringement and/or trade secret misappropriation claims." Mot. at 24. StoneCastle provides no authority for this proposition, as there is none. StoneCastle's theft of Island IP's intellectual property, while a single course of conduct, implicates multiple causes of action, each with its own elements. StoneCastle fails to identify any pleading deficiencies with respect to any part of these claims, so none of these claims should be dismissed.

## V. THE ALTER EGO CLAIMS ARE WELL-PLED

Lastly, StoneCastle demands dismissal of Island IP's alter ego claims because "[a]s to SCFC and S[C]AM, Island IP alleges no facts whatsoever to support its alter ego cause of action," and "Island IP's claim against SCP fares no better." Mot. at 24-25.

"[N]umerous factors come into play when discussing whether separate legal entities should be regarded as alter egos …. Stated generally, the inquiry initially focuses on whether those in control of a corporation did not treat[ ] the corporation as a distinct entity; and, if they did not, the court then seeks to evaluate the specific facts with a standard of 'fraud' or 'misuse' … such as whether the corporation was used to engage in … an unfair trade practice …." *NetJets Aviation, Inc. v. LHC Commc'n, LLC*, 537 F.3d 168, 177 (2d Cir. 2008) (citations and internal quotation omitted). Alter ego claims have been found well-pled where multiple entities are

plausibly alleged to have "operated as a single enterprise" (*Hinds County, Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 367 (S.D.N.Y. Apr. 26, 2010)), and/or have shown "a disregard of corporate formalities, complete overlap in ownership, common office space, addresses, and email addresses of the two corporations." *Golden Horn Shipping Co. Ltd. v. Volans Shipping Co. Ltd.,* 2014 WL 5778535, *6 (S.D.N.Y. Nov. 6, 2014).

The Complaint meets this pleading standard. It states that "each nominally separate StoneCastle entity is in fact operated by SCP as a single entity, dominated and controlled by SCP," which "was used to commit a wrong against Island IP which resulted in its injury," and that "CFC and SCAM are additional alter egos of SCCM and SCIS who unjustly benefitted therefrom." Compl. ¶¶ 140-42. In support thereof, the Complaint details how:

> While StoneCastle nominally identifies a series of separate operating subsidiaries, in reality the entire corporate family is run as a single entity, dominated and controlled by the parent company, SCP. Each StoneCastle entity shares essentially the same Board of Directors and senior management. In its promotional materials, StoneCastle boasts that "all subsidiaries within the StoneCastle organizational tree … share[s] personnel and systems with its parent, receiving beneficial support and expertise" and that it "incorporates a team approach to managing the various investment and strategic initiatives that involve the firm" with "weekly" meetings involving overlapping executives. It advertises "$16.1B in assets under administration," a figure that necessarily includes all StoneCastle entities. By virtue of this incestuous relationship, each StoneCastle entity benefits from Island IP's Intellectual Property, developed by Island IP over decades and at great expenses, without payment.

Compl. ¶ 9; *see also* Decl. Exh. L. StoneCastle does not dispute any of these facts; *it simply ignores them*. Consequently, its dismissal demand is without merit.

## VI.    LEAVE TO REPLEAD SHOULD BE GRANTED IF NEEDED

"When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999). Island IP believes it has pled its claims with sufficient particularity. If, however, the Court disagrees, Island IP is ready to cure any deficiencies. *See* accompanying declaration of Bruce R. Bent II.

Dated: New York, New York
September 4, 2019

EMMET, MARVIN & MARTIN, LLP

*/s/ John Dellaportas*

_____
John Dellaportas
Beth Khinchuk (SDNY application pending)
120 Broadway
New York, NY 10271
Telephone: (212) 238-3000
Facsimile: (212) 238-3100

*Attorneys for Plaintiff*
*Island Intellectual Property LLC*

# APPENDIX A

# Claim 1 of the '766 Patent (8,150,766)

1. A method, comprising:

 (A) accessing, using one or more computers, one or more electronic databases, stored on one or more computers readable media, the one or more databases comprising:

