UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ISLAND INTELLECTUAL PROPERTY,
LLC,

                              Plaintiff,                          19-CV-4792 (JPO)

              -v-                                                 OPINION AND ORDER

STONECASTLE ASSET
MANAGEMENT LLC *et al.*,
                              Defendants.

J. PAUL OETKEN, District Judge:

Island Intellectual Property, LLC ("Island") initiated this action against StoneCastle Cash

Management LLC ("StoneCastle") and affiliated entities, alleging patent infringement and other

federal and state-law causes of action.  (*See* Dkt. No. 13 ("Compl.").)  The principal issue raised

on this motion to dismiss is whether the asserted patent claims — which, broadly speaking,

disclose a computer-implemented, multibank reciprocal-deposit system — are drawn to a patent-

ineligible abstract idea.  StoneCastle also moves to dismiss Island's other causes of action on

assorted grounds.  The Court concludes that the patents are directed at a patent-ineligible abstract

idea, that the complaint fails to state a trade secret claim, and that the exercise of supplemental

jurisdiction over the remaining state-law claims is unwarranted.  The motion to dismiss is

therefore granted.

## I.      Background

Island is a corporate affiliate of Double Rock Corporation, a cash-management business

that caters to financial-services providers.  (*See* Compl. ¶ 13.)  In 2017, StoneCastle Insured

Sweep LLC (SCIS), a subsidiary of Stonecastle, acquired Intermedium Financial LLC

("Intermedium"), a licensee of Island's intellectual property.  (*See* Compl. ¶ 42.)  In light of the

acquisition, Intermedium and Island executed an addendum to their pre-existing licensing agreement, permitting SCIS to assume any rights and obligations under that agreement, provided that StoneCastle's other corporate affiliates and subsidiaries would not use the intellectual property without additional licenses.  (*See* Compl. ¶¶ 38–39, 42.)  But by October 2018, Island grew suspicious that StoneCastle was employing its intellectual property without license by offering "Federally Insured Cash Accounts" to local government entities.  (*See* Compl. ¶¶ 20, 44.)

The allegedly infringed patents at issue fall into two categories.  The first category comprises the "Reciprocal Deposit Patents," four patents that share a single specification.  *See* U.S. Patent No. 8,719,157 (the "'157 Patent"); U.S. Patent No. 8,359,267 (the "'267 Patent"); U.S. Patent No. 8,712,911 (the "'911 Patent"); U.S. Patent No. 8,150,766 (the "'766 Patent"). The second category consists of a single patent, the "Allocation Model Patent," U.S. Patent No. 8,655,689 (the "'689 Patent").

## A.     The Reciprocal Deposit Patents

According to the Reciprocal Deposit Patents' shared specification, the invention discloses "a method and system by which banks can earn greater returns on their investment of public deposits."  *See, e.g.,* '766 Patent col. 1 ll. 47–49.  The scheme is a solution to a quandary raised by bank deposits from public entities.  As the specification explains, "banks often are obliged by statute, practice or sense of community to accept public deposits from federal, state or municipal entities."  *Id.* ll. 31–33.  By law, those "public deposits . . . often must be federally insured or, alternatively, 'collateralized' by having banks pledge government securities . . . to secure public deposits in the event of the institution's failure."  *Id.* ll. 34–39.  That puts banks in a bind, though, because the interest rates paid to public depositors are typically higher than the interest rates earned on government securities; in short, the banks are on the losing end of the spread.  *Id.*

ll. 40–46.  The disclosed scheme offers a way out of that jam: the recipient bank (often a local

bank) may distribute the deposited public funds to another (usually larger) bank or network of

banks that are better positioned to receive public deposits, in exchange for funds from those

banks that do not trigger the same regulatory requirements and that may be covered by federal

deposit insurance.  Each claim is a variation on this basic model.  For example, in one

embodiment, the first bank transfers the public deposit to another bank or network of banks with

ample government securities to secure the deposit, in exchange for funds that can be loaned out

to borrowers at profitable interest rates.  *See id.* col. 4 ll. 40–67, col. 5 ll. 1–38.  By divvying up

the public deposit among the network, the original deposit bank ensures that the funds are

adequately secured without losing on the spread.