  (1) aggregated account information for a plurality of government backed-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program, wherein funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein;

  (2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, comprising a respective balance of funds, of the respective client account, held in each of one or more of the aggregated deposit accounts holding funds of the respective client account; and

 (B) obtaining into the one or more computers, transfer data comprising an amount of governmental funds of one or more of the client accounts sourced for the program from a first one of the financial institutions, that are to be deposited in one or more other of the financial institutions;

 (C) allocating the amount of governmental funds sourced from the first financial institution, using the one or more computers, to one or more of a first set of the financial institutions other than the first financial institution, for deposit in one or more aggregated deposit accounts held therein, based at least in part on obtaining government backed deposit insurance and/or collateralization by government securities for the funds;

 (D) allocating, using the one or more computers, to the first financial institution for the one or more aggregated deposit accounts held therein, an amount of funds from one or more of a second set of the financial institutions other than the first financial institution, so that an amount of funds sourced from the second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution;

 (E) generating and communicating data comprising one or more amounts for one or more instructions, using the one or more computers and a network communication link, to transfer funds between or among two or more of the financial institutions based at least in part on one or more of the allocating steps; and

 (F) using the one or more computers, to update at least data for the aggregated account information for one or more of the aggregated deposit accounts taking into consideration at least the amounts from the steps (C), (D) and/or (E), and to update data for one or more respective balances of funds for one or more of the respective client accounts held in each of one or more of the aggregated deposit accounts holding funds of the respective client account taking into consideration at least the amounts from the allocating steps (C) and (D), in one or more of the electronic databases.

# Claim 31 of the '766 Patent (8,150,766)

31. A system, comprising:

one or more computers comprising memory wherein the memory stores computer-readable instructions comprising program code that, when executed, cause the one or more computers to perform the steps:

   (A) accessing, using the one or more computers, one or more electronic databases, stored on one or more computers-readable media, the one or more databases comprising:

   (1) aggregated account information for a plurality of government backed-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program, wherein funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein;

   (2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, comprising a respective balance of funds, of the respective client account, held in each of one or more of the aggregated deposit accounts holding funds of the respective client account; and (B) obtaining into the one or more computers, transfer data comprising an amount of governmental funds of one or more of the client accounts sourced for the program from a first one of the financial institutions, that are to be deposited in one or more other of the financial institutions;

   (C) allocating the amount of governmental funds sourced from the first financial institution, using the one or more computers, to one or more of a first set of the financial institutions other than the first financial institution, for deposit in one or more aggregated deposit accounts held therein, based at least in part on obtaining government backed deposit insurance and/or collateralization by government securities for the funds;

   (D) allocating, using the one or more computers, to the first financial institution for the one or more aggregated deposit accounts held therein, an amount of funds from one or more of a second set of the financial institutions other than the first financial institution, so that an amount of funds sourced from the second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution;

   (E) generating and communicating data comprising one or more amounts for one or more instructions, using the one or more computers and a network communication link, to transfer funds between or among two or more of the financial institutions based at least in part on one or more of the allocating steps; and

   (F) using the one or more computers, to update at least data for the aggregated account information for one or more of the aggregated deposit accounts taking into consideration at least the amounts from the steps (C), (D) and/or (E), and to update data for one or more respective balances of funds for one or more of the respective client accounts held in each of one or more of the aggregated deposit accounts holding funds of the respective client account taking into consideration at least the amounts from the allocating steps (C) and (D), in one or more of the electronic databases.