### B.      The Allocation Model Patent

According to its specification, the Allocation Model Patent "generally relates to a system,

method and program product for modeling fund movements, such as for sweep programs" —

like that disclosed in the Reciprocal Deposit Patents — "and/or for predicting available capacity

in a deposit system."  '689 Patent col. 1 ll. 14–17.  It is, essentially, a scheme for computerized

management of account balances across a multi-bank, multi-account depository system.

## II.     Legal Standard

To survive a motion to dismiss for failure to state a claim upon which relief may be

granted, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its

face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In considering such a motion, a

court must accept the factual allegations in the plaintiff's complaint as true and draw all

inferences in the plaintiff's favor.  *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir.

2006).

"Patent eligibility, a question of law often involving subsidiary factual questions, can be decided on a motion to dismiss 'when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'" *Pers. Beasties Grp. LLC v. Nike, Inc.*, 341 F. Supp. 3d 382, 386 (S.D.N.Y. 2018) (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125, 1128 (Fed. Cir. 2018)), *aff'd*, 792 F. App'x 949 (Fed. Cir. 2020) (per curiam).

## III.   Discussion

The Court addresses first Island's claims for patent infringement and then its claim under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1831 *et seq.*

### A.   Patent Infringement

Section 101 of the Patent Act makes patentable "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  This general principle is subject to a critical exception: "[l]aws of nature, natural phenomena, and abstract ideas" are not eligible for patent protection, because cordoning off that ground "'tend[s] to impede innovation more than it . . . tend[s] to promote it,' thereby thwarting the primary object of the patent laws.'" *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citation omitted).

The framework set out in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), and refined in *Alice Corp. v. CLS Bank International*, 573 U.S. 208, guides the Court's application of this exception.  At the *Mayo/Alice* first step, the Court must determine whether the claims are "drawn to [an] abstract idea." *Alice*, 573 U.S. at 218.  The distinction between an unpatentable "abstract idea" and a patentable invention must be delineated "carefully," because, "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply'" unpatentable ideas. *Id.* at 217 (quoting *Mayo*, 566 U.S. at 71 (second alteration in

4

original).)  If, at the first step, the Court concludes the claims are directed to an unpatentable

abstract idea, it must proceed to ask, at the second step, "What else is there in the claims . . . ?"

*Mayo*, 566 U.S. at 78.  Step two is, in other words, "a search for an 'inventive concept' — *i.e.*, an

element or combination of elements that is 'sufficient to ensure that the patent in practice

amounts to significantly more than a patent upon the [ineligible concept] itself.'"  *Alice*, 573 U.S.

at 217–18 (quoting *Mayo*, 566 U.S. at 72–73) (alteration in original).

In the context of computerized systems, claims "purporting to improve the functioning of

the computer itself, or improving an existing technological process might not succumb to the

abstract idea exception."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)

(internal quotation marks, alterations, and citation omitted).  But it is not enough that a patent

invoke a computer "merely as a tool" to execute an otherwise unpatentable idea.  *Enfish*, 822

F.3d at 1335–36.