<u>**Claim 1 of the '267 Patent (8,359,267)**</u>

1. A method, comprising:

    (A) accessing, using one or more computers, one or more electronic databases, stored on one or more computers readable media, the one or more databases comprising:

        (1) aggregated account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program, wherein the plurality of financial institutions include one or more money center financial institutions that hold respective inventories of government securities eligible as collateral, wherein funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein, the aggregated account information for the respective aggregated deposit accounts comprising: a balance of funds held in the respective aggregated deposit account; and for each transfer to the program a listing of a source and an amount of the transfer of FDIC-insured funds;

        (2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, comprising a respective balance of funds of the respective client account held in each of one or more of the aggregated deposit accounts holding funds of the respective client account;

    (B) obtaining into the one or more computers, transfer data comprising an amount of governmental funds of one or more of the client accounts sourced for the program from a first one of the financial institutions;

    (C) allocating at least a portion of the amount of govern mental funds sourced from the first financial institution, using the one or more computers, to a first set of one or more of the money center financial institutions other than the first financial institution, comprising selecting one or more of the money center financial institutions for the first set based at least in part on receiving accessing the data listing the source and the amount of the transfer of FDIC-insured funds which data is held in the one or more databases for the respective transfers to the program and determining that funds that are FDIC-insured have been received for the program from the respective money center financial institution;

    (D) allocating, using the one or more computers, to the first financial institution for the one or more aggregated deposit accounts held therein, an amount of funds that is FDIC-insured from a second set of one or more of the financial institutions other than the first financial institution and which one or more of the financial institutions in the second set may include one or more of the money center financial institutions, so that an amount of funds sourced from the second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution;

    (E) generating and communicating data comprising one or more amounts for one or more instructions, using the one or more computers and a network communication link, to transfer funds between or among two or more of the financial institutions based at least in

part on the transfers to and/or from the respective one of more of the financial institutions set forth in the allocating steps; and

(F) using the one or more computers to update the one or more databases, comprising updating for respective of the aggregated deposit accounts a balance of respective funds held in the respective aggregated deposit account, updating the data for each of the transfers, and updating the one or more respective balances of funds for one or more of the respective client accounts held in each of one or more of the aggregated deposit accounts holding funds of the respective client account based on the transfers to and/or from the respective one of more of the financial institutions set forth in the allocating steps and the data generated and communicated to transfer funds between or among two or more of the financial institutions.

## Claim 27 of the '267 Patent (8,359,267)

27. A system, comprising:

one or more computers comprising memory wherein the memory stores computer-readable instructions comprising program code that, when executed, cause the one or more computers to perform the steps:

(A) accessing, using the one or more computers, one or more electronic databases, stored on one or more computers-readable media, the one or more databases comprising:

> (1) aggregated account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program, wherein the plurality of financial institutions include one or more money center financial institutions that hold respective inventories of government securities eligible as collateral, wherein funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein, the aggregated account information for the respective aggregated deposit accounts comprising: a balance of funds held in the respective aggregated deposit account; and for each transfer to the program a listing of a source and an amount of the transfer of FDIC-insured funds;

> (2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, comprising a respective balance of funds of the respective client account held in each of one or more of the aggregated deposit accounts holding funds of the respective client account;

(B) obtaining into the one or more computers, transfer data comprising an amount of governmental funds of one or more of the client accounts sourced for the program from a first one of the financial institutions;

(C) allocating, using the one or more computers, at least a portion of the amount of governmental funds sourced from the first financial institution, using the one or more computers, to a first set of one or more of the money center financial institutions other than the first financial institution, comprising selecting one or more of the money center financial institutions for the first set based at least in part on accessing the data listing the Source and the amount of the transfer of FDIC-insured funds which data is held in the one or more databases for the respective transfers to the program and determining that funds that are FDIC-insured have been received for the program from the respective money center financial institution

(D) allocating, using the one or more computers, to the first financial institution for the one or more aggregated deposit accounts held therein, an amount of funds that is FDIC-insured from a second set of one or more of the financial institutions other than the first financial institution and which one or more of the financial institutions in the second set may include one or more of the money center financial institutions, so that an amount of funds sourced from the second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution;

(E) generating and communicating, using the one or more computers, data, comprising one or more amounts for one or more instructions, using the one or more computers and a network communication link, to transfer funds between or among two or more of the financial institutions

based at least in part on the transfers to and/or from the respective one of more of the financial institutions set forth in the allocating steps; and

(F) using the one or more computers to update the one or more databases, comprising updating for respective of the aggregated deposit accounts a balance of respective funds held in the respective aggregated deposit account, updating the data for each of the transfers, and updating the one or more respective balances of funds for one or more of the respective client accounts held in each of one or more of the aggregated deposit accounts holding funds of the respective client account based on the transfers to and/or from the respective one of more of the financial institutions set forth in the allocating steps and the data generated and communicated to transfer funds between or among two or more of the financial institutions.