To apply these principles, the Court first determines which claims to consider in

analyzing the viability of the asserted patents.  "In a § 101 analysis, courts may evaluate

representative claims."  *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989,

991 (Fed. Cir. 2018).  StoneCastle submits that this Court need consider only claim 1 of the '766

Patent (Dkt. No. 41 at 7); Island responds that the Court should consider (a) claims 1 and 31 of

the '766 Patent; (b) claims 1 and 27 of the '267 Patent; (c) claims 1 and 20 of the '911 Patent; (d)

claims 1 and 26 of the '157 Patent; and (e) claims 1 and 19 of the '689 Patent (Dkt. No. 49 at 15

n.2).  But Island has not identified any limitation or element that differentiates these claims with

respect to the *Alice* analysis.  Indeed, Island does not distinguish among them *at all* in its

opposition to the present motion.  And it is appropriate to treat a claim as representative "if the

patentee does not present any meaningful argument for the distinctive significance of any claim

limitations not found in the representative claim." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). The Court would thus be justified in treating claim 1 of the '766 patent as representative of each asserted claim, consistent with Island's own undifferentiated briefing. Nonetheless, the Court treats claim 1 of the '766 Patent as representative of the asserted Reciprocal Deposit claims and claim 1 of the '689 Patent as representative of the asserted Allocation Model claims.

### 1. Reciprocal Deposit Patents

Turning to the first step of the *Mayo/Alice* analysis, the Court concludes the Reciprocal Deposit Patents are directed to an abstract idea: namely, the use of a multibank depository program to stay within insurance limits. The idea of dividing and transferring funds to stay within insurance limits is a fundamental economic practice. *See, e.g.,* FDIC Interpretive Ltr. 86-22 (Aug. 11, 1986), 1986 WL 379662; FDIC Interpretive Ltr. 86-21 (July 23, 1986), 1986 WL 379661. Though the claim is directed at the application of that idea in the specific context of government deposits, "a claim is not patent eligible merely because it applies an abstract idea in a narrow way. For an application of an abstract idea to satisfy step one, the claim's focus must be something other than the abstract idea itself." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287 (Fed. Cir. 2018).

Island does not meaningfully dispute that the idea of a multibank depository program of the kind described by the '766 Patent is not patentable. But it maintains that the claims are not "merely directed at high level 'reciprocal deposits,' but are instead directed to a particular application of that allegedly abstract idea," because they "improve the way computers operate through 'logical structures and processes.'" (Dkt. No. 49 at 17 (second quoting *Enfish*, 822 F.3d at 1339).) Island, however, nowhere explains how the claims "improve the way computers" execute this idea, and a review of the representative claim reveals no such innovation. The

portions of that claim that disclose computerization "do nothing more than spell out what it means to 'apply it on a computer'" at a high level of generality. *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015); *see* '766 Patent col. 9 ll. 52–54 ("accessing, using one or more computers, one or more electronic databases, stored on one or more computer-readable media"); *id.* col. 10 ll. 5–6 ("obtaining into the one or more computers, transfer data comprising an amount of governmental funds"); *id.* col. 10 ll. 11–13 ("allocating the amount of governmental funds sourced from the first financial institution, using the one or more computers"); *id.* col. 10 ll. 19–22 ("allocating, using the one or more computers, . . . an amount of funds"); *id.* col. 10 ll. 29–31 ("generating and communicating data . . . using the one or more computers and a network communication link"); *id.* col. 10 ll. 35–45 ("using the one or more computers, to update . . . data . . . in one or more of the electronic databases").

It is revealing, in this respect, that the problem described by the patent's specification is not a shortcoming in existing computerized methods of executing reciprocal deposits, but rather the problem the reciprocal deposits are themselves intended to solve: regulatory burdens and associated costs on banks. *See* '766 Patent col. 1 ll. 47–49 ("[W]hat is needed is a method and system by which banks can earn greater returns on their investment of public deposits.").  If anything, the specification implies that the patent eschews limitation to any particular "logical structures or processes":

> Embodiments of the invention have been described in the general context of method steps which may be implemented in one embodiment by a program product including machine-executable instructions, such as program code . . . . The particular sequence of such executable instructions or associated data structures represent examples of corresponding acts for implementing the functions described in such steps.

'766 Patent, col. 8 ll. 56–61, 67, col. 9 ll. 1–3.  The patent on its face belies Island's argument that it discloses a specific improvement in "logical structures and processes."