## <u>Claim 1 of the '911 Patent (8,712,911)</u>

1. A method, comprising:

    (A) accessing, using one or more computers, one or more electronic databases, stored on one or more computers readable media, the one or more databases comprising:

        (1) aggregated account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program, wherein funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein, the aggregated account information for the respective aggregated deposit accounts comprising a balance of funds held in the respective aggregated deposit account;

        (2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, comprising a respective balance of funds of the respective client account held in each of one or more of the aggregated deposit accounts holding funds of the respective client account;

    (B) receiving or obtaining into the one or more computers via the Internet, transfer data comprising an amount of governmental funds for one or more of the client accounts of a first one of the financial institutions;

    (C) allocating at least a portion of the amount of govern-mental funds for the one or more of the client accounts of the first financial institution, using the one or more computers, to a first set of one or more of the financial institutions other than the first financial institution, comprising selecting one or more of the financial institutions for the first set based at least in part on accessing the data held in the one or more databases to determine that funds that are FDIC-insured have been received for the pro-gram on behalf of one or more of the client accounts of the respective financial institution;

    (D) selecting one or more of the financial institutions for a second set of financial institutions based at least in part on a maximum and/or a minimum level of funds in the pro-gram to be held at the respective financial institution;

    (E) allocating, using the one or more computers, to the first financial institution for the one or more aggregated deposit accounts held therein, an amount of funds that is FDIC-insured from the second set of one or more of the financial institutions other than the first financial institution, so that an amount of funds sourced from the second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution;

    (F) generating and communicating data comprising one or more amounts for one or more instructions, using the one or more computers and a network communication link, to transfer funds between or among two or more of the financial institutions based at least in part on the allocations to and/or from the respective one of more of the financial institutions set forth in the allocating steps; and

(G) using the one or more computers to update the one or more databases, comprising updating for respective of the aggregated deposit accounts a balance of respective funds held in the respective aggregated deposit account, and updating the client account information for funds, for each of multiple of the respective client accounts, held in one or more of the plurality of the financial institutions, comprising a respective balance of funds of the respective client account held in each of one or more of the aggregated deposit accounts holding funds of the respective client account based on at least the allocating steps.

## Claim 20 of the '911 Patent (8,712,911)

20. A system, comprising:

one or more computers comprising memory wherein the memory stores computer-readable instructions comprising program code that, when executed, cause the one or more computers to perform the steps:

(A) accessing, using the one or more computers, one or more electronic databases, stored on one or more computers-readable media, the one or more databases comprising:

(1) aggregated account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program, wherein funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non penalized liquidity for the funds held therein, the aggregated account information for the respective aggregated deposit accounts comprising a balance of funds held in the respective aggregated deposit account,

(2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, comprising a respective balance of funds of the respective client account held in each of one or more of the aggregated deposit accounts holding funds of the respective client account;

(B) receiving or obtaining into the one or more computers via the Internet, transfer data comprising an amount of governmental funds for one or more of the client accounts of a first one of the financial institutions;

(C) allocating at least a portion of the amount of govern mental funds for the one or more of the client accounts of the first financial institution, using the one or more computers, to a first set of one or more of the financial institutions other than the first financial institution, comprising selecting one or more of the financial institutions for the first set based at least in part on accessing the data held in the one or more databases to determine that funds that are FDIC-insured have been received for the program on behalf of one or more of the client accounts of the respective financial institution;

(D) selecting one or more of the financial institutions for a second set of financial institutions based at least in part on a maximum and/or a minimum level of funds in the program to be held at the respective financial institution;

(E) allocating, using the one or more computers, to the first financial institution for the one or more aggregated deposit accounts held therein, an amount of funds that is FDIC-insured from the second set of one or more of the financial institutions other than the first financial institution, so that an amount of funds sourced from the second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution;