Resisting that conclusion, Island attempts to analogize to patent-eligible examples in the Federal Circuit's post-*Alice* case law. (See Dkt. No. 49 at 17–18.)  But even when squinting, the Court perceives little resemblance between the patents in the cited cases and the claims at issue here, except that they pertain generally to computers or financial services.  In *Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890 (Fed. Cir. 2019), the claims were directed to a specific method of distributing software, namely, the "use of file packets with segments configured to initiate centralized registration of an application from an application server."  *Id.* at 897.  *Trading Techs. Int'l, Inc. v. CQG, INC.*, 675 F. App'x 1001 (Fed. Cir. 2017) is even less similar; there, the claims described a "specific, structured graphical user interface paired with a prescribed functionality directly related to the graphical user interface's structure."  *Id.* at 1004.  And furthest afield is *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016).  The claims held eligible there disclosed an innovative method of computer processing, namely, a self-referential table for a computer database.  *Id.* at 1330.  In each case, the disputed claims taught methods or systems directed at an "improvement in the functioning of a computer," *Enfish*, 822 F.3d at 1338, or designed to "resolve a specifically identified problem in the prior state of the art."  *Trading Techs.*, 675 F. App'x at 1004.  Here, in contrast, Island has tendered only limitations that amount to a command to "do it on a computer" and its own *ipse dixit*.[1]

---

[1] Nor is the Court persuaded that Judge Forrest's opinion upholding a predecessor patent carries water post-*Alice*.  *See Island Intellectual Prop. LLC v. Deutsche Bank AG*, No. 09-CV-2675, 2012 WL 386282, *2–8 (S.D.N.Y. Feb. 6, 2012).  The fulcrum of that decision was the determination that the patent at issue was "most analogous," *id.* at *7, to those declared eligible in a pre-*Alice* case, *Ultramercial, LLC v. HULU, LLC*, 657 F.3d 1323 (Fed. Cir. 2011).  In her opinion, however, Judge Forrest presciently opined that "the law in this area has been evolving (and may continue to evolve) at a rapid rate."  *Id.* at *2.  Evolve the law did.  *Ultramercial* was vacated by the Supreme Court shortly thereafter, and, on remand, the *Ultramercial* invention was determined to be patent *ineligible* in light of *Alice*.  *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711 (Fed. Cir. 2014).  At a minimum, then, Judge Forrest's decision describing the predecessor patent as "most analogous" to a now-ineligible patent does

Numerous post-*Alice* opinions — not to mention *Alice* itself — have held much more closely analogous patents invalid.  *See, e.g.*, *Alice*, 573 U.S. at 224–27 (method of mitigating risk via intermediated settlement); *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1166 (Fed. Cir. 2019) (method of crediting a merchant account while electronically processing a check); *In re Greenstein*, 774 F. App'x 661, 664–65 (Fed. Cir. 2019) (method of allocating returns, using a computer, to different investors in a collective investment vehicle); *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1092–96 (Fed. Cir. 2019) (financial trading method used by a computer); *In re Villena*, 745 F. App'x 374, 376–77 (Fed. Cir. 2018) (method of computerized property valuation); *Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 F. App'x 950, 953–55 (Fed. Cir. 2017) (method of electronically certifying financial data); *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 982– 84 (Fed. Cir. 2017) (method of controlling access to data based on payment); *In re Chorna*, 656 F. App'x 1016, 1019–22 (Fed. Cir. 2016) (per curiam) (hindsight allocation instrument for tracking financial instruments).  The determination that the claims here are directed to an abstract idea is thus in harmony with post-*Alice* case law disfavoring patents that involve only "'fundamental economic and conventional business practices,' [or] the addition of 'conventional computer components to well-known business practices.'"  *Verint Sys. Inc. v. Red Box Recorders Ltd.*, 226 F. Supp. 3d 190, 194–95 (S.D.N.Y. 2016) (quoting *Enfish*, 822 F.3d at 1335, 1338); *see also id.* (collecting cases).