(F) generating and communicating data comprising one or more amounts for one or more instructions, using the one or more computers and a network communication link, to transfer funds between or among two or more of the financial institutions based at least in part on the allocations to and/or from the respective one of more of the financial institutions set forth in the allocating steps; and

(G) using the one or more computers to update the one or more databases, comprising updating for respective of the aggregated deposit accounts a balance of respective funds held in the respective aggregated deposit account, and updating the client account information for funds, for each of multiple of the respective client accounts, held in one or more of the plurality of the financial institutions, comprising a respective balance of funds of the respective client account held in each of one or more of the aggregated deposit accounts holding funds of the respective client account based on at least the allocating steps.

## Claim 1 of the '157 Patent (8,719,157)

1. A method, comprising:

   (A) accessing, using one or more computers, one or more electronic databases, stored on one or more computers readable media, the one or more databases comprising:

   (1) aggregated account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program, wherein funds from client accounts of a plurality of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein, the aggregated account information for the respective aggregated deposit accounts comprising a balance of funds held in the respective aggregated deposit account;

   (2) client account information for funds, for each of a plurality of respective client accounts, held in one or more of the plurality of the financial institutions, comprising a respective balance of funds of the respective client account held in each of one or more of the aggregated deposit accounts holding funds of the respective client account;

   (B) receiving or obtaining into the one or more computers via the Internet, transfer data comprising an amount of governmental funds for one or more of the client accounts of a first one of the financial institutions;

   (C) allocating at least a portion of the amount of govern-mental funds for the one or more of the client accounts of the first financial institution, using the one or more computers, to a first set of one or more of the financial institutions other than the first financial institution, comprising selecting one or more of the financial institutions for the first set based at least in part on accessing the data held in the one or more databases to determine that funds that are FDIC-insured have been received for the pro-gram on behalf of one or more of the client accounts of the respective financial institution;

   (D) allocating, using the one or more computers, to the first financial institution for the one or more aggregated deposit accounts held therein, an amount of funds that is FDIC-insured from a second set of one or more of the financial institutions other than the first financial institution, so that an amount of funds sourced from the second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution;

   (E) generating and communicating data comprising one or more amounts for one or more instructions, using the one or more computers and a network communication link, to transfer funds between or among two or more of the financial institutions based at least in part on the transfers to and/or from the respective one of more of the financial institutions set forth in the allocating steps; and

   (F) using the one or more computers to update the one or more databases, comprising up-dating for respective of the aggregated deposit accounts a balance of respective funds held in the respective aggregated deposit account, updating the data for each of the trans-fers, and updating the one or more respective balances of funds for one or more of the re-

spective client accounts held in each of one or more of the aggregated deposit accounts holding funds of the respective client account based on the transfers to and/or from the respective one of more of the financial institutions set forth in the allocating steps and the data generated and communicated to transfer funds between or among two or more of the financial institutions.

<u>**Claim 26 of the '157 Patent (8,719,157)**</u>

26. A system, comprising:

one or more computers comprising memory wherein the memory stores computer-readable instructions comprising program code that, when executed, cause the one or 10 more computers to perform the steps:

(A) accessing, using the one or more computers, one or more electronic databases, stored on one or more computers-readable media, the one or more databases comprising:

(1) aggregated account information for a plurality of Federal Deposit Insurance Corporation (FDIC)-insured and interest-bearing aggregated deposit accounts held in a plurality of financial institutions participating in a program, wherein funds from client accounts of a plurality 20 of clients are aggregated with funds of other client accounts in the aggregated deposit accounts held in the financial institutions, with the aggregated deposit accounts providing non-penalized liquidity for the funds held therein, the aggregated account information for the 25 respective aggregated deposit accounts comprising a balance of funds held in the respective aggregated deposit account;

(2) client account information for funds, for each of a plurality of respective client accounts, held in one or 30 more of the plurality of the financial institutions, comprising a respective balance of funds of the respective client account held in each of one or more of the aggregated deposit accounts holding funds of the respective client account;