Because the patents "simply seek[] to monopolize [a long-understood concept] by masking it through the medium of technology," *Iron Gate Sec., Inc. v. Lowe's Cos., Inc.*, No.

---

not move the needle in Island's favor; at most, by negative implication, it nudges it toward Stonecastle.

15-CV-8814, 2016 WL 4146140, at *8 (S.D.N.Y. Aug. 3, 2016), the Court must proceed to the second step of the *Mayo/Alice* analysis.

At step two, the Court must "search for an 'inventive concept.'  The 'inventive concept' may arise in one or more of the individual claim limitations or in the ordered combination of the limitations."  *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 217).  But that inventive concept must offer "significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer."  *Id.*

In an attempt to satisfy step two, Island trumpets the patents' "sol[ution to] difficult technological problems . . . with a very particular detailed solution of how to do it, using a detailed, practical combination of steps explained through multiple embodiments."  (Dkt. No. 49 at 19).  Yet Island never identifies — nor do the patents make manifest — what "difficult technological problem" they solve, or what inventive concept their "practical combination of steps" offers.

A comparison to the Federal Circuit's decision in *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC* (cited by Island) is illustrative.  In *BASCOM*, the Federal Circuit held that claims that embodied the abstract idea of "filtering content on the Internet" nonetheless embodied an inventive concept.  827 F.3d at 1350–51.  Specifically, the Court found that the claims' limitations *in combination* furnished an inventive concept, because by pairing two individually generic computer components (a filtering tool remote from end-users, and individually customizable filtering), the claimed invention permitted bespoke filtering but prevented circumvention by sophisticated end-users.  *Id.*  The combination of those otherwise generic components was inventive in that it offered a solution to the trade-off inherent in prior art

between individualization and vulnerability.  *Id.*  Here, in contrast, Island has articulated no specific innovation or improvement over prior art that the claim's order or combination of "practical steps" discloses.  Instead, it points only to the fact of practical steps.  But spelling out what was inherent in the abstract idea itself is not an inventive concept within the meaning of *Mayo*/*Alice*.

Other authorities, Island protests, have already found that the disclosed invention is patent-eligible; the Examiner, in Island's words, "expressly found[] the inventions disclose and address an unconventional technological solution to a technological problem."  (Dkt. No. 49 at 19.)  But a search of the cited allowance for such an "express" finding (or, for that matter, an implicit finding) yields nothing.  (*See* Dkt. No. 49, Ex. J.)  The misleading citations do not stop there: "[I]n 2017," Island says, "all of the Patents-In-Issue in this case were adjudged" by the District of Delaware to be "valid, enforceable, and patent eligible."  (Dkt. No. 49 at 9.)  No such thing was "adjudged"; instead, a judge in the District of Delaware signed *consent* judgments wherein the private parties agreed that the patents were eligible.  (Dkt. No. 49, Exs. H, I.)  That judge's assent indicates no more than his "minimal determination" that the private settlement "agreement is appropriate to be accorded the status of a judicially enforceable decree."  *Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir. 1986); *see also Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 277 (3d Cir. 2001) ("A [consent judgment] embodies the agreement of the parties . . . .").

Indeed, one can search the asserted claims, their specifications, Island's briefing, and the cited sources in vain for any "technological problem" or any "unconventional technological solution" to said problem.  The Court cannot conclude that the claims embody any inventive

concept at *Mayo*/*Alice* step two.  The Reciprocal Deposit claims are therefore directed at patent-ineligible subject matter, and the motion to dismiss is granted as to them.