(B) receiving or obtaining into the one or more computers via the Internet, transfer data comprising an amount of governmental funds for one or more of the client accounts of a first one of the financial institutions;

(C) allocating at least a portion of the amount of govern- 40 mental funds for the one or more of the client accounts of the first financial institution, using the one or more computers, to a first set of one or more of the financial institutions other than the first financial institution, comprising selecting one or more of the financial institutions for the first set based at least in part on accessing the data held in the one or more databases to determine that funds that are FDIC-insured have been received for the program on behalf of one or more of the client accounts of the respective financial institution:

(D) allocating, using the one or more computers, to the first financial institution for the one or more aggregated deposit accounts held therein, an amount of funds that is FDIC-insured from a second set of one or more of the financial institutions other than the first financial institution, so that an amount of funds sourced from the second set of the financial institutions and held in the first financial institution is approximately equal to or greater than the amount of the governmental funds sourced from the first financial institution:

(E) generating and communicating data comprising one or more amounts for one or more instructions, using the one or more computers and a network communication link, to transfer funds between or among two or more of the financial institutions based at least in part on the transfers to and/or from the respective one of more of the financial institutions set forth in the allocating steps; and

(F) using the one or more computers to update the one or more databases, comprising updating for respective of the aggregated deposit accounts a balance of respective funds

held in the respective aggregated deposit account, updating the data for each of the transfers, and updating the one or more respective balances of funds for one or more of the respective client accounts held in each of one or more of the aggregated deposit accounts holding funds of the respective client account based on the transfers to and/or from the respective one of more of the financial institutions set forth in the allocating steps and the data generated and communicated to transfer funds between or among two or more of the financial institutions. The system as defined in claim 26, wherein the allocating step (C) comprises allocating at least a portion of the amount of governmental funds to one or more of the financial institutions that hold respective inventories of government securities and using this inventory of government securities to collateralize at least a portion of the governmental funds.

<u>**Claim 1 of the '689 Patent (8,655,689)**</u>

1. An allocation modeling method in a depository program with a government backed insurance limit, comprising: accessing, using one or more computers, one or more electronic databases, stored on one or more computer-read able media, comprising:

(i) aggregated account information for a plurality of government backed-insured and interest-bearing aggregated deposit accounts held in a plurality of depository institutions in a program, wherein funds from a plurality client accounts are held in the aggregated deposit accounts in the depository institutions in the program, the aggregated account information for a respective one of the aggregated deposit accounts comprising a balance of funds held in the respective aggregated deposit account;

(ii) client account information for each of the respective client accounts, wherein the client account represents funds of the respective client held in the one or more aggregated deposit accounts holding funds of the respective client, the client account information comprising a respective balance of funds from the respective client account held in each of the one or more insured and interest-bearing aggregated deposit accounts holding funds of the respective client account,

(iii) depository institution information for respective of the depository institutions in the program, the depository information for a respective one of the depository institutions comprising a capacity cap for funds held therein from the program, and

for each respective one of a plurality of depository institutions participating in the program performing the steps: obtaining, using the one or more computers, for a high stratification a current or an adjusted total high Stratification balance in the respective depository institution, comprising a total of balances held or that may be held in the respective depository institution of high stratification client accounts, each of the high Stratification client accounts having a total balance managed by the program within a highest range of balances that may be fully insured with government backed insurance through an allocation across government backed-insured interest-bearing aggregated deposit accounts in a first number of depository institutions;

obtaining, using the one or more computers, for a second stratification a current or an adjusted total second stratification balance in the respective depository institution, comprising a total of balances held or that may be held in the respective depository institution of second stratification client accounts, each of the second stratification client accounts having a total balance managed by the program within a second range of balances that may be fully insured with government backed insurance through an allocation across government backed-insured interest-bearing aggregated deposit accounts in a second number of depository institutions, wherein the second range has a lower upper limit than the highest range;

obtaining, using the one or more computers, for a lowest stratification a current or an adjusted total lowest stratification balance in the respective depository