## 2.     Allocation Model Patent

The Court concludes at step one that the Allocation Model Patent is also directed at a patent-ineligible abstract idea.  On its face, the patent merely recites execution on a computer of a bookkeeping process that could be executed by humans manually: essentially, accessing and obtaining information about a plurality of tiered accounts participating in the program, calculating a bank's excess capacity for program funds, allocating funds to be transferred, and updating account information to reflect transfers.  It seeks to "automate 'pen and paper methodologies'" and is therefore a "quintessential 'do it on a computer' patent . . . directed to [an] abstract idea[]."  *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019); *see also Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) (holding ineligible claims "directed to . . . collecting, displaying, and manipulating data").  Indeed, the specification explicitly discloses that several steps of the claimed invention can be performed over the phone or in person.  *See, e.g.*, '689 Patent col. 8 ll. 59–62, col. 9 ll. 21–27, col. 11 ll. 12–21, col. 12 ll. 38–45, col. 12 ll. 50–57, 63–67, col. 22 ll. 57–58, col. 26 ll. 6–8, col. 26 ll. 16–19, 23–24.

Nor at step two can the Court detect any inventive concept in the asserted claim.  The opposition brief's preliminary statement[2] describes the patent's inventive concept as

> formation of client account stratifications based on account balances and, after allocation of funds from the stratified client accounts to depositary institutions, parameters are modified and the account stratifications are adjusted to account for excess capacity available at the depositary institutions so that transfer of funds to the

---

[2] Island's brief contains no specific articulation or defense of the patent's inventive concept in its argumentation section.

> depositary institutions can be performed more efficiently by using the excess capacity. This process expedited the speed in which such allocations are performed and minimized the wires that might otherwise need to be made if conventional allocations were used.

(Dkt. No. 49 at 4.) But this description of the claimed invention reveals no inventive concept; it is merely a verbose recitation of otherwise quotidian and manually executable bookkeeping practices. And Island again has not identified any nonconclusory allegation nor any specific limitation that would permit the Court to conclude otherwise. The claim is directed at patent-ineligible subject matter, and the motion to dismiss must be granted as to the Allocation Model Patent, too.

### B.   Misappropriation of Trade Secrets

The DTSA "provides a private cause of action to the owner of a trade secret that is misappropriated." *Opternative, Inc. v. JAND, Inc.*, No. 17-CV-6936, 2019 WL 624853, at *6 (S.D.N.Y. Feb. 13, 2019) (internal quotation marks and citation omitted). "Trade secret" is defined broadly as "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible," provided that "the owner thereof has taken reasonable measures to keep such information secret; and . . . the information derives independent economic value, actual or potential, from" its secrecy. 18 U.S.C.A. § 1839(3)(A)–(B).

"[T]o survive a motion to dismiss, a party alleging that it owns a trade secret must put forth specific allegations as to the information owned . . . ." *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018). Of course, a trade-secret plaintiff "has no obligation to reveal those secrets in the [c]omplaint simply to prove that they exist." *SD Prot., Inc. v. Del Rio*, 498 F. Supp. 2d 576, 586 (E.D.N.Y. 2007). But to satisfy Rule 8, the pleadings must "give the opposing party fair notice of what the plaintiff's claim is" — including,

in at least some identifying detail, the trade secret it is alleged to have misappropriated. *Alexander Interactive, Inc. v. Leisure Pro Ltd.*, No. 14-CV-2796, 2014 WL 4651942, at *4 (S.D.N.Y. Sept. 16, 2014) (quoting *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 440 (S.D.N.Y. 2012)).  In its pleadings, Island identified the allegedly stolen trade secrets only in the broadest terms, stating that StoneCastle had misappropriated "certain proprietary, secret and confidential information relating to cash management and money regulation systems and, in particular, to the implementation of the inventions set forth in" the asserted patents.  (Compl. ¶ 104.)  This extremely general description is not adequate to put Defendants on notice of the trade secrets at issue.