institution, comprising a total of balances held or that may be held in the respective depository institution of lowest stratification client accounts, each of the lowest stratification client accounts having a total balance managed by the program within a third range of balances that may be fully insured with government backed insurance through an allocation across government backed-insured interest-bearing aggregated deposit accounts in a third number of depository institutions, wherein the lowest range has a lower upper limit than the second range;

calculating or having calculated, using the one or more computers, for each of the respective depository institutions, a respective total balance in the program, based at least in part on the total high Stratification balance, the total second stratification balance, and the total lowest stratification balance, held in the respective depository institution;

calculating or having calculated, using the one or more computers, a respective excess capacity for each of the respective depository institutions based at least in part on a difference between the capacity cap for the respective depository institution and the total balance for the respective depository institution; and

modifying, based at least in part on the respective excess capacities of the respective depository institutions, one or more of parameters selected from the group of a number of client accounts, additional client account funds, a total number of the depository institutions participating in the program, and the capacity caps for one or more of the depository institutions.

## Claim 19 of the '689 Patent (8,655,689)

19. A system, comprising:

one or more computers configured to perform the following steps:

accessing, using one or more computers, one or more electronic databases, stored on one or more computer readable media, comprising:

(i) aggregated account information for a plurality of government backed-insured and interest-bearing aggregated deposit accounts held in a plurality of depository institutions in a program, wherein funds from a plurality client accounts are held in the aggregated deposit accounts in the depository institutions in the program, the aggregated account information for a respective one of the aggregated deposit accounts comprising a balance of funds held in the respective aggregated deposit account;

(ii) client account information for each of the respective client accounts, wherein the client account rep resents funds of the respective client held in the one or more aggregated deposit accounts holding funds of the respective client, the client account information comprising a respective balance of funds from the respective client account held in each of the one or more insured and interest-bearing aggregated deposit accounts holding funds of the respective client account;

(iii) depository institution information for respective of the depository institutions in the program, the depository information for a respective one of the depository institutions comprising a capacity cap for funds held therein from the program, and

for each respective one of a plurality of depository institutions participating in the program, performing the steps:

obtaining, using the one or more computers, for a high stratification a current or an adjusted total high stratification balance in the respective depository institution, comprising a total of balances held or that may be held in the respective depository institution of high stratification client accounts, each of the high stratification client accounts having a total balance managed by the program within a highest range of balances that may be fully insured with government backed insurance through an allocation across government backed-insured interest-bearing aggregated deposit accounts in a first number of depository institutions;

obtaining, using the one or more computers, for a second stratification a current or an adjusted total second stratification balance in the respective depository institution, comprising a total of balances held or that may be held in the respective depository institution of second stratification client accounts, each of the second stratification client accounts having a total balance managed by the program within a second range of balances that may be fully insured with government backed insurance through an allocation across government backed-insured interest-bearing aggregated deposit accounts in a second number of depository institutions, wherein the second range has a lower upper limit than the highest range;

obtaining, using the one or more computers, for a lowest stratification a current or an adjusted total lowest stratification balance in the respective depository institution, comprising a total of balances held or that may be held in the respective depository institution of lowest stratification client accounts, each of the lowest stratification client accounts having a total balance managed by the program within a third range of balances that may be fully insured with government backed insurance through an allocation across government backed-insured interest-bearing

aggregated deposit accounts in a third number of depository institutions, wherein the lowest range has a lower upper limit than the second range;

calculating or having calculated, using the one or more computers, for each of the respective depository institutions, a respective total balance in the program, based at least in part on the total high stratification balance, the total second stratification balance, and the total lowest stratification balance, held in the respective depository institution;

calculating or having calculated, using the one or more computers, a respective excess capacity for each of the respective depository institutions based at least in part on a difference between the capacity cap for the respective depository institution and the total balance for the respective depository institution; and

modifying, based at least in part on the respective excess capacities of the respective depository institutions, one or more of parameters selected from the group of a number of client accounts, additional client account funds, a total number of the depository institutions participating in the program, and the capacity caps for one or more of the depository institutions.