As Island fairly points out, courts in this district have accepted relatively general descriptions of alleged secrets at the motion to dismiss stage.  *See, e.g., Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17-CV-5966, 2017 WL 6507110, at *9 (S.D.N.Y. Dec. 18, 2017) (holding that "technical data, internal pricing information, work product, research, engineering designs" was sufficiently specific in light of the specific course of conduct alleged).  But in none of those cases did courts accept pleadings as nebulous as those offered here, which identify only at the highest level of generality the subject matter of the secrets and do not even describe the type of information allegedly misappropriated.

The declaration of Bruce Bent II, submitted by Island as an attachment to its opposition brief, does not cure this deficiency, because it is not properly before the Court on this motion to

dismiss.[3]  Because Island fails to state a claim for misappropriation of trade secrets, the DTSA

claim is dismissed.[4]

## C.  State Law Claims

A court "may decline to exercise supplemental jurisdiction" over pendent state-law

claims if it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C.

§ 1367(c).  Indeed, "in the usual case in which all federal-law claims are eliminated before trial,

the balance of factors to be considered under the pendent jurisdiction doctrine — judicial

---

[3] StoneCastle contends that the pleadings are deficient for the additional reason that Island has failed to plausibly allege misappropriation.  As StoneCastle argues, a trade-secret plaintiff must allege more than mere possession of the trade secret by the defendant.  (*See* Dkt. No. 41 at 23.)  At the same time, "[i]n the context of trade secret misappropriation cases — where it is 'well recognized' that 'misuse can rarely be proved by convincing direct evidence' . . . copying can be established by showing that a defendant had 'access' to the alleged trade secrets and that there is a 'substantial similarity' between the original product which embodied those trade secrets and the alleged copy created by the defendant."  *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 512 (S.D.N.Y. 2017) (twice quoting *Q–Co Indus., Inc. v. Hoffman*, 625 F.Supp. 608, 618 (S.D.N.Y. 1985); and then twice quoting *Fabkom, Inc. v. R.W. Smith & Assocs., Inc.*, No. 95-CV-4552, 1996 WL 531873, at *9 (S.D.N.Y. Sept. 19, 1996)).  It follows that at the pleading stage, allegations of circumstances indirectly suggesting misappropriation may collectively render a trade-secret complaint plausible.  Here, Island has alleged not only possession of the putative trade secrets but also the release of a copycat product.

There is, however, a tension in Island's allegations.  "Publication in a patent destroys the trade secret, because patents are intended to be widely disclosed — that is the quid for the quo of the patentee's exclusive right to make and sell the patented device."  *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 269 (S.D.N.Y. 2014) (citation and alteration omitted), *aff'd sub nom. Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015).  An allegation that the copycat product is alleged to imitate only the asserted patents — without imitating any matter not disclosed therein — would not bolster the plausibility of the trade-secret claim, because the contents of the asserted patent are not themselves trade secrets.  This tension notwithstanding, the generality of Island's description of the trade secret is sufficient to warrant dismissal, and that defect frustrates any attempt to assess the sufficiency of Island's allegations in other respects.  Thus, the Court need not and does not decide the plausibility of the misappropriation allegations.

[4] Island alleges that StoneCastle's corporate affiliates are also liable for the alleged misconduct on an alter-ego theory.  Having dismissed the federal claims on grounds applicable to all defendants, however, the Court need not address this argument.

economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Here, because all of Island's federal claims have been dismissed at an early stage of this litigation, the Court declines in its discretion to exercise supplemental jurisdiction over the remaining state-law claims.  Accordingly, all of the remaining claims are dismissed without prejudice.

**IV.   Leave to Amend**

In the event of dismissal, Island has requested leave to amend.  The request is granted with respect to the trade secret claim.  *See Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.").  It is denied, however, as to the patent claims, as amendment would be futile.  *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87 (2d Cir. 2002).

**V.   Conclusion**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 40.  If Plaintiff chooses to file an amended complaint, it shall do so on or before June 26, 2020.  If it does not do so by that date, final judgment will be entered.

SO ORDERED.

Dated: May 29, 2020
      New York, New York

                                               J. PAUL OETKEN
                                   United States District Judge